**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

KATHERINE RINDERLE; TONYA GRIMMKE;
and GEORGIA ASSOCIATION OF EDUCATORS,

   *Plaintiffs*,

  v.

COBB COUNTY SCHOOL DISTRICT;
CHRIS RAGSDALE, in his official capacity
as Superintendent of Cobb County School District;
RANDY SCAMIHORN, in his official capacity as
member of the Cobb County Board of
Education; DAVID BANKS, in his official
capacity as member of the Cobb County Board
of Education; DAVID CHASTAIN, in his official
capacity as member of the Cobb County Board
of Education; BRAD WHEELER, in his official
capacity as member of the Cobb County Board
of Education; BECKY SAYLER, in her official
capacity as member of the Cobb County Board
of Education; NICHELLE DAVIS, in her official
capacity as member of the Cobb County Board
of Education; and LEROY TRE' HUTCHINS, in
his official capacity as member of the Cobb
County Board of Education; CHRIS DOWD, in
his official capacity as an employee of the Cobb
County School District,

   *Defendants.*

CIVIL ACTION NO.:

_____

**COMPLAINT FOR
DECLARATORY RELIEF,
INJUNCTIVE RELIEF,
AND DAMAGES**

JURY TRIAL DEMANDED

1

**INTRODUCTION**

1. Plaintiffs Katherine Rinderle ("Rinderle") and Tonya Grimmke ("Grimmke") are experienced and accomplished teachers who served and serve in the Cobb County School District ("CCSD"), and Plaintiff Georgia Association of Educators ("GAE") represents 1,625 teachers, administrators, and education support professionals who teach and work in CCSD. Plaintiffs support the education of all students regardless of their gender identity or sexual orientation, including their lesbian, gay, bisexual, transgender, and/or queer ("LGBTQ") students. Yet Plaintiffs have been terminated or fear discipline under CCSD's vague censorship policies for actively and openly supporting their LGBTQ students.

2. CCSD's vague censorship policies enable arbitrary, discriminatory, and retaliatory enforcement against educators, like Plaintiffs, who support LGBTQ students. Rinderle has been terminated simply for reading an award-winning children's book, written from the perspective of a student who does not conform to gender stereotypes, to her fifth-grade students.

3. Plaintiffs seek relief from CCSD's vague censorship policies that include undefined terms such as "controversial," "divisive," and "sensitive." These opaque policies were used to terminate Rinderle, and pose a continuing threat to other teachers in the school district, including Grimmke and GAE members, and harm Cobb County students' ability to learn in safe and inclusive classrooms.

2

Further, Plaintiffs seek relief from CCSD's discriminatory and retaliatory actions against Rinderle, who was targeted and terminated for her outspoken support of LGBTQ students.

## THE PARTIES

4.     **Plaintiff Katherine Rinderle ("Rinderle")** was an elementary school educator in CCSD for over a decade until her termination. She earned teacher tenure protections under the Georgia Fair Dismissal Act when she accepted her fourth teaching contract from CCSD before her termination. In the 2022-23 school year, Rinderle taught at Due West Elementary School ("Due West") in CCSD but was placed on administrative leave in March 2023 and then terminated in August 2023, giving rise to this lawsuit.

5**.**     **Plaintiff Tonya Grimmke ("Grimmke")** is a teacher who has served in CCSD for the last eighteen years. She earned teacher tenure protections under the Georgia Fair Dismissal Act when she accepted her fourth teaching contract from CCSD. Grimmke currently teaches at Birney Elementary School ("Birney"). Her duties and responsibilities include compliance with all CCSD policies, procedures, and practices.

6.     **Plaintiff Georgia Association of Educators ("GAE")** is a non-profit professional association that represents public school educators throughout Georgia, including 1,625 teachers, administrators, and education support professionals who

teach and work in CCSD. GAE advocates for strong public schools and the fair treatment of students and staff in public schools.  CCSD's enforcement of its vague censorship policies has resulted in the termination of one GAE member, and at least one member faces a realistic danger of suffering discipline and termination, harming GAE's members and the organization's advocacy and interests. GAE has incurred substantial costs as a result of CCSD's action and diverted resources from other GAE programs to address CCSD's vague censorship policies. The GAE legal services program operates to protect its members' employment rights and funds litigation on behalf of members by engaging the services of outside network attorneys. GAE has expended legal services program funds to hire attorneys to represent members working in CCSD. The costs and staff time devoted to these tasks reduced the amount of funds and staff time available for GAE's work on behalf of other members.

7.     **Defendant Cobb County School District ("CCSD")** is a governmental entity operating the public school system of Cobb County, Georgia, under the control and management of the Cobb County Board of Education ("the Board"), pursuant to Ga. Const. art. 8, § 5, ¶ I; O.C.G.A. § 20-2-50.

8.     **Defendant Chris Ragsdale ("Ragsdale")** is CCSD's Superintendent and the Board's executive officer. Ragsdale is a final policymaker and decisionmaker responsible for implementing the Board's policies and state rules and regulations under Ga. Const. art. 8, § 5, ¶ III; O.C.G.A. §§ 20-2-61(a); 20-2-109.

Ragsdale, acting under color of law, enforced vague censorship policies to terminate Rinderle, restricted student access to information about gender nonconforming and LGBTQ persons based on sex stereotyping, and retaliated against Rinderle for statutorily protected activity. Ragsdale is sued in his official capacity.

9.      **Defendants Randy Scamihorn ("Scamihorn"), Brad Wheeler ("Wheeler"), David Chastain ("Chastain"),** and **David Banks ("Banks") (collectively, "Board Majority")** are four of the Board's seven members and are responsible for CCSD's control and management. Ga. Const. art. 8, § 5, ¶ II; O.C.G.A. §§ 20-2-50; 20-2-61. The Board is a final policymaker in establishing and enforcing CCSD's vague censorship policies at issue in this action. Scamihorn, Wheeler, Chastain, and Banks, as members of the Board, establish, maintain, and enforce local policies and must ensure their compliance with state, federal, and constitutional law. The Board Majority, acting under color of law, established and enforced vague censorship policies at issue in this action and voted to terminate Rinderle for her support of gender nonconforming and LGBTQ students. Scamihorn, Wheeler, Chastain, and Banks are sued in their official capacities.

10.     **Defendants Becky Sayler ("Sayler"), Nichelle Davis ("Davis"), and Leroy Tre' Hutchins ("Hutchins") (collectively, "Board Minority")** are three of the Board's seven members and are responsible for CCSD's control and management. Ga. Const. art. 8, § 5, ¶ II; O.C.G.A. §§ 20-2-50; 20-2-61. Sayler,

5

Davis, and Hutchins, as members of the Board, establish, maintain, and enforce local policies and must ensure their compliance with state, federal, and constitutional law. Sayler, Davis, and Hutchins are sued in their official capacities.

11.     **Defendant Christopher Dowd ("Dowd")** is CCSD's executive director for employee relations. Dowd is a final policymaker responsible for enforcing CCSD's vague censorship policies at issue in this action. Acting under color of law, Dowd oversaw and engineered a flawed and misleading investigation of Rinderle's conduct, which ultimately resulted in her termination for advocating and supporting gender nonconforming and LGBTQ students. Defendant Dowd is sued in his official capacity.

## JURISDICTION AND VENUE

12.     This civil and constitutional action arises under the United States Constitution, 42 U.S.C. § 1983, and Title IX of the Education Amendments Act of 1972.

13.     This Court has subject matter jurisdiction over this action pursuant to Article III of the United States Constitution, 28 U.S.C. §§ 1331, 1343, and 1367, and 20 U.S.C. § 1681(a).

14.     This Court has the authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and this Court's general legal and equitable powers.

6

15.     This Court has personal jurisdiction over Defendants because Defendants are public officials domiciled in the State of Georgia and who perform their official duties in the State of Georgia.

16.     Venue in this District is proper under 28 U.S.C. § 1391(b)(1),(2) because one or more Defendants reside in this District, all Defendants are residents of the State in which this District is located, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and are occurring in this District.

## FACTUAL ALLEGATIONS

### CCSD's Censorship Policies At Issue In This Action

17.     The State of Georgia enacted the Protecting Students First Act in 2022, which prohibited "espousing personal political beliefs" concerning "divisive concepts," which the statute defines as a list of concepts regarding the role of race and racism in the United States of America.  O.C.G.A. § 20-1-11 *et seq*.

18.     That same year, "the Parents' Bill of Rights" was also enacted. It states, "[A]ll parental rights are reserved to the parent of a minor child in this state without obstruction or interference from a state or local government entity…including, but not limited to: (A) The right to direct the upbringing and the moral or religious training of his or her minor child."  O.C.G.A. § 20-2-786.

19.     In July 2022, following the passage of these state laws, the Board, as a final policymaker, amended Administrative Rules IKB-R ("IKB"), *Controversial*

*Issues*, and IFAA-R ("IFAA"), *Instructional Resources Selection and Acquisition* (collectively, "Censorship Policies") and adopted them as CCSD's official policies.

20.     CCSD used the Censorship Policies to terminate Rinderle for reading *My Shadow Is Purple* and is actively using these policies to threaten the employment of Grimmke and other current CCSD teachers.

21.     Defendants' broad allegations against Rinderle coupled with an inability to specifically identify the applicable sections from the Censorship Policies demonstrate the vagueness of the Censorship Policies.

> A.     *IKB – Controversial Issues*

22.     A true and correct copy of CCSD's *IKB, Controversial Issues* policy is attached as Plaintiffs' Ex. 1.

23.     In relevant part, Section B (Political/Partisan Issues) of IKB summarily prohibits CCSD employees from using classroom instruction to influence students regarding political or partisan issues or to espouse personal political beliefs. The policy further prohibits CCSD employees from improperly infringing on parents' rights to direct the upbringing and moral or religious training of their children. And the policy requires, during classroom instruction, that educators observe objectivity on all issues, present balanced points of view on issues, and refrain from identifying personal positions on issues and political candidate preferences.

8

24.     IKB contains no additional definitions or guidance concerning what the terms "controversial issues," "political," "partisan," "objectivity," "balanced points of view," and "improperly infringe" upon parents' "right to direct the upbringing and the moral or religious training of their children" mean.

25.     IKB does not expressly mention or prohibit classroom instruction or discussions of gender identity, gender conformity or nonconformity, or sexual orientation.

B.     *IFAA – Instructional Resources Selection and Acquisition*

26.     A true and correct copy of CCSD's *IFAA-Instructional Resources Selection and Acquisition* is attached as Exhibit 2.

27.     IFAA regulates the selection and use of instructional materials and has two sections. Section I regulates core resources, which are instructional materials and content that constitute the principal source of study in a course. Section II regulates how supplemental learning resources are to be chosen. The book that Rinderle was terminated for reading was a supplemental learning resource.

28.     Section II(A)(1) provides that: "Supplementary learning resources are any medium, print or non-print, designed to supplement the core learning resources purchased at the District or local school level. These materials include, but are not limited to, articles, online simulations, worksheets, novels, biographies, speeches,

videos, music, and similar resources in any medium, including both physical or digital."

29.     Section II(A)(3) states that: "All non-school print and non-print materials utilized in the instructional program by teachers, students, and guest presenters shall be supportive of the adopted curriculum for the course being taught and appropriate for the targeted audience. It is the responsibility of the teacher to preview non-school materials prior to use and to inquire of a guest presenter information regarding his/her objectives and the contents of his/her presentation prior to the presentation."

30.     Section II(B)(2)(b) states: "Content that advocates for divisive concepts shall be prohibited" and lists by way of definition the "concepts" and "views" that are regulated as "divisive concepts" under O.C.G.A. § 20-1-11, which only include topics related to race.

31.     Section II(B)(10) states: "Topics of a sensitive nature (i.e., social, political, religious) should be given a balanced treatment, with both pros and cons represented."

32.     Section II(C) states:

     1.     Preview: Teachers are responsible for completely previewing all supplemental materials (regardless of their source) before using them for whole-class instruction.

10

2.      Permission: The Teacher, Principal or designee of a school may require written permission (Form IFAA-1[Parent/Guardian Permission Form for Supplementary Materials]) of parents/guardians prior to the reading/viewing of supplementary materials if in his/her opinion the content may be of a sensitive nature within the school's community or the age group served by the school.

33.    Section II(D) states: "Professional discretion of the Principal or designee and staff must be used in the use of supplementary materials which might include topics of a sensitive nature as perceived by the community served. Parents/guardians of a student always have the option of requesting alternative assignments."

34.    IFAA does not define "sensitive," or "balanced treatment," explain how educators must determine whether "content may be of a sensitive nature within the school's community or the age group served by the school" or explain how to determine whether materials are "appropriate for the targeted audience." Nor does IFAA provide any examples of what constitutes permissible or impermissible content.

35.    IFAA does not mention or prohibit classroom instruction or discussions of gender identity, gender conformity or nonconformity, or sexual orientation except

to provide, that Core Learning Resources, "shall avoid bias and adhere to standards of sensitivity relative to student race, gender, religion, culture, ethnicity, disability, and socioeconomic status in compliance with applicable state law and district policies and rules." IFAA, Section II(D)(i).

CCSD EDUCATORS AND STAFF RECEIVED<br>INADEQUATE TRAINING ON CENSORSHIP POLICIES

36.     During preplanning in July of 2022, just days after the Board enacted the Censorship Policies, a brief and insufficient teacher training occurred regarding the Censorship Policies for the 2022-2023 school year.

37.     At Due West, Principal Cissi Kale offered a PowerPoint presentation that merely restated excerpts of CCSD's vague Censorship Policies without explaining or defining terms or policy language. The purported training failed to provide any explanation of the new vague terms, define the limits of the Censorship Policies, or give any other information to assist Rinderle or other educators with compliance. Critically, the purported training never defined or clarified the terms "controversial," "sensitive," or "divisive."

38.     During the training, Principal Kale provided no specific examples of books or materials that would violate the Censorship Policies, nor did she offer any direction on the limits of these new terms.

39.     Grimmke taught at Wheeler High School in CCSD during the 2022-2023 school year, and she received the same inadequate PowerPoint training about

CCSD's Censorship Policies as Rinderle. Grimmke's administrators were confused and did not understand the contents of the training, and they were unable to answer questions or define "controversial," "sensitive," or "divisive" in the Censorship Policies.

40.     Grimmke transferred to Birney before the 2023-2024 school year, and her new administrators similarly provided inadequate training that lacked meaningful guidance or clarity about CCSD's Censorship Policies, even after Rinderle's termination.

41.     CCSD teachers, including Rinderle and Grimmke, were never told that gender identity, gender nonconformity, or sexual orientation constituted *per se* "controversial" or "sensitive" subjects. Nor were teachers in CCSD provided any clarity by anyone in the school district as to what topics might be "controversial," "sensitive," or "divisive" under the Censorship Policies.

42.     The Board's adoption, implementation, and enforcement of the vague Censorship Policies banning "controversial," "divisive," and "sensitive" topics denied Plaintiffs and GAE members fair notice that recognizing or discussing gender identity, gender nonconformity, or sexual orientation might subject them to adverse employment action.

43.     CCSD denied Plaintiffs fair notice that recognizing or discussing gender identity, gender nonconformity, or sexual orientation violated the Censorship Policies.

44.      Given that many CCSD students and their family members have gender nonconforming and LGBTQ identities, Defendants understood or should have understood that teachers would likely recognize gender nonconforming and LGBTQ individuals in their classrooms and schools.

PLAINTIFFS ARE ACCOMPLISHED AND EXPERIENCED TEACHERS WHO SEEK TO CREATE SAFE AND INCLUSIVE SCHOOLS AND CLASSROOMS FOR THEIR STUDENTS

A.     Katherine Rinderle

45.     Rinderle is a lifelong Cobb County resident. She attended CCSD from kindergarten through high school graduation and earned her bachelor's degree in education from Kennesaw State University in 2012.

46.     Rinderle accepted a full-time teaching position with CCSD as an elementary classroom teacher in 2013. She has taught at various CCSD elementary schools. Most recently, she taught at Due West, which serves kindergarten through fifth-grade students.

47.     As a leader at Due West, Rinderle served on the Guiding Coalition Committee. She provided subject matter expertise in English/Language Arts.

48.     Rinderle's performance exceeded her supervisors' expectations for ten consecutive years. Until CCSD and Ragsdale recommended termination for Rinderle

in 2023, she received unblemished and "exemplary" formal performance evaluations that contained only positive comments.

49.     Rinderle's most recent supervisor at Due West, Principal Kale, commended her teaching expertise, professionalism, and passion for education.

50.     During the 2022-23 school year, Rinderle taught gifted and talented students in the "Target" class for first through fifth grades at Due West. Target classes use Georgia and CCSD's gifted curriculum and standards.

51.     Rinderle constructed her Target lessons to promote curiosity, divergent thinking, and critical thinking, as mandated by CCSD's gifted curriculum, which also includes lessons on inclusion and acceptance.

52.      In February 2023, Rinderle attended the Due West Scholastic Book Fair, authorized by CCSD, where she purchased several books, including an elementary-level picture book titled *My Shadow is Purple*. A true and correct copy of *My Shadow Is Purple* is attached as Exhibit 3.

53*.     My Shadow is Purple* was written and illustrated by Scott Stuart, an Australian author. The book is a 32-page story about a family that includes two parents who have gender identities and expression that align with sex stereotypes, and their child, whose gender identity and expression does not align with sex stereotypes, as they navigate the child's many interests and the challenges of social differences in a school setting. The publisher recommends the picture book for

children from ages 4 through 8. The average age of Rinderle's class, as are most fifth grade students, was 10 years old.

54.     As Rinderle testified during her termination hearing, she chose *My Shadow Is Purple* at the Due West Scholastic Book Fair because of its anti-bullying message, to highlight that there were gender nonconforming students and other students with diverse identities in her school whose needs for acceptance were not being recognized or addressed, and because she believed it would help address issues that underlie bullying, such as labeling, isolation, and not accepting others, especially including gender nonconforming children.

55.     *My Shadow Is Purple* represented the identities and perceived identities of students attending Due West and Rinderle's classes: students with varying interests and identities, including differing gender identities and LGBTQ students.

56.     Rinderle fully read *My Shadow Is Purple*, following IFAA's requirements for non-school print materials, at the book fair before she bought it. In Rinderle's professional judgment, the book supported CCSD's gifted standards and reflected the Due West and CCSD community.

57.     *My Shadow Is Purple* was not a Core Learning Resource because it was a non-school print material purchased independently by Rinderle; therefore, the book was not subject to the requirements of the IFAA for such materials. Instead, Rinderle included the book as one of many in her classroom library.

58.     *My Shadow is Purple* contains characters who are gender conforming as well as one character who is gender nonconforming.

59.     To the extent *My Shadow is Purple* "advocated" anything, it is acceptance of differences in others and self-acceptance.

60.     On March 8, 2023, about a month after purchasing *My Shadow Is Purple* at the Due West Scholastic Book Fair, Rinderle allowed her students to select a picture book for a "community read aloud," which was Rinderle's morning meeting with her students, intended to build community in the classroom and help students understand each other and themselves.

61.     Rinderle's use of "community read aloud" activities promoted CCSD's Gifted Standard G5 – Relationships & Connections, and Standard G9 - Respect for Others. Under Standard G9, Rinderle's "community read aloud" modeled how "students will be respectful members of their communities" and "recognize the value of individual differences."

62.     The fifteen fifth-grade students cast votes by placing sticky notes on their book of choice from nine or ten possible options. After two rounds of votes, nine of fifteen students selected *My Shadow is Purple* as the "community read-aloud" book.

63.     Before reading, Rinderle showed the students the cover and asked for their impressions. The students engaged in a discussion about the character's identity.

17

The discussion included debates about stereotypes, gender norms, and appearances. Rinderle reminded the students that they should not make assumptions about gender, and until they read the book, the character's identity was yet to be understood.

64.    Following the discussion about the main character's identity and some students' preconceived ideas about gender, Rinderle read the book to the class. Rinderle did not mention or discuss terms such as "LGBTQ," "gender identity," "transgender," "gender nonbinary," or "gender beyond binary." Nor were any of these terms included in the text of the book that she read.

65.    As a classroom activity, Rinderle asked the students to draw their own shadows and create an original poem explaining the color of their shadow. None of the poems mentioned gender identity or gender diversity.

66.    As detailed herein, the Board terminated Rinderle for reading *My Shadow Is Purple* because the story features a character who does not conform to traditional gender norms.

67.    Only after Rinderle read *My Shadow Is Purple* and was recommended for termination did she receive negative feedback in her annual summative performance evaluation for the first time in her ten-year career.

> B.    *Tonya Grimmke and Other CCSD Educators Who Are GAE Members*

68.    Grimmke is a special education teacher at Birney and has been employed in CCSD for eighteen years, teaching at various schools.

69.     Throughout their careers, Grimmke and other CCSD educators whom GAE represents have taught students of differing identities, including gender nonconforming and LGBTQ students.

70.     In their classrooms, Grimmke and other CCSD educators strive to provide their students with age and ability appropriate content that includes materials that are germane to the CCSD curriculum and that recognize people of differing identities, including gender nonconforming and LGBTQ people.

71.     Grimmke and other CCSD educators seek to foster safe and inclusive learning environments for all of their students and understand the importance of instruction that ensures students of differing identities, including gender nonconforming and LGBTQ identities, are represented in the curriculum.

72.     Grimmke and other CCSD educators fear adverse employment action should they guess wrong as to what curricular materials CCSD believes are "divisive," "sensitive," or "controversial."  Given CCSD's open hostility towards gender nonconforming and LGBTQ people, as evidenced by Rinderle's highly publicized termination for reading *My Shadow is Purple*, Grimmke and other CCSD educators fear adverse employment action if they include information about LGBTQ or gender nonconforming individuals in the age and ability appropriate information and materials they provide to their classes.

73.     Grimmke is the mother of a CCSD graduate. Grimmke's daughter openly identifies as a member of the LGBTQ community and did so when attending CCSD.

74.     Grimmke strives to make her classrooms and school communities safe and welcoming for LGBTQ and gender nonconforming students to learn and grow. From the gymnasium to the playground to the cafeteria, Grimmke has students who are LGBTQ and gender nonconforming and who are subjected to bullying and harassment, including students who have been subjected to slurs, derogatory language, and isolation. Grimmke hesitates about how or if to intervene in these situations or whether to communicate the impropriety of this behavior, because she fears retaliatory disciplinary action, including being terminated, like Rinderle.

75.     Other CCSD educators, whom GAE represents, have the same concerns as Grimmke and similarly hesitate to advocate for these students or intervene to prevent bullying and harassment of LGBTQ and gender nonconforming students. For example, they are uncertain whether they would be disciplined for addressing the bullying of students who wear clothes perceived as violating traditional sex stereotypes, or whether they can tell students that they should be respectful of the diverse gender identities of their classmates.

CCSD Enforces the Censorship Policies Against Rinderle

76.     Two days after Rinderle read *My Shadow Is Purple* to her class, a parent of one of Rinderle's students emailed a complaint to Principal Kale expressing "outrage" that "a book with such content was even allowed to be pushed on [her] child."

77.     Within an hour of Principal Kale receiving the complaint, she forwarded it directly to CCSD's central office. Kale quickly replied to the parent that she was unaware that Rinderle had read the book and apologized twice. Kale did all of this before speaking with Rinderle about the book or reading the book herself.

78.     By way of information and belief, Principal Kale has never previously apologized to a parent raising concerns about alleged classroom content without first reading the material or speaking to the teacher.

79.     By way of information and belief, Principal Kale has never immediately forwarded a complaint about educational material to CCSD's central office or otherwise elevated a parent complaint related to a disagreement about classroom discussion or content before first reading the material or speaking to the teacher.

80.     On the same day and a few hours later, a second parent emailed a complaint challenging Rinderle's reading of the book and stating, "[A]nything in the genre of 'LGBTQ' and 'Queer' was divisive."

81.     CCSD's central office was also notified of the second parental complaint. CCSD immediately removed Rinderle from her classroom and placed her on administrative leave beginning on March 13, 2023, until May 5, 2023, while CCSD investigated whether Rinderle violated CCSD's Censorship Policies.

82.     CCSD's investigation was inadequate, biased, and flawed. Defendant Dowd oversaw the investigation and presented the findings to Defendant Ragsdale and the Board. Dowd chose to only interview the few students in the class whose parents complained about the book, and none of the parents who supported the reading of the book. Dowd's supervision of the investigation resulted in material witnesses not being interviewed, false claims of dishonesty being raised, and inaccurate reporting of Rinderle's conduct.

83.     At least two Black parents emailed Principal Kale about the reading of *My Shadow Is Purple* in Rinderle's class, expressing support for Rinderle and the book's subject matter. CCSD did not interview the Black parents or their Black children. Nor did CCSD administrators meaningfully respond to the Black parents' emails.

84.     Upon information and belief, these Black parents and their Black children supported reading the book because of its theme of acceptance of differences and of self.

22

85.    At several investigative meetings, CCSD investigators and administrators claimed that any references to gender nonconformity or LGBTQ topics in class would be considered "divisive" or "controversial," and the introduction of those topics into a classroom discussion violated CCSD's Censorship Policies.

86.    Rinderle openly disagreed with CCSD's post-hoc interpretation and unanticipated enforcement of the vague Censorship Policies, including CCSD's position that the existence of LGBTQ people and families, or LGBTQ topics, are per se "divisive," "controversial," "sensitive," or prohibited from classroom discussions.

87.    Rinderle told CCSD investigators and administration that she bought the book at a school book fair because she believed it would benefit certain students in her class and was representative of student experiences.

88.    At one investigative meeting, Principal Kale described her initial conversation with Rinderle, identified the concerns that Rinderle had shared with Kale prior to the investigation, and stated her understanding as to why Rinderle read the book: "[Y]ou mentioned the three students – that could identify with the topics in the book . . . . Then you mentioned, like, that there's kids in the hall saying things about other people, you know, sometimes and you wanted – you were bringing people together. You said you heard people say things in the hallway in passing or a

child . . ." Kale also communicated that she understood that Rinderle read the book because students in her class were struggling with understanding gender identity.

89.    In the investigation, Rinderle also shared that she witnessed Due West students engaged in anti-LGBTQ bullying. And Rinderle raised concerns to parents and the school's administration about the anti-LGBTQ bullying which were not addressed.

90.    Rinderle made clear during CCSD's investigation that "the book is representative of the community," and she could not answer whether the book was "divisive," "controversial," or contained "sensitive" materials since she did not know the meaning of those undefined terms used in CCSD's policies.

91.    However, according to Defendant Dowd's remarks after CCSD removed Rinderle from her classroom, CCSD viewed *My Shadow is Purple* to be controversial because it involves the representation of a traditionally male-presenting child wearing traditionally feminine clothing and because the main character "is an individual who is… at the end is dressed in what we consider traditional female garb, traditional male garb up top."

92.    According to Principal Kale and CCSD's administration, as explained after CCSD removed Rinderle from her classroom, the Censorship Policies' prohibition on "controversial," "divisive," or "sensitive" turns on whether "two

24

people disagree" (including any two parents) or whenever there are two sides to an issue.

93.     According to Assistant Superintendent Gretchen Walton, *My Shadow Is Purple* is controversial because the "boy [sic] wears a suit top made by his father, a traditional outfit for a male at a dance and then wears a skirt made by his mother."

94. CCSD has a progressive discipline policy (*GBK-R Discipline, Suspension, and Dismissal of Staff*), under which "disciplinary actions normally follow a gradually escalating path." The policy states that "[a]ll administrators and supervisors will utilize progressive discipline in the treatment of all employees under their supervision." According to CCSD's policy, "[e]xcept in rare cases or cases involving serious offenses, employees should be progressively disciplined prior to termination."

95.     On May 5, 2023, CCSD notified Rinderle of its decision to recommend her termination to the Board. CCSD did not impose a less severe form of discipline prior to recommending termination. By way of information and belief, CCSD has not previously recommended an unblemished educator's termination for the content of a single book read aloud in school. Nor has CCSD previously recommended that any educator be terminated for reading a book aloud that featured children in gender conforming roles.

25

96.    Despite knowing that Rinderle's only alleged infraction consisted of reading a book about inclusion and acceptance of children whose gender identity or expression challenged sex stereotypes, Superintendent Ragsdale issued a "Notice of Charges" letter to Rinderle, on June 6, 2023, notifying her of CCSD's intent to terminate her employment contract for insubordination, willful neglect of duties, and any other good and sufficient cause. The letter restated CCSD's position that the content of Rinderle's lesson utilizing *My Shadow is Purple* "was a controversial subject (gender identity/fluidity) that is not an appropriate school topic for ten and eleven-year-old students."

97.    CCSD also charged Rinderle, *inter alia*, with an "unwillingness to acknowledge that [her] conduct was inappropriate and/or the actual topic of this book," which caused CCSD "to lose confidence in [her] ability to exercise appropriate judgment as a teacher." Ragsdale's letter stated that Rinderle's actions violated the Censorship Policies, among other allegations.

### RINDERLE CHALLENGES HER TERMINATION

98.    Rinderle's recommended termination for merely reading an age-appropriate and award-winning book about acceptance told through the lens of a gender nonconforming character made local, national, and international news throughout the summer of 2023.

26

99.    Rinderle continued to publicly oppose the Board's openly hostile position towards the LGBTQ community, as well as CCSD's interpretation, application, and enforcement of its vague Censorship Policies, which she reasonably and in good faith understood to be a violation of Title IX.

100.    In news media, Rinderle defended reading *My Shadow Is Purple* as an essential teaching opportunity about inclusion and acceptance of differences consistent with the Georgia and CCSD gifted curriculum and standards. Rinderle's actions and public statements were grounded in a good faith, reasonable belief that CCSD's knowledge of and deliberate indifference towards the hostile educational environment for LGBTQ and gender nonconforming students violated Title IX. She also had a good faith, reasonable belief that CCSD's interpretation, application, and enforcement of its Censorship Policies were discriminatory under Title IX, and she publicly communicated her opposition through media interviews.

101.    On June 22, 2023, Rinderle publicly stated her belief that "[w]hat happened to me is not just about me." According to Rinderle, "[i]t's the impact of what is being communicated to students – that it is acceptable to prioritize behaviors and attitudes rooted in bias and discrimination rather than ensuring that students' backgrounds, experiences and identities are seen, heard, connected and honored in their learning experience."

27

102.   Rinderle publicly stated that an email from a parent and fellow CCSD teacher prompted CCSD to investigate and remove her from her teaching position. The email said that "anything in the genre of 'LGBT' and 'Queer' was divisive." By CCSD's statements and actions against Rinderle, it adopted and enforced that discriminatory viewpoint.

103.   Through Rinderle's widely publicized statements, and as reflected by CCSD's responses to her public comments, which the media published, CCSD, the Board, Ragsdale, and Dowd knew of Rinderle's opposition to CCSD's discriminatory application of its policies to LGBTQ and gender nonconforming students and its deliberate indifference towards the hostile educational environment for LGBTQ and gender nonconforming students, and of her belief that CCSD's actions violated students' rights under Title IX.

104.   Rather than remain silent on an employment matter, CCSD made several false public comments attacking Rinderle's employment history and performance before her termination hearing. The Board and CCSD representatives repeatedly stated that Rinderle had a history of poor performance. Those statements were untrue. Rinderle had received unblemished and exemplary performance evaluations for ten consecutive years.

105.   Rinderle exercised her right to challenge CCSD's recommendation to terminate her employment contract, and a hearing was scheduled under Georgia's Fair Dismissal Act.

106.   Under the Fair Dismissal Act, the Board has final policymaking authority over matters of employment of CCSD teachers. As provided in the Fair Dismissal Act, the Board designated a three-member tribunal panel ("Tribunal") to submit findings and recommendations to the Board. A two-day hearing occurred on August 10-11, 2023.

107.   The Tribunal deliberated and rejected Defendant Ragsdale's recommendation that CCSD terminate Rinderle. By way of explanation for its determination, the Tribunal handwrote its acceptance and rejection of CCSD's proposed "Findings of Fact and Recommendations to the Cobb County Board of Education."

108.   The Tribunal found that CCSD should not terminate Rinderle's employment contract for reading *My Shadow Is Purple* and expressly rejected much of CCSD's evidence and contentions.

109.   On August 17, 2023, the Board met to consider the Tribunal's recommendation and take official action. The Board allowed public comment, and several spoke in support of Rinderle, including CCSD educators, students, community members, parents, and caregivers. They reiterated that there are LGBTQ

and gender nonconforming students at Due West and throughout CCSD, that anti-LGBTQ bias is prevalent in CCSD, and that CCSD should not tolerate it.

110.   Cobb County resident Beverly Wynne said four of her six children attended Due West, including one now adult child who experienced homophobic abuse from another student.

111.   Erin Elwell, President of the Marietta PFLAG chapter, a group for LGBTQ individuals and those who love them in Cobb County, spoke to widespread bullying of LGBTQ and gender nonconforming students and how inclusive classrooms can support these students.

112.   Former CCSD teacher Kim Carlton, who retired during the prior year due to her concerns about being punished for speaking freely in the classroom, said, "This sends a message to every teacher in Cobb County and probably in the state that you should not step out of line."

113.   Current CCSD teacher Anna Clay poignantly stated, "Some students are boys. Some are girls. Some are neither. Some are trans. Some are still figuring it out. They all deserve to be welcomed. They all deserve to be treated with respect. They all deserve to be represented in the classroom." Ultimately, the Board Majority disagreed.

114.   Defendant Chastain moved to adopt the Tribunal's findings but to override the Tribunal's recommendation against termination and instead terminate

Rinderle's employment. Defendant Sayler moved to table the decision to give the Board a chance to consider the entire record.

115.   Along partisan lines, the Board Majority voted 4-3 against Sayler's motion and in favor of Chastain's motion. The Board did not explain its decision or why it veered from its common practice of accepting the Tribunal's recommendation, stating inscrutably that the "findings of fact of the Tribunal are adopted in full and the employment contract of Katherine Rinderle is terminated."

116.   Rinderle's termination resulted from and in retaliation for her reading a book about a gender nonconforming character, her advocacy for LGBTQ and gender nonconforming students, and her opposition to discrimination against students due to their nonconformity with gender roles and sex stereotypes.

117.   Rinderle appealed her termination to the Georgia State Board of Education, which is currently considering her appeal.

CCSD HAS A HISTORY OF HOSTILITY TO THE LGBTQ COMMUNITY

118.   With approximately 107,000 students, CCSD is Georgia's second-largest school district and one of the largest school districts in the United States.

119.   CCSD has a substantial and vibrant community of students, families, teachers, and staff, which is broadly diverse, including many who are members of and advocates for the LGBTQ community. Slightly over one-third of CCSD students are white, slightly under one-third are Black, one-fourth are Hispanic/Latine, and

31

just under five percent identify as multiracial. Nationwide, approximately nine percent of students are estimated to be LGBTQ, and there is no reason to believe that percentage does not hold true in the CCSD student population as well.

120.   Within the past five years, gender nonconforming students in CCSD have knowingly and intentionally been addressed by teachers and administrators by their birth or given name after they changed that name – conduct referred to as "deadnaming" – which denies students the dignity of being addressed by their chosen name and having their identity recognized.

121.   In December 2023, the Cobb County Courier reported that CCSD currently employs three staff members in its executive cabinet and central office who are or have been affiliated with Gary DeMar, the leader of the Cobb County based anti-LGBTQ group, American Vision. Gary DeMar often communicates his anti-LGBTQ beliefs, and he has called for the death penalty of LGBTQ people. By way of information and belief, these three individuals remain employed with CCSD despite their known affiliation.

122.   At least two of the aforementioned CCSD employees reportedly had past employment affiliations with Gary DeMar before they became employed in CCSD's communications department, which drafted and released public press statements and information about Rinderle's termination and past employment during the summer and fall of 2023. One of those two employees reportedly has

32

previously authored articles attributing "the existence of HIV/AIDS to the LGBTQ community's 'negative and immoral behavior,'" and written that "being homosexual is one of the most deleterious choices one can make for their health."

123.   Several high ranking CCSD employees are known for their anti-LGBTQ beliefs, including Defendant Dowd, who is a former Atlanta Police Department officer. In 2009, Dowd took part in an infamous unlawful raid on an Atlanta gay bar during which police forced gay patrons to lay face down on a beer soaked floor and where he was alleged to have made anti-LGBTQ statements to a fellow officer. In a civil rights lawsuit which settled, defendants – including Dowd – were found to have "unlawfully searched, detained, and/or arrested" dozens of gay men despite "that none of the Plaintiffs was personally suspected of any criminal activity" and no evidence of criminal activity was found. Dowd was also found by an independent investigation to have violated policy and procedure related to the illegal raids. CCSD hired Dowd after he left the Atlanta Police Department.

124.   Since Rinderle's termination, Defendants CCSD and Ragsdale have removed many LGBTQ-themed books, including *Flamer*, *The Perks of Being a Wallflower*, *Beyond the Gender Binary*, and *All Boys Aren't Blue*, from CCSD schools and libraries, and Ragsdale has publicly justified removal of books on more than one occasion by stating that the "situation is about...good and evil."

33

125.   At schools where Rinderle, Grimmke, and other CCSD educators have taught and teach, there are and have been LGBTQ and gender nonconforming students.

126.   Rinderle, Grimmke, and other CCSD educators have taught LGBTQ and gender nonconforming students and supported them in school, in the hallways, on the playground, and in the lunchroom.

127.   Since 2020 and through her termination in 2023, Rinderle observed that Due West was not a welcoming, inclusive, or supportive community for LGBTQ and gender nonconforming students.

128.   Rinderle witnessed Due West students openly use anti-LGBTQ slurs in the school.

129.   Rinderle observed Due West students excluding and bullying students who identified or were perceived as LGBTQ.

130.   Rinderle observed Due West administration's lack of awareness of and support for LGBTQ and gender nonconforming students.

131.   Rinderle observed parents of students in the Due West community condoning their childrens' anti-LGBTQ conduct while at school.

132.   During the 2021-2022 school year, Rinderle taught at least one fourth-grade student whose gender expression and/or gender identity was incongruent with her sex assigned at birth (J. Doe). Rinderle knew this student prior to her transition

from traditionally masculine gender expression to traditionally feminine gender expression.

133.   During J. Doe's transition, Rinderle witnessed an outgoing, funny, and intelligent student who easily made friends become increasingly socially isolated and experience negative interactions from her peers.

134.   From 2020 to 2023, Due West administration was aware of and deliberately indifferent to known anti-LGBTQ actions and failed to take necessary and appropriate steps to eliminate anti-LGBTQ hostility at the school. Moreover, the Due West administration's actions increased the likelihood of anti-LGBTQ hostility.

## CLAIMS FOR RELIEF

### COUNT ONE: VAGUENESS
### U.S. CONST. AMEND. XIV

### PLAINTIFFS RINDERLE, GRIMMKE, AND GAE AGAINST ALL DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR EQUITABLE RELIEF, AND PLAINTIFF RINDERLE AGAINST DEFENDANT CCSD FOR DAMAGES

135.   Plaintiffs incorporate and reallege the following paragraphs 1-134 and assert the following for all times relevant to this action.

136.   The Fourteenth Amendment prohibits States and their components from depriving any person of life, liberty, or property without due process of law.

137.   The basic principle of due process requires that laws that regulate persons or entities must give fair notice of forbidden or required conduct.

138.   Government regulations that prohibit conduct are impermissibly vague when they fail to provide people of ordinary intelligence a reasonable opportunity to understand what conduct the regulation prohibits and/or when they authorize or even encourage arbitrary and discriminatory enforcement.

139.   Due process principles apply when the government harms a liberty or property interest protected by the Constitution. Regulations threatening to inhibit individuals' exercise of constitutionally protected rights, including those with a severe penalty or lack of a scienter requirement, receive heightened review for vagueness.

> *A.*   *Rinderle Claims*

140.   As a tenured teacher under the Georgia Fair Dismissal Act, Rinderle has a property interest in her employment protected by the Due Process Clause.

141.   During Rinderle's tribunal hearing, CCSD's employees and witnesses had divergent views about what educators can legally teach under the Censorship Policies, highlighting the immense risk CCSD's educators face daily, including the potential loss of their employment and teaching licenses.

142.   Defendants did not define critical concepts in the Censorship Policies, and there is no clear definition of "divisive," "controversial," or "sensitive."

143.  CCSD's training was also inadequate, with Principal Kale simply reading the Censorship Policies verbatim from a PowerPoint presentation without clarifying terms or giving hypothetical examples of what might constitute a violation.

144.  Defendants' Censorship Policies are unconstitutionally vague as applied to Rinderle. Defendants failed, and continue to fail, to provide fair notice, invite arbitrary and discriminatory enforcement, and produce uncertainty about what speech and conduct is prohibited.

145.  Rinderle had no notice or fair warning about the meaning of "controversial," "sensitive," or "divisive." Rinderle had no fair notice that a book about acceptance of different identities and gender nonconformity, purchased at her school-sponsored book fair, violated CCSD's Censorship Policies.

146.  Defendants' Censorship Policies are vague and violate Rinderle's Fourteenth Amendment right to due process.

147.  Unless this Court enjoins Defendants' Censorship Policies to prevent arbitrary and discriminatory enforcement, Rinderle will not have fair warning about what information and material will subject her to adverse employment action when she is reinstated.

148.  Defendants' unlawful conduct has caused and will continue to cause irreparable harm to Rinderle, including violations of her Fourteenth Amendment right to due process.

149.   Rinderle seeks nominal and compensatory damages due to her termination and the adverse employment actions taken against her, and injunctive relief reinstating her to her former position and excising all disciplinary action taken against her according to the activities described herein.

150.   Rinderle seeks declaratory and injunctive relief to prevent enforcement of CCSD's Censorship Policies, IKB and IFAA, that allow for adverse employment action based on discussion or provision of materials that are "controversial," "divisive," and/or "sensitive."

> B.    *The Claims of GAE Members, including Grimmke*

151.   As a tenured teacher under the Georgia Fair Dismissal Act, Grimmke has a property interest in her employment protected by the Due Process Clause. Many CCSD educators which GAE represents also hold property interests in their employment protected by the Due Process Clause. Grimmke and other CCSD educators' speech is protected under the First Amendment.

152.   Defendants have not defined critical concepts in the Censorship Policies. There is no reference to what constitutes a "divisive," "controversial" issue or a clear definition of "sensitive."

153.   CCSD's training is inadequate and does little to clarify terms in the Censorship Policies or provide explanatory hypotheticals.

154.   CCSD's Censorship Policies are vague and violate CCSD educators' due process rights by inhibiting them from presenting age-appropriate curriculum-related or adjacent information and/or discussions about gender nonconformity, LGBTQ people, characters, and topics, as well as topics that may be considered "divisive," "sensitive," and/or "controversial" under the Censorship Policies.

155.   GAE and Grimmke seek declaratory and injunctive relief to prevent enforcement of the Censorship Policies, IKB and IFAA, that allow for adverse employment action based on discussion or provision of materials that are "controversial," "divisive," and/or "sensitive."

COUNT TWO: DEPRIVATION OF EQUAL PROTECTION
DISCRIMINATION ON THE BASIS OF SEX
U.S. CONST. AMEND. XIV

PLAINTIFFS RINDERLE, GRIMMKE, AND GAE
AGAINST ALL DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR EQUITABLE RELIEF,
AND PLAINTIFF RINDERLE AGAINST DEFENDANT CCSD FOR DAMAGES

156.   Plaintiffs incorporate and reallege the following paragraphs 1-134 and assert the following for all times relevant to this action.

157. The Equal Protection Clause of the Fourteenth Amendment, enforceable under 42 U.S.C. § 1983, states that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

158.   Defendants' Censorship Policies and their enforcement of the policies to prohibit, upon pain of termination, teachers from discussing topics, presenting material, or otherwise providing age-appropriate information to students about people whose gender expression, gender identities and/or sexual orientation violate sex stereotypes is prohibited sex discrimination. Defendants do not enforce their Censorship Policies to prohibit teachers from discussing topics, presenting material, or presenting age-appropriate information about people or characters whose gender expression, gender identities, and/or sexual orientation conform to sex stereotypes.

159.   Discrimination on the basis of sex in violation of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983 includes, but is not limited to, discrimination based on gender, gender nonconformity, transgender status, gender expression, and gender identity.

160.   Defendants interpret the Censorship Policies to mean that the mere fact of gender nonconformity and non-binary gender identity is so age-inappropriate, "controversial," "political," and "divisive" that teachers who refuse to enforce Defendants' discriminatory policies must be terminated.

161.   Defendants' Censorship Policies effectuate the erasure, silencing, and stigmatization of gender nonconforming and LGBTQ students by singling their identities out for official disapproval as "controversial," denying them access to materials and curriculum that represent their identities and communities, and chilling

CCSD teachers from affirming their identities and addressing anti-LGBTQ harassment.

162. Defendants acted under color of law to deprive Rinderle of the right to equal protection by enforcing the Censorship Policies against her to restrict student access to age-appropriate information about gender nonconforming and LGBTQ persons based on sex stereotypes.

163. Defendants' adverse employment actions against Rinderle were the result of Defendants' disapproval of a traditionally male-presenting child wearing traditionally feminine clothing in the book Rinderle read to her students.

164. Under the Equal Protection Clause, government classifications based on sex are presumptively unconstitutional and subject to heightened scrutiny.

165. Government action that discriminates on the basis of sex must be substantially related to a sufficiently important government interest. That interest must be genuine, neither hypothesized, invented in response to litigation, nor grounded in fixed notions concerning the roles of males and females.

166. All people, regardless of gender identity, are protected from discrimination on the basis of sex stereotypes.

167. Sex stereotyping occurs when the government discriminates on the basis of behavioral norms and expectations defined by gender.

168.   Defendants' Censorship Policies and actions taken against Rinderle under those policies, constitute an unwritten policy to enforce sex stereotypes in curricula and to punish employees who challenge sex stereotyping by presenting information about gender identities, gender expression, and/or sexual orientation that does not conform to traditional sex stereotypes.

169.   By terminating Rinderle, Defendants have sent all CCSD educators the message that conveying or allowing students access to information that violates sex stereotypes by mentioning or acknowledging LGBTQ and gender nonconforming people is prohibited.  Such discrimination is offensive to the Constitution and serves no legitimate government interest.

170.   Defendants' Censorship Policies, practices, and actions, as described herein, prohibit teachers from creating safe and inclusive environments for gender nonconforming students and prevent them from presenting information about gender identities and/or expressions that do not conform to sex stereotypes.

171.   But for Defendants' Censorship Policies, practices, and actions as described herein, Plaintiffs would create safe and inclusive environments for gender nonconforming students by presenting information about gender identities and/or expression that do not conform to sex stereotypes

172. As a direct and proximate result of Defendants' conduct and enforcement of the Censorship Policies, Rinderle has suffered financial, psychological, and emotional harm.

173. As a direct and proximate result of Defendants' conduct and enforcement of the Censorship Policies, Rinderle, Grimmke, and GAE have suffered and will continue to suffer irreparable harm, including violations of their Fourteenth Amendment right to equal protection – violations that will continue unabated absent prospective injunctive relief.

174. Rinderle, Grimmke, and GAE seek injunctive and declaratory relief against Defendants in their official capacities to prevent enforcement of the Censorship Policies, IKB and IFAA, in a manner that excludes age-appropriate information or material about, or representation of, people or characters whose gender expression and/or gender identities violate sex stereotypes, including material about gender nonconforming individuals, when that information is related or adjacent to curriculum.

175. Rinderle also seeks nominal, presumed, and actual damages against CCSD for the enforcement of the Censorship Policies against her.

<u>COUNT THREE: VIOLATION OF TITLE IX (RETALIATION)</u>
<u>EDUCATION AMENDMENTS OF 1972; 20 U.S.C. § 1681, ET SEQ.</u>

<u>PLAINTIFF RINDERLE AGAINST ALL DEFENDANTS IN THEIR OFFICIAL CAPACITIES</u>
<u>FOR EQUITABLE RELIEF, AND PLAINTIFF RINDERLE AGAINST CCSD FOR DAMAGES</u>

176.   Plaintiffs hereby reallege and incorporate all allegations contained in paragraphs 1-4, 7-38, 41-67, 76-134 as if fully set forth herein.

177.   Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.*, states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

178.   Title IX is implemented through the Code of Federal Regulations. *See* 34 C.F.R. Part 106.

179.   At all material times, CCSD was a recipient of Federal financial assistance from the Department of Education and, thus, subject to Title IX's prohibitions on sex- and gender-based discrimination and retaliation.

180.   The U.S. Supreme Court has recognized that "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 172–73 (2005).

181.   Plaintiff Rinderle has a private right of action under Title IX for retaliation, which permits Rinderle to seek monetary damages against the school district.

182.   Courts in the Eleventh Circuit import the standards for a retaliation claim under Title VII to establish the elements necessary to constitute a retaliation claim under Title IX.

183.   To state a claim of retaliation under Title IX, the plaintiff must plausibly allege that they engaged in protected activity, that they suffered an adverse employment action, and that there was a causal link between the two.

184.   Rinderle engaged in statutorily protected activity under Title IX, including but not limited to, advocating for the recognition of students, gender nonconforming and LGBTQ students, reporting incidents that contributed to Due West's hostile environment for LGBTQ and gender nonconforming students to Principal Kale, publicly opposing CCSD's deliberate indifference towards the hostile educational environment for LGBTQ and gender nonconforming students, agreeing to read *My Shadow Is Purple* to her class to prevent and curb harassment and discrimination against gender nonconforming and LGBTQ students, and then publicly opposing CCSD's after-the-fact interpretation, application, and enforcement of its Censorship Policies, which Rinderle had a good faith and reasonable belief violated Title IX.

185.   When Rinderle engaged in protected activity under Title IX, she did so under a good faith, reasonable belief that the hostile educational environment for LGBTQ and gender nonconforming students at Due West, CCSD's deliberate indifference towards the hostile educational environment for LGBTQ and gender nonconforming students, as well as CCSD's interpretation, application, and enforcement of its Censorship Policies violated Title IX.

186.   Defendants and other CCSD officials knew or should have known of Rinderle's statutorily protected activity, and Defendants' and CCSD's officials' adverse actions against her, were in retaliation for her statutorily protected activity.

187.   Defendant Dowd oversaw and engineered an intentionally flawed, biased, and misleading investigation of Rinderle's conduct, which ultimately resulted in her termination, in retaliation for her advocacy for and support of LGBTQ and gender nonconforming students. Defendant Dowd's supervision of the investigation resulted in material witnesses not being interviewed, false claims of dishonesty being raised, and inaccurate reporting of Rinderle's conduct that the Board relied on to justify Rinderle's termination. Defendant Dowd acted under color of law to deprive Rinderle of a federal right by retaliating against her for her advocacy based on her reasonable, good faith belief that CCSD was discriminating against LGBTQ and gender nonconforming students in violation of Title IX.

188.  Within close temporal proximity to Rinderle's statutorily protected activity, including her public opposition to CCSD's discriminatory interpretation, application, and enforcement of its Censorship Policies, Defendants took adverse action against her, which was discriminatory retaliation.

189.  Defendants and CCSD's decisionmaking administrators knew or should have known that terminating Rinderle for her advocacy and public statements reporting sex discrimination at CCSD were unlawful. Defendants and CCSD's decisionmaking adminstrators had the authority to reinstate Rinderle and/or otherwise follow customary progressive discipline guidelines and policies, but refused to do so in order to retaliate against Rinderle.

190.  CCSD's retaliatory actions against Rinderle include the Board's vote to terminate her employment contract, despite the Tribunal's findings that CCSD should not terminate Rinderle's contract, and the Tribunal's express rejection of much of CCSD's evidence and claims against Rinderle. Defendants Scamihorn, Banks, Chastain, and Wheeler knew or should have known that it was unlawful to retaliate against Rinderle for advocating for and supporting LGBTQ and gender nonconforming students.

191.  Rinderle has suffered and will continue to suffer economic and reputational harm because of Defendants' retaliatory actions.

192.   Rinderle seeks equitable relief of reinstatement and future treatment free of retaliatory animus as to CCSD and all Defendants in their official capacity.

193.   Rinderle also seeks damages against CCSD for its retaliatory acts.

## PRAYER FOR RELIEF

194.   WHEREFORE, Plaintiffs respectfully request that this Court:

a.      Declare the actions complained of herein to violate 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, and Title IX;

b.      Issue preliminary and permanent injunctive relief restraining Defendants, their employees, agents, and successors in office from enforcing Defendants' Censorship Policies, IKB and IFAA, against Plaintiffs in a manner that discriminates on the basis of gender nonconformity, nonbinary gender identity, and stereotypes grounded in gender-based behavioral norms;

c.      Issue preliminary and permanent injunctive relief restraining Defendants, their employees, agents, and successors in office from enforcing Sections B(1), B(2), B(3), B(4), B(5)(a), and B(5)(b) of IKB and from otherwise enforcing these policies against Plaintiffs to prohibit "divisive," "controversial," and "sensitive" topics in a vague and arbitrary manner that deprives them of due process and fair warning of prohibited conduct;

d.     Issue preliminary and permanent injunctive relief restraining Defendants, their employees, agents, and successors in office from enforcing Sections II(A)(3), II(B)(2)(a), II(B)(10), II(C)(2), and II(D) of IFAA against Plaintiffs and otherwise enforcing this policy to prohibit "divisive," "controversial," and "sensitive" topics in a vague and arbitrary manner that deprives them of due process and fair notice of prohibited conduct;

e.     Issue preliminary and permanent injunctive relief restoring Plaintiff Rinderle's employment and modifying her employment records to remove any record of discipline and misconduct in relation to her alleged violation of the Censorship Policies;

f.     Award Plaintiff Rinderle nominal, presumed, and actual monetary damages against Defendants for her loss of employment, emotional distress, humiliation, and damage to her reputation resulting from CCSD's violation of the Equal Protection Clause of the Fourteenth Amendment, enforceable under 42 U.S.C. § 1983;

g.     Award Plaintiff Rinderle nominal, presumed, and actual monetary damages against Defendants for Rinderle's loss of employment, emotional distress, humiliation, damage to her reputation resulting from the knowing establishment and enforcement of CCSD's arbitrary and vague

49

Censorship Policies which intentionally deprived Rinderle of due process in violation of the Fourteenth Amendment;

h.   Award Plaintiff Rinderle nominal, presumed, and actual monetary damages against Defendants for Rinderle's loss of employment, emotional distress, humiliation, damage to her reputation, and for Defendants' violation of Title IX;

i.   Award Plaintiff Rinderle reinstatement of her former CCSD teaching position and remove any record of discipline and misconduct in relation to her alleged violation of the Censorship Policies;

j.   Award Plaintiffs' costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. 1988 and other applicable law; and

k.   Award all other relief that this Court deems just and proper.

Dated this 13th day of February, 2024.

/s/ Craig Goodmark
Craig Goodmark
Georgia Bar No. 301428
GOODMARK LAW FIRM
1425A Dutch Valley Place
Atlanta, Georgia 30324
(404) 719-4848
cgoodmark@gmail.com

/s/ Gerald Weber
Gerald Weber
Georgia Bar No. 744878
LAW OFFICES OF GERRY WEBER, LLC
Post Office Box 5391

/s/ Michael J. Tafelski
Michael J. Tafelski
Georgia Bar No. 507007
Elizabeth "Beth" Littrell
Georgia Bar No. 454949
Brock Boone*
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Ste. 340
Atlanta, Georgia 30030
(334) 315-0179
michael.tafelski@splcenter.org
beth.littrell@splcenter.org
brock.boone@splcenter.org

Atlanta, Georgia 31107
(404) 522-0507
wgerryweber@gmail.com

/s/ Danielle E. Davis
Alice O'Brien*
Danielle E. Davis*
Nicole B. Carroll*
NATIONAL EDUCATION ASSOCIATION
1201 16th Street, N.W.
Washington, DC 20036-3290
(202) 822-7035
AObrien@nea.org
DDavis@nea.org
NCarroll@nea.org

*Attorneys for Plaintiffs*
* pro hac vice motion forthcoming

/s/ Harry Chiu
Harry Chiu*
SOUTHERN EDUCATION FOUNDATION
101 Marietta Street, NW, Ste. 1650
Atlanta, GA 30303
(404) 523-0001
hchiu@southerneducation.org