## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**KATHERINE RINDERLE**; **TONYA GRIMMKE**; **GEORGIA ASSOCIATION OF EDUCATORS**; **GEORGIA YOUTH JUSTICE COALITION FOR ACTION, INC.**; and **A.A.**, by and through her parent and next friend**, B.A.**,

        *Plaintiffs,*

    v.

**COBB COUNTY SCHOOL DISTRICT**; **CHRIS RAGSDALE**, in his official capacity as Superintendent of Cobb County School District and his individual capacity; **RANDY SCAMIHORN**, in his official capacity as member of the Cobb County Board of Education and his individual capacity; **DAVID BANKS**, in his official capacity as member of the Cobb County Board of Education and his individual capacity; **DAVID CHASTAIN**, in his official capacity as member of the Cobb County Board of Education and his individual capacity; **BRAD WHEELER**, in his official capacity as member of the Cobb County Board of Education and his individual capacity; **BECKY SAYLER**, in her official capacity as member of the Cobb County Board of Education; **NICHELLE DAVIS**, in her official capacity as member of the Cobb County Board of Education; and **LEROY TRE' HUTCHINS**, in his official capacity as member of the Cobb County Board of Education; **CHRIS DOWD**, in his official capacity as an employee of the Cobb County School District and his individual capacity,

        *Defendants.*

CIVIL ACTION NO.:
1:24-CV-00656-JPB

**FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND DAMAGES**

JURY TRIAL DEMANDED

1

**INTRODUCTION**

1.     Katherine Rinderle ("Rinderle") and Tonya Grimmke ("Grimmke") are experienced and accomplished teachers who served and serve in the Cobb County School District ("CCSD"), and the Georgia Association of Educators ("GAE") represents 1,625 teachers, administrators, and education support professionals who teach and work in CCSD (collectively, "Educator Plaintiffs"). A.A. is a transgender girl who attends school in CCSD and one of Rinderle's former students. And the Georgia Youth Justice Coalition for Action, Inc. is a grassroots student organization, which includes 187 CCSD student members, that is dedicated to advancing the rights of marginalized youth across Georgia (collectively, "Student Plaintiffs").

2.     Educator Plaintiffs and Student Plaintiffs (collectively, "Plaintiffs") support the education of all students without viewpoint-based discrimination against students based on gender identity or sexual orientation, including lesbian, gay, bisexual, transgender, and/or queer ("LGBTQ") students.

3.      CCSD's vague censorship policies enable arbitrary, discriminatory, and retaliatory enforcement that harms all Plaintiffs.

4.     Plaintiffs seek relief from CCSD's vague censorship policies that include undefined terms subject to discriminatory enforcement such as "controversial," "divisive," and "sensitive." These opaque policies were interpreted and enforced to terminate Rinderle for simply reading an award-winning children's book, written from the perspective of a student who does not conform to gender stereotypes, to her fifth-grade students; deny A.A. and GYJCA's CCSD student members of their right to receive information and to learn in a safe and inclusive environment free from sex-based discrimination; and pose a continuing threat to CCSD's teachers, including Grimmke and GAE members, and students. Further, Plaintiffs seek relief from CCSD's discriminatory and retaliatory actions against Rinderle, who was targeted and terminated for her outspoken support of LGBTQ students.

## THE PARTIES

5.     **Plaintiff Katherine Rinderle ("Rinderle")** was an elementary school educator in CCSD for over a decade until her termination. She earned teacher tenure protections under the Georgia Fair Dismissal Act when she accepted her fourth teaching contract from CCSD before her termination. In the 2022-23 school year, Rinderle taught at Due West Elementary School ("Due West") in CCSD but was placed on administrative leave in March 2023 and then terminated in August 2023 for reading *My Shadow Is Purple*, giving rise to this lawsuit.

6**.**     **Plaintiff Tonya Grimmke ("Grimmke")** is a teacher who has served in CCSD for the last eighteen years. She earned teacher tenure protections under the Georgia Fair Dismissal Act when she accepted her fourth teaching contract from CCSD. Grimmke currently teaches at Birney Elementary School ("Birney"). Her duties and responsibilities include compliance with all CCSD policies, procedures, and practices.

7.     **Plaintiff Georgia Association of Educators ("GAE")** is a member-led non-profit professional association that represents public school educators throughout Georgia, including 1,625 teachers, administrators, and education support professionals who teach and work in CCSD. GAE advocates for strong public schools and the fair treatment of students and staff in public schools. Rinderle and Grimmke are GAE members along with many other CCSD educators (collectively, "GAE members"). CCSD's enforcement of its vague censorship policies has resulted in the termination of one GAE member, placed another GAE member in immediate danger of suffering discipline and termination, and placed many other GAE members in fear of discipline causing them to change their instruction and speech, harming GAE's members and the organization's advocacy and interests. GAE has incurred substantial costs as a result of CCSD's action and has diverted resources from other GAE programs to address the impact of CCSD's vague censorship policies. The GAE legal services program operates to protect its members' employment rights and funds litigation on behalf of members by engaging the services of outside network attorneys. GAE has expended legal services program funds to hire attorneys to represent members working in CCSD. The costs and staff

time devoted to these tasks has reduced the amount of funds and staff time available for GAE's work on behalf of other members.

8. **Plaintiff A.A., by and through her parent and next friend, B.A.,** is a sixth grade student at McClure Middle School ("McClure") in CCSD and a lifelong Cobb County resident.[1] Rinderle was A.A.'s second and fourth grade teacher at Due West, during which time A.A. transitioned from being a male-presenting student who did not object to being addressed using he/him pronouns to a student who identifies as female and now uses she/her pronouns. A.A. attended Due West when CCSD disciplined Rinderle for reading *My Shadow Is Purple*. Since second grade, Rinderle has been a major source of emotional support and advocacy for A.A. and her family as A.A. navigated the process of socially transitioning at school.

9. **Plaintiff Georgia Youth Justice Coalition for Action, Inc. ("GYJCA")** is a youth-led collaborative dedicated to advocating for youth power and justice in Georgia. GYJCA has 187 student members attending CCSD, which includes gender nonconforming and LGBTQ students. GYJCA works to ensure that youth voices, many who live and attend school in CCSD, are valued, amplified, and harnessed to shape the issues impacting the lives of young people, including racial justice, education, LGBTQ rights, climate change, and community safety. One of GYJCA's core goals and mission is to advocate for inclusive, supportive, and equitably-funded public schools that welcome all students, including LGBTQ students and students from other historically marginalized communities. CCSD's enforcement of its vague censorship policies has resulted in discriminatory stigmatic, educational, and psychological harms to GYJCA's gender nonconforming and LGBTQ student members in CCSD. GYJCA has been forced to incur substantial costs to mitigate the harms of CCSD's actions against students, diverting limited monetary, personnel,

---

[1] A.A., through her parent and next friend, B.A., moves this Court concurrently to proceed in this litigation using pseudonyms because A.A. is a minor, transgender girl and she is concerned about her privacy and safety as detailed in her motion. *See Plaintiff A.A.'s Motion for Leave to Proceed Using Pseudonyms and Memorandum of Law in Support.*

and political resources, and reducing the available resources and personnel for GYJCA's work on behalf of other organizational causes, members, and communities.

10.     **Defendant Cobb County School District ("CCSD")** is a governmental entity operating the public school system of Cobb County, Georgia, under the control and management of the Cobb County Board of Education ("the Board"), pursuant to Ga. Const. art. 8, § 5, ¶ I; O.C.G.A. § 20-2-50.

11.     **Defendant Chris Ragsdale ("Ragsdale")** is CCSD's Superintendent and the Board's executive officer. Ragsdale is a final policymaker and decisionmaker responsible for implementing the Board's policies and state rules and regulations under Ga. Const. art. 8, § 5, ¶ III; O.C.G.A. §§ 20-2-61(a); 20-2-109. Ragsdale, acting under color of law, enforced vague censorship policies to terminate Rinderle, restricted student access to information about gender nonconforming and LGBTQ persons based on sex stereotyping, and retaliated against Rinderle for statutorily protected activity. Ragsdale is sued in his official and individual capacities.

12.     **Defendants Randy Scamihorn ("Scamihorn"), Brad Wheeler ("Wheeler"), David Chastain ("Chastain"),** and **David Banks ("Banks") (collectively, "Board Majority")** are four of the Board's seven members and are responsible for CCSD's control and management. Ga. Const. art. 8, § 5, ¶ II; O.C.G.A. §§ 20-2-50; 20-2-61. The Board is a final policymaker in establishing and enforcing CCSD's vague censorship policies at issue in this action. Scamihorn, Wheeler, Chastain, and Banks, as members of the Board, establish, maintain, and enforce local policies and must ensure their compliance with state, federal, and constitutional law. The Board Majority, acting under color of law, established and enforced the vague censorship policies at issue in this action, restricted student access to information about gender nonconforming and LGBTQ persons based on sex stereotyping, and voted to terminate Rinderle for her support of gender nonconforming and LGBTQ students. Scamihorn, Wheeler, Chastain, and Banks are sued in their official and individual capacities.

13.    **Defendants Becky Sayler ("Sayler"), Nichelle Davis ("Davis"),** and **Leroy Tre' Hutchins ("Hutchins") (collectively, "Board Minority")** are three of the Board's seven members and are responsible for CCSD's control and management. Ga. Const. art. 8, § 5, ¶ II; O.C.G.A. §§ 20-2-50; 20-2-61. Sayler, Davis, and Hutchins, as members of the Board, establish, maintain, and enforce local policies and must ensure their compliance with state, federal, and constitutional law. The Board Minority did not support the vote to terminate Rinderle. Sayler, Davis, and Hutchins are sued in their official capacities only.

14.    **Defendant Christopher Dowd ("Dowd")** is CCSD's executive director for employee relations. Dowd is a final policymaker responsible for enforcing CCSD's vague censorship policies at issue in this action. Acting under color of law, Dowd oversaw and engineered a flawed and misleading investigation of Rinderle's conduct, which ultimately resulted in her termination for advocating and supporting gender nonconforming and LGBTQ students. Defendant Dowd is sued in his official and individual capacities.

## JURISDICTION AND VENUE

15.    This civil and constitutional action arises under the United States Constitution, 42 U.S.C. § 1983, and Title IX of the Education Amendments Act of 1972.

16.    This Court has subject matter jurisdiction over this action pursuant to Article III of the United States Constitution, 28 U.S.C. §§ 1331, 1343, and 1367, and 20 U.S.C. § 1681(a).

17.    This Court has the authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and this Court's general legal and equitable powers.

18.    This Court has personal jurisdiction over Defendants because Defendants are public officials domiciled in the State of Georgia and who perform their official duties in the State of Georgia.

19.     Venue in this District is proper under 28 U.S.C. § 1391(b)(1),(2) because one or more Defendants reside in this District, all Defendants are residents of the State in which this District is located, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred and are occurring in this District.

## FACTUAL ALLEGATIONS

### CCSD's CENSORSHIP POLICIES AT ISSUE IN THIS ACTION

20.     The State of Georgia enacted the Protecting Students First Act in 2022, which prohibited "espousing personal political beliefs" concerning "divisive concepts," which the statute defines as a list of concepts regarding the role of race and racism in the United States of America.  O.C.G.A. § 20-1-11 *et seq*.

21.     That same year, "the Parents' Bill of Rights" was also enacted. It states, "[A]ll parental rights are reserved to the parent of a minor child in this state without obstruction or interference from a state or local government entity…including, but not limited to: (A) The right to direct the upbringing and the moral or religious training of his or her minor child."  O.C.G.A. § 20-2-786.

22.     In July 2022, following the passage of these state laws, the Board, as a final policymaker, amended Administrative Rules IKB-R ("IKB"), *Controversial Issues*, and IFAA-R ("IFAA"), *Instructional Resources Selection and Acquisition* (collectively, "Censorship Policies") and adopted them as CCSD's official policies.

23.     This litigation is centered on the enactment and enforcement of CCSD's Censorship Policies. CCSD used the Censorship Policies to terminate Rinderle for reading *My Shadow Is Purple* and is actively using these policies to threaten the employment of Grimmke and other current CCSD teachers, who are GAE members, and deprive students of their right to an inclusive education free from discrimination.

24.     Defendants' reliance on the broad terms of the Censorship Policies to arbitrarily target entire communities based on demeaning stereotypes – coupled with their inability to define key terms or even the general contours of what is prohibited – demonstrate the vagueness of the Censorship Policies.

*IKB – Controversial Issues*

25.    A true and correct copy of CCSD's *IKB*, *Controversial Issues* policy is attached as Plaintiffs' Ex. 1.

26.    In relevant part, Section B (Political/Partisan Issues) of IKB summarily prohibits CCSD employees from using classroom instruction to influence students regarding political or partisan issues or to espouse personal political beliefs. The policy further prohibits CCSD employees from improperly infringing on parents' rights to direct the upbringing and moral or religious training of their children. And the policy requires, during classroom instruction, that educators observe objectivity on all issues, present balanced points of view on issues, and refrain from identifying personal positions on issues and political candidate preferences.

27.    IKB contains no additional definitions or guidance concerning what the terms "controversial issues," "political," "partisan," "objectivity," "balanced points of view," and "improperly infringe" upon parents' "right to direct the upbringing and the moral or religious training of their children" mean.

28.    Nowhere in IKB do the terms gender identity, gender conformity or nonconformity, or sexual orientation appear.

*IFAA – Instructional Resources Selection and Acquisition*

29.    A true and correct copy of CCSD's *IFAA, Instructional Resources Selection and Acquisition* is attached as Exhibit 2.

30.    IFAA regulates the selection and use of instructional materials and has two sections. Section I regulates core resources, which are instructional materials and content that constitute the principal source of study in a course. Section II regulates how supplemental learning resources are to be chosen. The book that Rinderle was terminated for reading was a supplemental learning resource.

31.    Section II(A)(1) provides that: "Supplementary learning resources are any medium, print or non-print, designed to supplement the core learning resources purchased at the District or local school level. These materials

include, but are not limited to, articles, online simulations, worksheets, novels, biographies, speeches, videos, music, and similar resources in any medium, including both physical or digital."

32.     Section II(A)(3) states that: "All non-school print and non-print materials utilized in the instructional program by teachers, students, and guest presenters shall be supportive of the adopted curriculum for the course being taught and appropriate for the targeted audience. It is the responsibility of the teacher to preview non-school materials prior to use and to inquire of a guest presenter information regarding his/her objectives and the contents of his/her presentation prior to the presentation."

33.     Section II(B)(2)(b) states: "Content that advocates for divisive concepts shall be prohibited" and lists by way of definition the "concepts" and "views" that are regulated as "divisive concepts" under O.C.G.A. § 20-1-11, which only include topics related to race.

34.     Section II(B)(10) states: "Topics of a sensitive nature (i.e., social, political, religious) should be given a balanced treatment, with both pros and cons represented."

35.     Section II(C) states:

1.     Preview: Teachers are responsible for completely previewing all supplemental materials (regardless of their source) before using them for whole-class instruction.

2.     Permission: The Teacher, Principal or designee of a school may require written permission (Form IFAA-1[Parent/Guardian Permission Form for Supplementary Materials]) of parents/guardians prior to the reading/viewing of supplementary materials if in his/her opinion the content may be of a sensitive nature within the school's community or the age group served by the school.

36.     Section II(D) states: "Professional discretion of the Principal or designee and staff must be used in the use of supplementary materials which might include topics of a sensitive nature as perceived by the community served. Parents/guardians of a student always have the option of requesting alternative assignments."

37.     IFAA does not define "sensitive," or "balanced treatment," explain how educators must determine whether "content may be of a sensitive nature within the school's community or the age group served by the school" or explain how to determine whether materials are "appropriate for the targeted audience." Nor does IFAA provide any examples of what constitutes permissible or impermissible content.

38.     IFAA does not mention or prohibit classroom instruction or discussions of gender identity, gender conformity or nonconformity, or sexual orientation except to provide, that Core Learning Resources, "shall avoid bias and adhere to standards of sensitivity relative to student race, gender, religion, culture, ethnicity, disability, and socioeconomic status in compliance with applicable state law and district policies and rules." IFAA, Section II(D)(i).

CCSD EDUCATORS AND STAFF RECEIVED
INADEQUATE TRAINING ON CENSORSHIP POLICIES

39.     During preplanning in July of 2022, just days after the Board enacted the Censorship Policies, CCSD administrators conducted brief, insufficient, and deliberately indifferent teacher trainings regarding the meaning, scope, and limits of the Censorship Policies for the 2022-2023 school year.

40.     At Due West, Principal Cissi Kale offered a PowerPoint presentation that merely restated excerpts of CCSD's vague Censorship Policies without explaining or defining terms or policy language. The purported training completely failed to provide any explanation of the new vague terms, define the limits of the Censorship Policies, or give any other information to assist Rinderle or other educators with compliance. Critically, the purported training never defined or clarified the terms "controversial," "sensitive," or "divisive."

41.     During the training, Principal Kale provided no specific examples of books or materials that would violate the Censorship Policies, nor did she offer any direction on the limits of these new terms.

42.     Grimmke taught at Wheeler High School in CCSD during the 2022-2023 school year, and she received the same inadequate PowerPoint training about CCSD's Censorship Policies as Rinderle. Grimmke's administrators

were confused and did not understand the contents of the training, and they were unable to answer questions or define "controversial," "sensitive," or "divisive" in the Censorship Policies. This training was so woefully inadequate as to be deliberately indifferent to provide guidance to teachers as to what was permitted and prohibited.

43.   Grimmke transferred to Birney before the 2023-2024 school year, and her new administrators similarly provided inadequate training that lacked meaningful guidance or clarity about CCSD's Censorship Policies, even after Rinderle's termination. This training too was so woefully inadequate as to be deliberately indifferent to provide guidance to teachers as to what was permitted and prohibited.

44.   CCSD teachers, including Rinderle and Grimmke, were never told that gender identity, gender nonconformity, or sexual orientation constituted *per se* "controversial" or "sensitive" subjects. Nor were teachers in CCSD provided any clarity by anyone in the school district as to what topics might be "controversial," "sensitive," or "divisive" under the Censorship Policies.

45.   The Board's adoption, implementation, and enforcement of the vague Censorship Policies banning "controversial," "divisive," and "sensitive" topics denied Plaintiffs and GAE members fair notice that recognizing or discussing gender identity, gender nonconformity, or sexual orientation might subject them to adverse employment action.

46.   CCSD denied Plaintiffs fair notice that recognizing or discussing gender identity, gender nonconformity, or sexual orientation violated the Censorship Policies.

47.   Given that many CCSD students and their family members have gender nonconforming and LGBTQ identities, it was obvious to Defendants that teachers would recognize gender nonconforming and LGBTQ individuals in their classrooms and schools.

<u>EDUCATOR PLAINTIFFS ARE ACCOMPLISHED AND EXPERIENCED TEACHERS</u>
<u>COMMITTED TO CREATING SAFE AND INCLUSIVE SCHOOLS AND CLASSROOMS FOR THEIR STUDENTS</u>

*Katherine Rinderle, an exemplary educator at Due West,*
*purchases My Shadow Is Purple at a school-sponsored book fair.*

48.    Rinderle is a lifelong Cobb County resident. She attended CCSD from kindergarten through high school graduation and earned her bachelor's and master's degrees in education from Kennesaw State University in 2012 and 2023, respectively.

49.    Rinderle accepted a full-time teaching position with CCSD as an elementary classroom teacher in 2013. She has taught at various CCSD elementary schools. Most recently, she taught at Due West, which serves kindergarten through fifth-grade students.

50.    As a leader at Due West, Rinderle served on the Guiding Coalition Committee. She provided subject matter expertise in English/Language Arts.

51.    Rinderle's performance exceeded her supervisors' expectations for ten consecutive years. Until CCSD and Ragsdale recommended Rinderle's termination in 2023, she received unblemished and "exemplary" formal performance evaluations that contained only positive comments.

52.    Rinderle's most recent supervisor at Due West, Principal Kale, commended her teaching expertise, professionalism, and passion for education.

53.    During the 2022-23 school year, Rinderle taught gifted and talented students in the "Target" class for first through fifth grades at Due West. Target classes use Georgia and CCSD's gifted curriculum and standards.

54.    Rinderle constructed her Target lessons to promote curiosity, divergent thinking, and critical thinking, as mandated by CCSD's gifted curriculum, which also includes lessons on inclusion and acceptance.

55.     In February 2023, Rinderle attended the Due West Scholastic Book Fair, authorized by CCSD, where she purchased several books, including an elementary-level picture book titled *My Shadow is Purple*. A true and correct copy of *My Shadow Is Purple* is attached as Exhibit 3.

56.     *My Shadow is Purple* was written and illustrated by Scott Stuart, an Australian author. The book is a 32-page story about a family that includes two parents who have gender identities and expression that align with sex stereotypes, and their child, whose gender identity and expression does not align with sex stereotypes, as they navigate the child's many interests and the challenges of social differences in a school setting. The publisher recommends the picture book for children from ages 4 through 8. The average age of Rinderle's class, as most are fifth grade students, was 10 years old.

57.     As Rinderle testified during her termination hearing, she chose *My Shadow Is Purple* at the Due West Scholastic Book Fair because of its anti-bullying message, to highlight that there were gender nonconforming students and other students with diverse identities in her school whose needs for acceptance were not being recognized or addressed, and because she believed it would help address issues that underlie bullying, such as labeling, isolation, and not accepting others, especially including gender nonconforming children. Rinderle routinely purchased books for her classroom library to be read during community reading time, often selecting books that would help promote the gifted standard goals of inclusion and acceptance or help her students appreciate their unique giftedness.

58.     Since 2020 and through her termination in 2023, Rinderle observed that Due West was not a welcoming, inclusive, or supportive community for LGBTQ and gender nonconforming students. Rinderle witnessed Due West students openly use anti-LGBTQ slurs in school. Rinderle observed Due West students exclude and bully students who identified or were perceived as LGBTQ and Due West's lack of awareness and support for its LGBTQ and

gender nonconforming students. And Rinderle observed parents of students in the Due West community condone their children's anti-LGBTQ conduct while at school.

*Rinderle teaches and supports A.A., a transgender girl at Due West*

59.     One of those gender nonconforming students, A.A., is a transgender girl who uses she/her pronouns. A.A. attended Due West from kindergarten through fifth grade. Rinderle taught A.A. in second and fourth grades. A.A. was in fifth grade when Rinderle read *My Shadow Is Purple* during the 2022-2023 school year. Even though Rinderle was not her teacher that year, A.A. met with, talked to, and relied upon Rinderle for educational and emotional support.

60.     During second grade, A.A. presented as a boy and did not object to her classmates and teachers referring to her using he/him (as well as they/them and she/her) pronouns. A.A. occasionally wore clothes to school that did not align with traditional expectations for children assigned male at birth, including her favorite pair of rainbow shoes.

61.     On one occasion, a classmate told A.A. that wearing rainbow shoes meant that she was gay. When Rinderle found out, she told A.A. and A.A.'s mother, B.A., that she would not allow children to torment A.A. with anti-LGBTQ comments and to inform her if similar situations occurred again.

62.     A.A. began expressing a more consistent female gender identity during third grade, which was virtual due to the COVID-19 pandemic.

63.     By fourth grade, when CCSD's in-person schooling resumed, A.A. presented as a girl. She told her mother that she was most excited to wear her new skirt when she returned to school. Upon returning to school, A.A.'s classmates asked her questions about why she grew her hair out and if she was a girl now. Although A.A. preferred she/her pronouns, many of A.A.'s classmates continued to refer to her using he/him pronouns. A.A. did not often correct them because she knew her classmates did not understand and she felt unable to explain her transition to

them. At least one classmate told A.A. that she could not be a girl. A.A. believes that comment reflected the beliefs of many of her classmates and she did not feel able to change their minds. These comments, and her peers' lack of understanding, were hurtful and isolating.

64. To ease her transition at school and throughout A.A.'s time at Due West, Rinderle provided significant and consistent support to A.A. and advocacy on her behalf. This included showing A.A. the location of the staff restroom that she had been assigned to use and how to operate the lights and other facilities. Since other children typically went to the restroom at designated times and lined up in the hallways to wait, Rinderle attempted to spare A.A. the isolating experience of being seen by other students walking to the staff bathroom and allowed A.A. to use the restroom whenever needed without having to ask.

65. As a result of the school environment following A.A.'s transition, Rinderle witnessed an outgoing, funny, and intelligent student who easily made friends become increasingly socially isolated, experience negative interactions from her peers, and lose friends. So, A.A. would often spend recess and break times with Rinderle, who provided her companionship and support as well as validation of her gender identity as a girl.

66. Rinderle served as a frequent, reliable, valuable, and rare source of emotional support of A.A., including validation of her gender identity, throughout her transition and educational experience at Due West.

*Rinderle reads award-winning book, My Shadow Is Purple, to her fifth grade gifted students*

67. *My Shadow Is Purple* represented students attending Due West and in Rinderle's classes: students with all interests and identities, including differing gender identities and LGBTQ students.

68. Rinderle fully read *My Shadow Is Purple*, in accordance with IFAA's requirements for non-school print materials, at the book fair before she bought it. In Rinderle's professional judgment, the book supported CCSD's gifted standards of inclusion and dissuaded bullying behaviors and also reflected the Due West and CCSD community.

15

69.     *My Shadow Is Purple* was not a Core Learning Resource because it was a non-school print material purchased independently by Rinderle; therefore, the book was not subject to the IFAA requirements for such materials. Instead, Rinderle included the book as one of many in her classroom library.

70.     *My Shadow is Purple* contains gender conforming characters as well as one character who is gender nonconforming.

71.     To the extent *My Shadow is Purple* "advocated" anything, it is acceptance of others' differences, self-acceptance, and rejecting stereotypes.

72.     On March 8, 2023, about a month after purchasing *My Shadow Is Purple* at the Due West Scholastic Book Fair, Rinderle allowed her students to select a picture book for a "community read aloud," which was Rinderle's morning meeting with her students, intended to build community in the classroom and help students understand each other and themselves.

73.     Rinderle's use of "community read aloud" activities promoted CCSD's Gifted Standard G5 – Relationships & Connections, and Standard G9 - Respect for Others. Under Standard G9, Rinderle's "community read aloud" modeled how "students will be respectful members of their communities" and "recognize the value of individual differences."

74.     The fifteen fifth-grade students – who were in the same grade as A.A. – cast votes by placing sticky notes on their book of choice from nine or ten possible options. After two rounds of votes, nine of fifteen students selected *My Shadow is Purple* as the "community read-aloud" book.

75.     Before reading, Rinderle showed the students the cover and asked for their impressions. The students engaged in a discussion about the character's identity, including debates about stereotypes, gender norms, and appearances. Rinderle reminded the students that they should not make assumptions about gender, and until they read the book, the character's identity was yet to be understood.

16

76.     Following the discussion about the main character's identity and some students' preconceived ideas about gender, Rinderle read the book to the class. Rinderle did not mention or discuss terms such as "LGBTQ," "gender identity," "transgender," "gender nonbinary," or "gender beyond binary." Nor were any of these terms included in the text of the book that she read.

77.     As a classroom activity, Rinderle asked the students to draw their own shadows and create an original poem explaining the color of their shadow.

78.     As detailed herein, the Board terminated Rinderle for reading *My Shadow Is Purple* because the story features a character who does not conform to traditional gender norms.

79.     Only after Rinderle read *My Shadow Is Purple* and was recommended for termination did she receive negative feedback in her annual summative performance evaluation for the first time in her ten-year career.

*Tonya Grimmke and other GAE member educators in CCSD*

80.     Grimmke is a special education teacher at Birney and has been employed in CCSD for eighteen years, teaching at various schools. She is a GAE member.

81.     Throughout their careers, Grimmke and other CCSD educators whom GAE represents (collectively, "GAE members") have taught students of differing identities, including gender nonconforming and LGBTQ students.

82.      In their classrooms, GAE members strive to provide their students with age and ability appropriate content that includes materials that are germane to the CCSD curriculum and that recognize people of differing identities, including gender nonconforming and LGBTQ people.

83.     GAE members seek to foster safe and inclusive learning environments for all of their students and understand the importance of instruction that ensures students of differing identities, including gender nonconforming and LGBTQ identities, are represented in the curriculum. They seek to include age-appropriate books that include LGBTQ characters in their classroom libraries.

84.    GAE members fear adverse employment action should they guess wrong as to what curricular materials CCSD believes are "divisive," "sensitive," or "controversial."  Given CCSD's open hostility towards any actions or support for gender nonconforming and LGBTQ people, as evidenced by Rinderle's highly publicized termination for reading *My Shadow is Purple*, GAE members fear adverse employment action if they provide age and ability appropriate information and materials about LGBTQ or gender nonconforming individuals to their classes.

85.    Grimmke is the mother of a CCSD graduate. Grimmke's daughter openly identifies as a member of the LGBTQ community and did so when attending CCSD.

86.    Grimmke strives to make her classrooms and school communities safe and welcoming for all students, including LGBTQ and gender nonconforming students, to learn and grow. From the gymnasium to the playground to the cafeteria, Grimmke has students who are LGBTQ and gender nonconforming and who are subjected to bullying and harassment, including students who have been subjected to slurs, derogatory language, and isolation. Grimmke hesitates about how or if to intervene in these situations or whether to communicate the impropriety of this behavior, because she fears retaliatory disciplinary action, including being terminated, like Rinderle.

87.    Other GAE members have the same concerns as Grimmke and similarly hesitate to advocate for these students or intervene to prevent bullying and harassment of LGBTQ and gender nonconforming students. For example, they are uncertain whether they would be disciplined for addressing the bullying of students who wear clothes perceived as violating traditional sex stereotypes, or whether they can tell students that they should be respectful of the diverse gender identities of their classmates.

88.    In the coming school semester and thereafter, but for the Censorship Policies, GAE members, including Grimmke, would include in their classroom libraries age and ability appropriate books that contain LGBTQ and/or gender nonconforming characters and would intervene in anti-LGBTQ bullying without hesitation.

CCSD Enforces the Censorship Policies Against Rinderle

89.     Two days after Rinderle read *My Shadow Is Purple* to her class, a parent of one of Rinderle's students emailed a complaint to Principal Kale expressing "outrage" that "a book with such content was even allowed to be pushed on [her] child."

90.     Within an hour of Principal Kale receiving the complaint, she forwarded it directly to CCSD's central office. Kale quickly replied to the parent that she was unaware that Rinderle had read the book and apologized twice. Kale did all of this before speaking with Rinderle about the book or reading the book herself.

91.     By way of information and belief, Principal Kale has never previously apologized to a parent raising concerns about alleged classroom content without first reading the material or speaking to the teacher.

92.     By way of information and belief, Principal Kale has never immediately forwarded a complaint about educational material to CCSD's central office or otherwise elevated a parent complaint related to a disagreement about classroom discussion or content before first reading the material or speaking to the teacher.

93.     On the same day and a few hours later, a second parent emailed a complaint challenging Rinderle's reading of the book and stating, "[A]nything in the genre of 'LGBTQ' and 'Queer' was divisive."

94.     CCSD's central office was also notified of the second parental complaint. CCSD immediately removed Rinderle from her classroom and placed her on administrative leave beginning on March 13, 2023, until May 5, 2023, while CCSD investigated whether Rinderle violated CCSD's Censorship Policies.

95.     CCSD's investigation was inadequate, biased, and flawed. Defendant Dowd oversaw the investigation and presented the findings to Defendant Ragsdale and the Board. Dowd chose to only interview the few students in the class whose parents complained about the book, and none of the parents who supported the reading of the book. Dowd's biased supervision of the investigation resulted in material witnesses not being interviewed, false claims of dishonesty being raised, and inaccurate reporting of Rinderle's conduct. For example, Dowd and Ragsdale claimed

that Rinderle failed to provide a required math lesson to her students on the day she read *My Shadow Is Purple* and failed to produce evidence that she completed the math lesson. These claims were false.

96.   At least two Black parents emailed Principal Kale about the reading of *My Shadow Is Purple* in Rinderle's class, expressing support for Rinderle and the book's subject matter. CCSD did not interview the Black parents or their Black children. Nor did CCSD administrators meaningfully respond to the Black parents' emails.

97.   Upon information and belief, these Black parents and their Black children supported reading the book because of its theme of acceptance of differences and of self.

98.   A.A. and B.A. were in disbelief in March of 2023 when they heard that Rinderle had been removed from her classroom for reading an age-appropriate book simply because it featured a gender nonconforming character. A.A. and B.A. assumed what they heard was a rumor. Weeks later, one of A.A.'s friends tearfully confirmed to A.A. that a guidance counselor told a class of students that Rinderle had been disciplined for reading *My Shadow Is Purple*. A.A. and B.A. were never interviewed or asked to provide input on Rinderle or *My Shadow Is Purple*. A.A. was confused and upset when she learned of Rinderle's removal and feared having to attend school without Rinderle's availability to provide emotional support.

99.   At several investigative meetings, CCSD investigators and administrators claimed that any references to gender nonconformity or LGBTQ topics in class would be considered "divisive" or "controversial," and the introduction of those topics into a classroom discussion violated CCSD's Censorship Policies.

100.   Rinderle openly disagreed with CCSD's post-hoc interpretation and unanticipated enforcement of the vague Censorship Policies, including CCSD's position that the existence of LGBTQ people and families, or LGBTQ topics, are per se "divisive," "controversial," "sensitive," or prohibited from classroom discussions.

101.   Rinderle told CCSD investigators and administration that she bought the book at a school book fair because she believed it would benefit certain students in her class and was representative of student experiences.

102.   At one investigative meeting, Principal Kale described her initial conversation with Rinderle, identified the concerns that Rinderle had shared with Kale prior to the investigation, and stated her understanding as to why Rinderle read the book: "[Y]ou mentioned the three students – that could identify with the topics in the book . . . . Then you mentioned, like, that there's kids in the hall saying things about other people, you know, sometimes and you wanted – you were bringing people together. You said you heard people say things in the hallway in passing or a child . . . ." Kale also communicated that she understood that Rinderle read the book because students in her class were struggling with understanding gender identity.

103.   In the investigation, Rinderle also shared with Dowd and other CCSD administrators that she witnessed Due West students engaged in anti-LGBTQ bullying directed at A.A. and other students. And Rinderle reminded CCSD administrators that she previously raised concerns to parents and the school's administration about the anti-LGBTQ bullying, which were not addressed.

104.   Rinderle made clear during CCSD's investigation that "the book is representative of the community," and she could not answer whether the book was "divisive," "controversial," or contained "sensitive" materials since she did not know the meaning of those undefined terms used in CCSD's policies.

105.   However, according to Defendant Dowd's remarks after CCSD removed Rinderle from her classroom, CCSD found *My Shadow is Purple* controversial because it portrays a traditionally male-presenting child wearing traditionally feminine clothing and because the main character "is an individual who is… at the end is dressed in what we consider traditional female garb, traditional male garb up top."

106.   According to Principal Kale and CCSD's administration, as explained after CCSD removed Rinderle from her classroom, the Censorship Policies' prohibition on "controversial," "divisive," or "sensitive" topics turns on whether "two people disagree" (including any two parents) or whenever there are two sides to an issue. If so, a topic is deemed "controversial" under the Censorship Policies.

107.   According to Assistant Superintendent Gretchen Walton, *My Shadow Is Purple* is controversial because the "boy [sic] wears a suit top made by his father, a traditional outfit for a male at a dance and then wears a skirt made by his mother."

108.   CCSD has a progressive discipline policy (*GBK-R Discipline, Suspension, and Dismissal of Staff*), under which "disciplinary actions normally follow a gradually escalating path." The policy states that "[a]ll administrators and supervisors will utilize progressive discipline in the treatment of all employees under their supervision." According to CCSD's policy, "[e]xcept in rare cases or cases involving serious offenses, employees should be progressively disciplined prior to termination."

109.   On May 5, 2023, CCSD notified Rinderle of its decision to recommend her termination to the Board. CCSD did not follow its progressive discipline policy by imposing a less severe form of discipline prior to recommending termination. By way of information and belief, CCSD has not previously recommended an unblemished educator's termination for the content of a single book read aloud in school. Nor has CCSD previously recommended that any educator be terminated for reading a book aloud that featured children in gender conforming roles.

110.   Despite knowing that Rinderle's only alleged infraction consisted of reading a book about inclusion and acceptance of children whose gender identity or expression challenged sex stereotypes, Superintendent Ragsdale issued a "Notice of Charges" letter to Rinderle, on June 6, 2023, notifying her of CCSD's intent to terminate her employment contract for insubordination, willful neglect of duties, and any other good and sufficient cause. The letter restated CCSD's position that the content of Rinderle's lesson utilizing *My Shadow is Purple* "was a controversial subject (gender identity/fluidity) that is not an appropriate school topic for ten and eleven-year-old students."

111.   CCSD also charged Rinderle, *inter alia*, with an "unwillingness to acknowledge that [her] conduct was inappropriate and/or the actual topic of this book," which caused CCSD "to lose confidence in [her] ability to exercise appropriate judgment as a teacher." Ragsdale's letter stated that Rinderle's actions violated the Censorship Policies, among other allegations.

RINDERLE CHALLENGES HER TERMINATION

112.   Rinderle's recommended termination for merely reading an age-appropriate and award-winning book about acceptance told through the lens of a gender nonconforming character made local, national, and international news throughout the summer of 2023.

113.   After being placed on leave, Rinderle continued to publicly oppose the Board's openly hostile position towards the LGBTQ community, as well as CCSD's interpretation and enforcement of its vague Censorship Policies, which she reasonably and in good faith understood to be a violation of Title IX.

114.   In news media, Rinderle defended reading *My Shadow Is Purple* as an important teaching opportunity about inclusion and acceptance of differences consistent with the Georgia and CCSD gifted curriculum and standards. Rinderle's actions and public statements were grounded in a good faith, reasonable belief that CCSD's openly hostile position towards the LGBTQ community contributed to a hostile educational environment, and that CCSD's knowledge of and deliberate indifference towards the hostile educational environment for LGBTQ and gender nonconforming students, including A.A., that permeated Due West, violated Title IX. She also had a good faith, reasonable belief that CCSD's interpretation and enforcement of its Censorship Policies were discriminatory under Title IX, and she publicly communicated her opposition through media interviews.

115.   On June 22, 2023, Rinderle publicly stated her belief that "[w]hat happened to me is not just about me." According to Rinderle, "[i]t's the impact of what is being communicated to students – that it is acceptable to prioritize

behaviors and attitudes rooted in bias and discrimination rather than ensuring that students' backgrounds, experiences and identities are seen, heard, connected and honored in their learning experience."

116.    Rinderle publicly stated that an email from a parent and fellow CCSD teacher prompted CCSD to investigate and remove her from her teaching position. The email said that "anything in the genre of 'LGBT' and 'Queer' was divisive." By CCSD's statements and actions against Rinderle, it adopted and enforced that discriminatory viewpoint.

117.    Through Rinderle's widely publicized statements, and as reflected by CCSD's responses to her public comments, which the media published, CCSD, the Board, Ragsdale, and Dowd knew of Rinderle's opposition to CCSD's openly hostile position towards the LGBTQ community and its deliberate indifference towards the hostile educational environment for LGBTQ and gender nonconforming students, and of her belief that CCSD's actions violated students' rights under Title IX.

118.    Prior to her termination hearing, rather than remain silent on an employment matter, CCSD made several false public comments attacking Rinderle's employment history and performance in retaliation for her public condemnation of their discriminatory treatment of LGBTQ students. The Board and CCSD representatives repeatedly stated that Rinderle had a history of poor performance. Those statements were untrue. Rinderle had received unblemished and exemplary performance evaluations for ten consecutive years.

119.    Rinderle exercised her right to challenge CCSD's recommendation to terminate her employment contract, and a hearing was scheduled under Georgia's Fair Dismissal Act.

120.    Under the Fair Dismissal Act, the Board has final policymaking authority over matters of employment of CCSD teachers. As provided in the Fair Dismissal Act, the Board designated a three-member tribunal panel ("Tribunal") to submit findings and recommendations to the Board. A two-day hearing occurred on August 10-11, 2023.

121.   The Tribunal deliberated and rejected Defendant Ragsdale's recommendation that CCSD terminate Rinderle. By way of explanation for its determination, the Tribunal handwrote the parts of CCSD's proposed "Findings of Fact and Recommendations to the Cobb County Board of Education" which it accepted and rejected.

122.   The Tribunal found that CCSD should not terminate Rinderle's employment contract for reading *My Shadow Is Purple* and expressly rejected much of CCSD's evidence and contentions.

123.   On August 17, 2023, the Board met to consider the Tribunal's recommendation and take official action. The Board allowed public comment, and several spoke in support of Rinderle, including CCSD educators, students, community members, parents, and caregivers. They reiterated that there are LGBTQ and gender nonconforming students at Due West and throughout CCSD, that anti-LGBTQ bias is pervasive in CCSD, and that CCSD should not tolerate it.

124.   Cobb County resident Beverly Wynne said four of her six children attended Due West, including one now adult child who experienced homophobic abuse from another student.

125.   Erin Elwell, President of the Marietta PFLAG chapter, a group for LGBTQ individuals, families, and their allies in Cobb County, spoke to widespread bullying of LGBTQ and gender nonconforming students and how inclusive classrooms can support these students.

126.   Former CCSD teacher Kim Carlton, who retired during the prior year due to her concerns about being punished for speaking freely in the classroom, said, "This sends a message to every teacher in Cobb County and probably in the state that you should not step out of line."

127.   Current CCSD teacher Anna Clay poignantly stated, "Some students are boys. Some are girls. Some are neither. Some are trans. Some are still figuring it out. They all deserve to be welcomed. They all deserve to be treated with respect. They all deserve to be represented in the classroom." Ultimately, the Board Majority disagreed.

128.   Defendant Chastain moved to adopt the Tribunal's findings but to override the Tribunal's recommendation against termination and instead terminate Rinderle's employment. Defendant Sayler moved to table the decision to give the Board a chance to consider the entire record.

129.   Along partisan lines, the Board Majority voted 4-3 against Sayler's motion and in favor of Chastain's motion. The Board did not explain its decision or why it veered from its standard practice of accepting the Tribunal's recommendation, stating inscrutably that the "findings of fact of the Tribunal are adopted in full and the employment contract of Katherine Rinderle is terminated."

130.   Rinderle's termination resulted from and was in retaliation for her reading a book about a gender nonconforming character, her advocacy for LGBTQ and gender nonconforming students, and her opposition to discrimination against students due to their nonconformity with gender roles and sex stereotypes.

131.   Rinderle appealed her termination to the Georgia State Board of Education, which affirmed the decision, and she subsequently appealed to the Superior Court of Cobb County, which is currently considering her appeal.

### ENFORCEMENT OF THE VAGUE CENSORSHIP POLICIES BY THE BOARD MAJORITY AND CCSD HAS A SIGNIFICANT IMPACT ON GAE AND ITS MEMBERS IN CCSD

132.   CCSD's interpretation and enforcement of its vague Censorship Policies, embraced and applied by the Board Majority, has forced GAE to divert substantial resources, including staff time, monetary expense, organizing capacity, and political capital, to mitigate the harm to members who work in the school district.

133.   GAE has been required to divert resources away from its planned organizing, legislative advocacy, and legal activities towards providing support to members who have been subjected to or threatened with adverse employment action for an alleged violation of the Censorship Policies, to members who wish to teach curriculum or engage in classroom instruction that may implicate the Censorship Policies, to members who are unclear about the meaning of the Censorship Policies, to members who are fearful that CCSD will enforce the Censorship Policies

against them or their colleagues, or to members who have self-censored or otherwise changed their classroom instruction and instructional materials in an attempt to avoid the same fate as Rinderle.

134.   Counteracting Defendants' enforcement of the vague Censorship Policies has reduced the amount of monetary resources, staff time, and organizing capacity available to GAE to advance the organization's mission and goals, including advocating for its members, representing its members within the state legislature and state agencies, and convening coalitions to support public education and public school educators.

135.   GAE's expenditures include paid staff time to meet with individual members regarding the Censorship Policies, legal fees from outside counsel, paid staff time to organize and attend in-person listening events to address members' concerns and gather information about the ongoing impact of the Censorship Policies on educators, students, and their families, and other logistical and transportation costs.

136.   But for Defendants' enforcement of the Censorship Policies, GAE would focus its advocacy, staff time, political capital, organizing capacity, and monetary resources on other pressing issues facing public education and public school educators, including labor rights, school funding, school safety, professional development, workplace conditions, mental health, and teacher pay.

137.   GAE will be forced to continue diverting monetary resources, staff time, and organizing capacity to mitigate the harms caused by the vague Censorship Policies so long as Defendants continue to enforce such policies against GAE members and subject GAE members to adverse employment action if they are deemed to have violated such policies.

138.   Defendants' interpretation and enforcement of the Censorship Policies frustrates GAE's mission and goals to provide support to students and educators in Georgia's public schools.

CCSD HAS A HISTORY OF HOSTILITY TO THE LGBTQ COMMUNITY

139.   With approximately 107,000 students, CCSD is Georgia's second-largest school district and one of the largest school districts in the United States.

140.   CCSD has a substantial and vibrant community of students, families, teachers, and staff, which is broadly diverse, including many who are members of and advocates for the LGBTQ community. Slightly over one-third of CCSD students are white, slightly under one-third are Black, one-fourth are Hispanic/Latine, and just under five percent identify as multiracial. Nationwide, approximately nine percent of students are estimated to be LGBTQ, and there is no reason to believe that percentage does not hold true in the CCSD student population as well.

141.   From 2020 to 2023, the Due West administration was aware of and deliberately indifferent to severe and pervasive anti-LGBTQ actions, yet failed to take necessary and appropriate steps to eliminate anti-LGBTQ hostility at school. Moreover, the Due West administration's actions increased the likelihood of anti-LGBTQ hostility.

142.   Within the past five years, teachers and administrators in CCSD have knowingly and intentionally addressed gender nonconforming students by their birth or given name after they changed that name – conduct referred to as "deadnaming" – which demeans the dignity of students by undermining their gender identity.

143.   In December 2023, the Cobb County Courier reported that CCSD currently employs three staff members in its executive cabinet and central office who are or have been affiliated with Gary DeMar, the leader of the Cobb County based anti-LGBTQ group, American Vision. Gary DeMar often communicates his anti-LGBTQ beliefs, and he has called for the death penalty to punish LGBTQ people. By way of information and belief, these three individuals remain employed with CCSD despite their known affiliation, and are actively involved in practices and decisions impacting Plaintiffs.

144.   At least two of the aforementioned CCSD employees reportedly had publicly known past employment affiliations with Gary DeMar before they became employed in CCSD's communications department, which drafted

and released public press statements and information about Rinderle's termination and past employment during the summer and fall of 2023. One of those two employees reportedly has previously authored articles attributing "the existence of HIV/AIDS to the LGBTQ community's 'negative and immoral behavior,'" and written that "being homosexual is one of the most deleterious choices one can make for their health."

145.   Several high ranking CCSD employees are publicly known for their anti-LGBTQ beliefs, including Defendant Dowd, who is a former Atlanta Police Department officer. In 2009, Dowd took part in an infamous unlawful raid on an Atlanta gay bar during which police forced gay patrons to lay face down on a beer-soaked floor and a fellow officer testified that Dowd made anti-LGBTQ statements. In a civil rights lawsuit which settled, defendants – including Dowd – were found to have "unlawfully searched, detained, and/or arrested" dozens of gay men despite "that none of the Plaintiffs was personally suspected of any criminal activity" and no evidence of criminal activity was found. Dowd was also found by an independent investigation to have violated policy and procedure related to the illegal raids. CCSD hired Dowd after he left the Atlanta Police Department.

146.   Since Rinderle's termination, Defendants CCSD and Ragsdale have removed many LGBTQ-themed books, including *Flamer*, *The Perks of Being a Wallflower*, *Beyond the Gender Binary*, and *All Boys Aren't Blue*, from CCSD schools and libraries, and Ragsdale has publicly justified the removal of books by stating that the "situation is about...good and evil" on more than one occasion.

### THE HARM OF CCSD's CENSORSHIP POLICIES ON LGBTQ STUDENTS AND FAMILIES, INCLUDING STUDENT PLAINTIFFS

147.   Rinderle, Grimmke, and other GAE Members have taught or teach LGBTQ and gender nonconforming students, like A.A. and GYJCA's CCSD student members, and supported them in school, in the hallways, on the playground, and in the lunchroom.

148.   A.A.'s gender expression and transition come from her genuine convictions about her true identity, as observed by her mother, B.A., from the age of two. It is important for A.A.'s health, well-being, and happiness that she be allowed to prioritize her true self over social expectations about how she should dress and behave because she was assigned male at birth. CCSD's Censorship Policies prevent this, perpetuate harm, and stigmatize her identity instead, as further explained herein.

149.   This harm followed A.A., after Rinderle's termination, to McClure as a sixth-grade student for the 2023-2024 school year. A.A. lives in a state of uncertainty, being forced to expend focus and energy, that should be devoted to her studies, inventing stories and justifications to avoid discovery of and explain her gender transition, sometimes as a result of school officials' unwillingness to accommodate the needs associated with her gender identity.

150.   For example, one middle school classmate outed A.A. as a transgender girl to all of her new friends. As a cover story, A.A. told her friends that she had been born a girl and pretended to be a boy when she was younger, dressing as such. In another incident, A.A.'s school refused to modify A.A.'s name on its rosters and official records to reflect her female gender identity despite B.A.'s repeated requests that they do so. This caused A.A.'s former name, typically associated with males, to be called out repeatedly in front of her large chorus class. Once again, A.A. was quick to invent a cover story, telling her classmates that her mother was "crazy" and gave her an inherited family name even though it is typically associated with boys. These efforts are necessary for her physical and emotional safety given the torment that would follow the discovery that she is transgender amid CCSD's pervasive anti-LGBTQ climate and messages that LGBTQ and gender nonconforming students are unwelcome and shameful, as conveyed through the enforcement of the Censorship Policies against Rinderle. A.A. and B.A. believe that A.A. should not have to attend a school environment where she is constantly under threat of having her personal identity and information outed and is forced to invent lies for her own protection and safety.

151.   In another event, McClure held a school dance, which A.A. was excited to attend early in the school year. A.A. requested that B.A. buy her a dress for the special occasion. B.A. was nervous about this public display of A.A.'s gender identity. B.A. had previously requested that A.A. be permitted to use the faculty restroom. This request was granted. B.A. asked that A.A.'s photograph be shared with custodians and other school employees who might question A.A. for using the faculty restroom and that she be provided a tour of where the restrooms were located. This was not done. And although the dance was on school premises, it was in a school location that A.A. did not frequent. So, A.A. did not know where the nearest faculty bathroom was. A.A. asked a friend to show her the bathroom, and her friend led her to the girls' bathroom. After using the bathroom, the vice principal pulled A.A. into the hallway and told her that she was not allowed to use the girls' bathroom. Standing a small distance away was A.A.'s math teacher, who had been the one who spotted A.A. entering the girls' bathroom and informed the vice principal, instead of escorting A.A. to the faculty bathroom. The school's public and punitive approach to addressing the situation isolated, stigmatized, and harmed A.A., and could have resulted in A.A. being outed to her classmates. A.A. has also been questioned and challenged by janitorial staff at school for using the faculty bathroom.

152.   B.A. fears for A.A.'s safety and fights a constant battle to ensure A.A. is not outed in school, the consequences of which would expose her child to devastating physical and emotional harm and impede her ability to access her education. The school's lack of cooperation with A.A.'s family, along with Defendants' Censorship Policies and public disapproval of gender nonconforming and LGBTQ people aggravates and escalates this situation. As a result, B.A. is constantly subjected to stress and anxiety to protect A.A. from being involuntarily outed in a severe and pervasively hostile educational environment in which Defendants and other CCSD officials openly disapprove of A.A.'s gender identity.

153.   B.A. believes that Rinderle's termination under the Censorship Policies and CCSD's ongoing delay and unwillingness to accommodate A.A.'s needs associated with her gender identity make explicit that Defendants view something wrong with A.A. and her family.

154.   A.A. and B.A. want Defendants to allow educators to teach children that gender nonconforming, non-binary, and transgender people exist, including among their classmates and that it is important to treat these students with respect. A.A. and B.A. know that A.A.'s educational experience, her ability to focus on learning, and her social and emotional wellbeing would be greatly improved, since many of her classmates' comments come from a lack of knowledge and understanding, if teachers felt able to validate and educate students about gender nonconforming people and address bullying which targets gender identity. But Defendants' enforcement of the Censorship Policies prevents this from happening.

155.   Both A.A. and B.A. suffer emotional pain, fear, anxiety, and feel hurt, offended, and betrayed by Defendants' decision to terminate Rinderle. They want A.A. and her peers to have access to *My Shadow Is Purple* and similar books featuring gender nonconforming characters who reflect A.A.'s identity and experience at school. They believe that it is wrong for Rinderle to lose her job just because she wanted to help students understand those who are different from themselves and improve the school environment to be more inclusive for students who do not fit in, including A.A. And they believe CCSD has an obligation to welcome and promote the wellbeing of all students regardless of their race, gender identity or expression, or background.

156.   By firing Rinderle and prohibiting educators from discussing gender nonconforming and non-binary people with students, A.A. and B.A. believe that Defendants communicated the message to every CCSD student and family that there is something wrong with people who do not conform with binary gender expectations that they are so objectionable that teachers who include them in their pedagogy must be fired and their teaching licenses revoked.

157.   GYJCA's student members, as well as CCSD's broader LGBTQ student community, have also experienced educational and emotional harm from being unwelcomed and disapproved of by CCSD based on their gender nonconforming or LGBTQ identities, including bullying, harassment, and discrimination against them. They do not often feel supported and protected at school. And this stigmatization and lack of support harms their motivation, focus, and engagement in school.

158.   GYJCA's CCSD student members who are gender nonconforming or LGBTQ and CCSD's other LGBTQ and gender nonconforming students have had their identities banned from CCSD's pedagogy and educational materials, and they have experienced stigmatic harm by having their personal gender identities labeled as "age inappropriate," "divisive," and "controversial." These students want immediate access to pedagogy, classroom library materials, supplemental learning resources, informal lessons, advice, and validation from their educators that is inclusive and representative of their identities. GYJCA student members and many LGBTQ students at CCSD also want educators who defend and support them when they face bullying, harassment, and discrimination targeted at them for their identities and who proactively seek to improve their learning environments by providing inclusive education about gender nonconforming and LGBTQ people.

159.   It has been documented in a publicly available complaint with the Office of Civil Rights at the United States Department of Education ("OCR Complaint") that students at CCSD's Walton High School attempted to start a Gay-Straight Alliance (GSA). However, administrators at the school prohibited the GSA because it would be "too divisive" – mirroring language from the Censorship Policies. This is an example of a larger pattern of CCSD schools "discriminating against," "ignore[ing,]" and "suppress[ing]" LGBTQ students and topics. In that same OCR Complaint, a former CCSD student reported that a school librarian discussed concerns about censorship and that he would not be able to "officially recommend" books for students, specifically naming *All Boys Aren't Blue*, a story about a non-binary person. The OCR Complaint also documented that Defendants' targeting of LGBTQ books and

content has magnified the fears of LGBTQ students and that "it's taken a toll on their mental health … knowing [these attacks are] happening to [them] now."

160.   At the Board's December 2023 meeting, a student spoke about how CCSD's censorship of inclusive books has created more fear and concerns in LGBTQ students over safety and hostile learning environments. Another former CCSD student noted that by banning books featuring LGBTQ people as characters or discussing LGBTQ identity, the Board was "saying [her] identity is 'inappropriate' – and that is definitely a hostile environment." And another student commented that books concerning "minority groups, like Black or brown or LGBTQ people … usually won't be approved."

161.   At the Board's January 2024 meeting, another student publicly commented that Defendants' "hostile attacks on our identity via book bans" indicates its hostility towards a "welcoming environment for LGBTQ students." And in February 2024, another student said that because of the "impact and direction of banning books," she believes that "students generally feel their identities are being invalidated, and that the Board does not see them as equally or they do not take them and their diverse identities seriously."

162.   Defendants' public anti-LGBTQ hostility makes students feel unsafe to speak at school board meetings about the harmful impact of Defendants' Censorship Policies. A student in the OCR Complaint identified Rinderle's termination and the fact that "a lot of administrators attended the board meetings and [that he knows] they're against supporting the LGBTQ community at [his high school] in general" make speaking about the impact of censorship "a tall ask for students who feel unsafe – and there have been many moments where I have felt unsafe myself."

163.   Some of GYJCA's student members have teachers who, but for Defendants' enforcement of the Censorship Policies, would immediately or imminently provide them with information, answers to their questions, content in their pedagogy and curriculums, and support and acknowledgment regarding nonbinary, transgender, and gender nonconforming identities and expression.

164.   Defendants' unlawful and discriminatory enforcement of the Censorship Policies has forced GYJCA to divert substantial amounts of its limited resources, including staff time, members' voluntary hours, monetary expense, and political capital, to mitigate and counteract the harm on CCSD's gender nonconforming and LGBTQ students and families. GYJCA does this by primarily advocating that Defendants and CCSD staff repeal the vague Censorship Policies.

165.   GYJCA has been required to divert resources to protect gender nonconforming, LGBTQ, and all students from discrimination on the basis of gender identity, sexual orientation, and sex stereotypes, as well as ensuring that students receive access to diverse, truthful, and LGBTQ-inclusive education, aligned with its core organizational mission.

166.   Counteracting Defendants' unlawful actions has reduced the amount of available resources that GYJCA would have spent elsewhere advocating for improvements in student rights, school resources, school conditions, mental health services, voter engagement, and other issues facing Georgia's students.

167.   GYCJA's expenditures include paid staff time for GYJCA members, organizing a press conference before the Board's September 15, 2023 meeting to advocate against pedagogical, curricular, and library restrictions at CCSD, including the Censorship Policies being challenged in this suit, and other monetary expenses for logistical and transportation costs. This press conference also required GYJCA to dedicate limited unpaid time of its student members to participate. Students' attendance at that meeting and press conference comes at great difficulty given students' challenges with mobility in that many of them cannot drive themselves to the meetings even though they are among the most directly impacted by CCSD's policies.

168.   GYJCA's development of a core issue campaign – "Freedom to Learn and Be Ourselves" – was motivated significantly in response to CCSD's interpretation and enforcement of its vague Censorship Policies and other anti-LGBTQ conduct. GYJCA has also been forced to direct resources to pay employees and staff members to

support student members in attending the Board's meetings to regularly advocate against CCSD's discriminatory and severe Censorship Policies.

169.   GYJCA will be forced to allocate many of the limited spots in its Changemakers Bootcamp program, which trains youth in legislative advocacy, electoral campaigning, and community organizing, to CCSD youth in order to combat Defendants' Censorship Policies. The locations of the Bootcamps were chosen in part because of their physical proximity to CCSD.

170.   GYJCA will be forced to continue diverting resources to mitigate the harms caused by Defendants' vague Censorship Policies so long as they continue to be enforced in an arbitrary and discriminatory manner against LGBTQ students, families, and the teachers who support them.

171.   GYJCA would (and would have greatly preferred to) focus its advocacy, staff time, member hours, political capital, and monetary resources across a wide range of its projects on other pressing issues of great importance to student wellbeing were it not for Defendants' enforcement of its uniquely severe and discriminatory Censorship Policies.

172.   Defendants' interpretation and enforcement of the Censorship Policies frustrates GYJCA's mission and ongoing projects to promote LGBTQ-inclusive pedagogy, curriculum, and pedagogical and library materials, increase the well-being of LGBTQ students, and protect LGBTQ students from discrimination, stigma, and bullying at school in CCSD.

**CLAIMS FOR RELIEF**

COUNT ONE: VAGUENESS
U.S. CONST. AMEND. XIV

*PLAINTIFFS RINDERLE, GRIMMKE, GAE, GYJCA, AND A.A. AGAINST ALL DEFENDANTS IN THEIR OFFICIAL CAPACITIES
FOR EQUITABLE RELIEF, AND PLAINTIFF RINDERLE AGAINST CCSD FOR DAMAGES*

173.   Plaintiffs incorporate and reallege the following paragraphs 1-172 and assert the following for all times relevant to this action.

174.   The Fourteenth Amendment, enforceable under 42 U.S.C. § 1983, prohibits States and their components from depriving any person of life, liberty, or property without due process of law.

175.   The basic principle of due process requires that laws that regulate persons or entities must give fair notice of forbidden or required conduct.

176.   Government regulations that prohibit conduct are impermissibly vague when they fail to provide people of ordinary intelligence a reasonable opportunity to understand what conduct the regulation prohibits and/or when they authorize or even encourage arbitrary and discriminatory enforcement by failing to provide sufficient guidance to enforcing authorities.

177.   Due process principles apply when the government harms a liberty or property interest protected by the Constitution. Regulations threatening to inhibit individuals' exercise of constitutionally protected rights, including those with a severe penalty or lack of a scienter requirement, receive heightened review for vagueness.

178.   At all relevant times, Defendants acted under color of law in taking the actions described herein.

*Rinderle's Claims*

179.   As a tenured teacher under the Georgia Fair Dismissal Act, Rinderle has a property interest in her employment protected by the Due Process Clause.

180.   During Rinderle's tribunal hearing, CCSD's employees and witnesses had divergent views about what educators can legally teach under the Censorship Policies, highlighting the immense risk CCSD's educators face daily, including the potential loss of their employment and teaching licenses.

181.   Defendants did not define critical concepts in the Censorship Policies, and there is no clear definition of "divisive," "controversial," or "sensitive."

182.   CCSD's training was also inadequate and deliberately indifferent, with Principal Kale simply reading the Censorship Policies verbatim from a PowerPoint presentation without clarifying terms or giving hypothetical examples of what might constitute a violation.

183.   Defendants' Censorship Policies are unconstitutionally vague as applied to Rinderle. Defendants failed, and continue to fail, to provide fair notice, invite arbitrary and discriminatory enforcement, and produce uncertainty about what speech and conduct is prohibited.

184.   Rinderle had no fair warning about the meaning of "controversial," "sensitive," or "divisive." Rinderle had no fair notice that a book about acceptance of different identities and gender nonconformity, purchased at her school-sponsored book fair, violated CCSD's Censorship Policies.

185.   Defendants' Censorship Policies are vague and violate Rinderle's Fourteenth Amendment right to due process.

186.   Unless this Court enjoins Defendants' Censorship Policies to prevent arbitrary and discriminatory enforcement, Rinderle will not have fair warning about what information and material will subject her to adverse employment action when she is reinstated.

187.   Defendants' unlawful conduct has caused and will continue to cause irreparable harm to Rinderle, including violations of her Fourteenth Amendment right to due process.

188.   Rinderle seeks nominal and compensatory damages due to her termination and the adverse employment actions taken against her, and injunctive relief reinstating her to her former position and excising all disciplinary action taken against her according to the activities described herein.

189.   Rinderle seeks declaratory and injunctive relief to prevent enforcement of CCSD's Censorship Policies, IKB and IFAA, that allow for adverse employment action based on discussion or provision of materials that are "controversial," "divisive," and/or "sensitive."

*Claims of GAE Members, including Grimmke*

190.   As a tenured teacher under the Georgia Fair Dismissal Act, Grimmke has a property interest in her employment protected by the Due Process Clause. Many GAE members also hold property interests in their employment protected by the Due Process Clause. Grimmke and other CCSD educators' speech is protected under the First Amendment.

191.   Defendants have not defined critical concepts in the Censorship Policies. There is no reference to what constitutes a "divisive," "controversial" issue or a clear definition of "sensitive."

192.   CCSD's training is inadequate, deliberately indifferent, and fails to clarify terms in the Censorship Policies or provide explanatory hypotheticals.

193.   CCSD's Censorship Policies are vague and violate GAE members' due process rights by inhibiting them from presenting age-appropriate curriculum-related or adjacent information and/or discussions about gender nonconformity, LGBTQ people, characters, and topics, as well as topics that may be considered "divisive," "sensitive," and/or "controversial" under the Censorship Policies.

194.   Grimmke and other GAE members seek declaratory and injunctive relief to prevent enforcement of the Censorship Policies, IKB and IFAA, that allow for adverse employment action based on discussion or provision of materials that are "controversial," "divisive," and/or "sensitive."

*Claims of A.A. and GYJCA*

195.   As public school students, A.A. and GYJCA's gender nonconforming and LGBTQ student members in CCSD want immediate access to *My Shadow Is Purple* and other pedagogy, information, and supplemental materials that are inclusive of their identities, communities, and topics, and they want educators who will defend and support them when confronted with bullying, harassment, and discrimination.

196.   Defendants' arbitrary and discriminatory adoption, interpretation, and enforcement of CCSD's vague Censorship Policies has denied and continues to deny A.A., GYJCA's CCSD student members, and other gender nonconforming or LGBTQ students in CCSD from receiving pedagogy and educational materials that represent and affirm their gender identity and also has inhibited and continues to inhibit CCSD educators from providing them much-needed support and validation when they experience bullying, harassment, and isolation due to their identities.

197.   Prior to Rinderle being placed on administrative leave, A.A. and other students had access to *My Shadow Is Purple* as a student at Due West.

198.   Defendants' enforcement of the vague Censorship Policies removed *My Shadow Is Purple* from A.A.'s school.

199.   Defendants' enforcement of the vague Censorship Policies also removed Rinderle's support and validation of A.A.'s gender identity at Due West.

200.   A.A. and GYJCA want Defendants to allow CCSD educators to teach children that gender nonconforming, non-binary, and transgender people exist, including among their classmates, that being gender nonconforming and LGBTQ should be celebrated like all unique student identities, and that it is important to treat all students with respect.

201.   Defendants' vague Censorship Policies have restricted the educational experiences of A.A. and GYJCA's CCSD student members and stigmatized and harmed them emotionally.

202. Defendants' Censorship Policies and actions as described herein directly and proximately cause A.A., GYJCA's CCSD student members, and other LGBTQ students in CCSD severe and irreparable stigmatic, psychological, and educational harms, including violation of their Fourteenth Amendment right to due process.

203. Defendants' actions also directly and proximately cause the frustration of GYJCA's mission of advancing the well-being of LGBTQ students. GYJCA has and will continue to be forced to divert resources to advocate, protect, and defend LGBTQ students in CCSD from the harm of the Censorship Policies, causing GYJCA to suffer and continue to suffer irreparable harm, including violations of its Fourteenth Amendment right to due process.

COUNT TWO: DEPRIVATION OF EQUAL PROTECTION
DISCRIMINATION ON THE BASIS OF SEX
U.S. CONST. AMEND. XIV

*PLAINTIFFS RINDERLE, GYJCA, AND A.A. AGAINST ALL DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR EQUITABLE RELIEF, AND PLAINTIFFS RINDERLE AND A.A. AGAINST DEFENDANTS RAGSDALE, SCAMIHORN, WHEELER, CHASTAIN, BANKS, AND DOWD IN THEIR INDIVIDUAL CAPACITIES AND CCSD FOR DAMAGES*

204. Plaintiffs incorporate and reallege the following paragraphs 1-5, 8-41, 44-131, 139-172 and assert the following for all times relevant to this action.

205. The Equal Protection Clause of the Fourteenth Amendment, enforceable under 42 U.S.C. § 1983, states that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

206. Defendants' creation and enforcement of the Censorship Policies prohibit, upon pain of termination, teachers from discussing topics, presenting material, or otherwise providing age-appropriate information in or outside the classroom to students about people whose gender expression,  gender identities and/or sexual orientation violate, in Defendants' view, traditional gendered expectations about how people should act, dress, and behave. This is prohibited sex discrimination. Defendants do not enforce their Censorship Policies to prohibit teachers from

41

discussing topics, presenting material, or presenting age-appropriate information about people or characters whose gender expression, gender identities, and/or sexual orientation conform, in Defendants' view, with traditional gendered expectations.

207.   Purposeful discrimination on the basis of sex in violation of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983 includes, but is not limited to, discrimination based on gender, gender nonconformity, transgender status, gender expression, and gender identity.

208.   Under the Equal Protection Clause, government classifications based on sex or sex stereotypes are presumptively unconstitutional and subject to heightened scrutiny.

209.   Government action that discriminates on the basis of sex must be substantially related to a sufficiently important government interest. That interest must be genuine, neither hypothesized, invented in response to litigation, nor grounded in fixed notions concerning the roles of males and females.

210.   No rational reason exists, let alone an exceedingly persuasive reason, for the Censorship Policies and their discriminatory impact on Plaintiffs.

211.   All people, regardless of gender identity, are protected from discrimination on the basis of sex stereotypes.

212.   Sex stereotyping occurs when the government discriminates on the basis of behavioral norms and expectations defined by gender.

213.   Defendants interpret the Censorship Policies to mean that gender nonconformity and non-binary gender identity are such age-inappropriate, "controversial," "political," and "divisive" topics and viewpoints that any references to these identities, communities, and topics must be censored from all pedagogy, curricula, and educational materials in CCSD.

214.  Defendants consider these communities so objectionable that they fired a ten-year teacher with uniformly excellent performance reviews for reading one age-appropriate book involving a nonbinary character to her class. And Defendants have demonstrated that teachers who refuse to comply with and otherwise enforce Defendants' discriminatory policies regarding gender must be disciplined and/or terminated.

215.  Defendants' enforcement of the Censorship Policies effectuate the erasure and stigmatization of gender nonconforming and LGBTQ students and families by singling their identities out for official disapproval as "controversial" and "age-inappropriate," denying them access to materials and curriculum that represent their identities, families, and communities, and chilling CCSD's educators from affirming their identities and effectively addressing anti-LGBTQ harassment.

216.  A party harmed as a result of government action which intentionally discriminates against persons with whom they have a sufficiently close relationship so as to ensure that they will be a zealous advocate of the legal rights of those persons has standing to challenge that action under the Equal Protection Clause. Specifically, educators have standing to bring an Equal Protection challenge to discriminatory action targeting a class of their students to remedy direct harm to themselves caused by that action.

217.  At all relevant times, Defendants acted under color of law in taking the actions described herein.

*Claims of A.A. and GYJCA*

218.  Defendants' enforcement of the Censorship Policies discriminates against similarly situated students and families based on whether their gender identities, gender expression, and/or sexual orientation align with traditional gender roles and sex stereotypes.

219.  Defendants officially and publicly justify their censorship of all references to gender nonconformity and non-binary gender identities as age-inappropriate and objectionable based on the demeaning assumption that because

43

people are assigned a particular sex at birth, they should conform to particular gender-based stereotypes - and if they do not, their identities must be censored from the pedagogy and curricula of Defendants' schools.

220.  In doing so, Defendants communicate to CCSD students whose gender identities, gender expression, and/or sexual orientation do not conform to the sex stereotypes Defendants seek to enforce ("gender nonconforming students") and families with gender nonconforming members ("gender nonconforming families") that it is CCSD's official position that there is something wrong with their identities and that they should feel inferior to students and families whose gender identities and expression, in Defendants' view, sufficiently conform to gender stereotypes ("gender conforming students" and "gender conforming families").

221.  Defendants discriminate against gender nonconforming students and gender nonconforming families, including A.A. and members of GYJCA, by sending the officially sanctioned message that there is something wrong with them or their families – that because of their nonconformity with gender stereotypes, their gender identities, gender expression, and/or sexual orientation are so "controversial," "politically divisive," and "age-inappropriate" that they must be censored entirely from CCSD's pedagogy and curriculum.

222.  This sense of inferiority affects the ability and motivation of children to learn, harming their educational and mental development.

223.  Discrimination that promotes demeaning stereotypes of students and families based on protected characteristics violates the Equal Protection Clause.

224.  Gender nonconforming students and gender nonconforming families are also discriminated against by being denied access to any material or information that supports, affirms, or otherwise reflects their sexual orientation, gender identities, or gender expression.

225.  Further, Defendants' Censorship Policies discriminate against gender nonconforming students by barring their teachers, without limitation, from: affirming gender nonconforming students' identities and existence;

44

educating gender nonconforming students' peers about LGBTQ people, including transgender and nonbinary people, and the need to treat them with respect and dignity; and responding effectively to anti-LGBTQ messages, bullying, and/or harassment. As a result, Defendants' Censorship Policies also discriminate against gender nonconforming students, including A.A. and GYJCA members, by denying them support and protection from their educators against anti-LGBTQ hostility.

226.    In contrast, gender conforming students and gender conforming families are sent welcoming and affirming messages regarding their sexual orientation, gender identities and/or gender expression. These students and families are spared the demeaning, officially-sanctioned stereotypes and stigma which Defendants inflict upon gender nonconforming students and gender nonconforming families.

227.    And gender conforming students and gender conforming families are routinely provided information, lessons, and access to material that reflects and affirms their identities.

228.    Rinderle's termination, based on her having read an age-appropriate book about acceptance and gender nonconformity, and Defendants' discriminatory interpretation and enforcement of the vague Censorship Policies, sends a clear message to gender nonconforming students and gender nonconforming families, including A.A. and GYJCA members, that unlike similarly situated students, they are not respected, valued, and/or safe in CCSD.

229.    Defendants' enactment and enforcement of the Censorship Policies were motivated by a desire to discriminate against gender nonconforming students and gender nonconforming families, like A.A. and GYJCA's student members.

230.    The differential treatment and its detrimental impact is based on Defendants' insistence on stigmatizing and stereotyping gender nonconforming students and gender nonconforming families as "controversial," "divisive," and "age-inappropriate" by censoring them entirely from curricula and pedagogy based on their nonconformity with traditional gender roles and sex stereotypes.

231.   Such discrimination inflicts stigmatic, emotional, and educational harms on gender nonconforming students and gender nonconforming families that is offensive to the Constitution and serves no legitimate government interest.

232.   As a direct and proximate result of the Censorship Policies, A.A. and GYJCA members have been made to feel unequal, unwelcome, and unsafe, and are not provided an equal educational environment in which to learn and thrive. CCSD's Censorship Policies have also negatively impacted A.A. and GYJCA members' sense of safety, motivation, and engagement in school, causing them stigmatic, educational, and emotional harms.

233.   But for Defendants' Censorship Policies, practices, and actions, some educators in CCSD, including GAE members, would provide safer and more inclusive environments for gender nonconforming students by presenting information about gender identities and/or expression that, like their own, do not conform to sex stereotypes. A.A. and GYJCA members would subsequently be afforded an equal learning environment, like their peers, free from sex discrimination based on sex stereotyping.

234.   As a direct and proximate result of Defendants' interpretation and enforcement of the Censorship Policies, A.A. and GYJCA members have suffered and will continue to suffer irreparable harm, including violations of their Fourteenth Amendment right to equal protection – violations that will continue unabated absent prospective injunctive relief.

235.   As a direct and proximate result of Defendants' Censorship Policies and enforcement, GYJCA's mission of advancing the wellbeing of LGBTQ students has been frustrated, and GYJCA has and will continue to be forced to divert resources to protect CCSD's LGBTQ students, including many of its members, from discriminatory harm. GYJCA has and will continue to suffer irreparable harm as an organization, including violations of its Fourteenth Amendment right to equal protection.

236.   To feel welcome, respected, and otherwise enjoy an equal educational environment in CCSD, A.A. and GYJCA members seek injunctive and declaratory relief against Defendants in their official capacities to prevent enforcement of the Censorship Policies in a manner that excludes age-appropriate information or material about, or representation of, people or characters – like themselves and/or their families – whose gender expression and/or gender identities transgress sex stereotypes, including material about gender nonconforming individuals, when that information is related or adjacent to curriculum or would be effective in responding to anti-LGBTQ comments or behavior.

237.   The stigma, prohibition on educators promoting LGBTQ awareness and inclusion, and denial of inclusive classroom education that Defendants inflict through their discriminatory Censorship Policies not only causes gender nonconforming students and gender nonconforming families, like A.A. and B.A., educational and emotional harms by forcing students to learn in unwelcoming and unsupportive environments, it also inflicts stress, terror, and heartbreak on entire families.

238.   Defendants' actions have resulted in A.A., GYJCA, and other LGBTQ students in CCSD experiencing more harassment and bullying and less support from their teachers, less access to inclusive materials and pedagogy, and increased feelings of unsafety and unwelcomeness at school, harming their motivation and ability to focus on learning.

239.   A.A. seeks nominal, presumed, and actual monetary damages against Defendants CCSD and Ragsdale, Dowd, Scamihorn, Chastain, Wheeler, and Banks, in their individual capacities, for her emotional distress, humiliation, and stigmatization resulting from Defendants' violation of the Equal Protection Clause of the Fourteenth Amendment.

*Rinderle's Claims*

240.   Defendants' Censorship Policies create at least two categories of similarly situated teachers and subjects one group to discipline, including termination, based on how they treat gender nonconforming students and/or the message they communicate to their students about gender.

241.   Educators, like Rinderle, are in a class of teachers who seek to provide age-appropriate information about gender nonconformity to be reflective, supportive, and/or affirming of all students, including gender nonconforming students, and as an effective means to respond to anti-LGBTQ comments and behavior. By contrast, similarly situated teachers who seek only to reinforce traditional gender roles are not burdened by the Censorship Policies. Such differential treatment – based solely on whether teachers comply with Defendants' requirement to enforce sex stereotypes – constitutes prohibited sex discrimination.

242.   Defendants' adverse employment actions against Rinderle were the result of Defendants' disapproval of her support for gender nonconforming students by reading a book about a character who expressed their gender in a manner that did not conform with traditional sex stereotypes.

243.   Defendants' Censorship Policies, and actions taken against Rinderle under those policies, constitute an unwritten policy to enforce sex stereotypes in curricula and to punish employees who challenge sex stereotyping by presenting information about gender identities, gender expression, and/or sexual orientation that does not conform to traditional sex stereotypes.

244.   By terminating Rinderle, Defendants have sent all CCSD educators the message that conveying or allowing students access to information that violates traditional sex stereotypes is prohibited. Such sex-based discrimination is offensive to the Constitution and serves no rational or legitimate government interest.

245.   But for Defendants' Censorship Policies, practices, and actions as described herein, Rinderle would create safe and inclusive environments for gender nonconforming students by presenting information about gender identities and/or expression that do not conform to sex stereotypes.

246.   As a direct and proximate result of Defendants' conduct and enforcement of the Censorship Policies, Rinderle has suffered financial, psychological, and emotional harm.

247.   As a direct and proximate result of Defendants' conduct and enforcement of the Censorship Policies, Rinderle has suffered and will continue to suffer irreparable harm, including violations of her Fourteenth Amendment right to equal protection.

248.   Rinderle was directly harmed by the enforcement of the Censorship Policies. Rinderle also has a sufficiently close relationship with LGBTQ and gender nonconforming students at CCSD, particularly A.A., as a former teacher in their school district and is incentivized by her interest in her employment as well as her demonstrated desire to advocate on behalf of students to address the sex discrimination effectuated by the enforcement of Defendants' Censorship Policies, which intentionally discriminate against LGBTQ and gender nonconforming students.

249.   Rinderle seeks injunctive and declaratory relief against Defendants in their official capacities to prevent enforcement of the Censorship Policies, IKB and IFAA, in a manner that excludes age-appropriate information or material about, or representation of, people or characters whose gender expression and/or gender identities violate sex stereotypes, including material about gender nonconforming individuals, when that information is related or adjacent to curriculum.

250.   Rinderle also seeks nominal, presumed, and actual damages against CCSD for the enforcement of the Censorship Policies against her.

COUNT THREE: VIOLATION OF FREE SPEECH
U.S. CONST. AMEND. I AND U.S. CONST. AMEND. XIV

*PLAINTIFFS A.A. AND GYJCA AGAINST ALL DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR EQUITABLE RELIEF, AND PLAINTIFF A.A. AGAINST RAGSDALE, SCAMIHORN, WHEELER, CHASTAIN, AND BANKS IN THEIR INDIVIDUAL CAPACITIES AND CCSD FOR DAMAGES*

251.   Plaintiffs hereby reallege and incorporate all allegations contained in paragraphs 1-5, 8-131, and 139-172 as if fully set forth herein.

252.   The First Amendment, applicable to the State of Georgia by the Fourteenth Amendment enforceable under 42 U.S.C. § 1983, provides in part that the government "shall make no law . . . abridging the freedom of speech."

253.   The United States Supreme Court has long recognized that the First Amendment includes the right to receive ideas as a "necessary predicate to the recipient's meaningful exercise of his own rights of speech," and has held, accordingly, that a school cannot remove certain materials because of a disagreement with the ideas in the book or to impose upon the students a "political orthodoxy."

254.   Defendants' viewpoint-based enforcement of the Censorship Policies impedes students' First Amendment right to receive information and ideas, including A.A. and GYJCA's CCSD student members – who seek access to age-appropriate books and resources, and to otherwise receive information about LGBTQ people, characters, and ideas about gender identities and expressions that do not conform to traditional gender roles and sex stereotypes while allowing the same materials that are consistent with traditional gender norms.

255.   Defendants' Censorship Policies, as applied and as interpreted by Defendants to prohibit, based on viewpoint, speech depicting and/or affirming LGBTQ people or characters and gender nonconforming behaviors and/or expression, and is premised on Defendants' desire to impose their orthodoxy on students and/or is otherwise

based on viewpoint of the prohibited speech. These polices are applied and interpreted to allow any similar materials consistent with traditional gender norms.

256.   Defendants' Censorship Policies are constitutionally impermissible where they are enforced on the viewpoint-based premise that material featuring LGBTQ people or characters and nonconforming gender identities or expression is objectionable and offensive to Defendants and prohibited in CCSD.

257.   Defendants' Censorship Policies do not serve a pedagogical or legitimate governmental interest.

258.   Unless enjoined, Defendants will continue to enforce the Censorship Policies in a way that explicitly censors messages of inclusion, affirmation, and support for people, including Student Plaintiffs, whose sexual orientation, gender identities, and/or gender expressions do not conform to traditional gender roles and sex stereotypes, as well as Student Plaintiffs who seek access to such age-appropriate information. Those policies are applied and interpreted to allow any similar materials consistent with traditional gender norms.

259.   At all relevant times, Defendants acted under color of law in taking the actions described herein.

260.   A.A. seeks nominal, presumed, and actual monetary damages against Defendants CCSD and Ragsdale, Scamihorn, Chastain, Wheeler, and Banks, in their individual capacities, for her emotional distress, humiliation, stigmatization, and denial of her right to receive information resulting from Defendants' violation of the First Amendment.

### COUNT FOUR: VIOLATION OF TITLE IX (RETALIATION)
### EDUCATION AMENDMENTS OF 1972; 20 U.S.C. § 1681, ET SEQ.

*PLAINTIFF RINDERLE AGAINST CCSD AND ALL DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR EQUITABLE RELIEF, AND PLAINTIFF RINDERLE AGAINST CCSD FOR DAMAGES*

261.   Plaintiffs hereby reallege and incorporate all allegations contained in paragraphs 1-5, 8-41, 44-79, 86-131, and 139-163 as if fully set forth herein.

262.   Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.*, states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefit of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

263.   Title IX is implemented through the Code of Federal Regulations. *See* 34 C.F.R. Part 106.

264.   At all material times, CCSD was a recipient of federal financial assistance from the Department of Education and, thus, subject to Title IX's prohibitions on sex- and gender-based discrimination and retaliation.

265.   At all relevant times, Defendants acted under color of law in taking the actions described herein.

266.   Defendants' and CCSD officials' discriminatory interpretation, application, and enforcement of its Censorship Policies created a hostile educational environment for gender nonconforming and LGBTQ students, in violation of Title IX. Removal of books and materials about LGBTQ people also creates a hostile environment, in violation of Title IX. This hostile environment is pervasive and has the systemic effect of excluding gender nonconforming and LGBTQ students participation in and denying gender nonconforming and LGBTQ students the benefit of CCSD's educational programs and activities.

267.   The U.S. Supreme Court has recognized that "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX's private cause of action." *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 172–73 (2005).

268.   Plaintiff Rinderle has a private right of action under Title IX for retaliation, which permits Rinderle to seek monetary damages against the school district.

269.   Courts in the Eleventh Circuit import the standards for a retaliation claim under Title VII to establish the elements necessary to constitute a retaliation claim under Title IX.

270.   To state a claim of retaliation under Title IX, the plaintiff must plausibly allege that they engaged in protected activity, that they suffered an adverse employment action, and that there was a causal link between the two.

271.   Prior to CCSD removing Rinderle from her classroom and placing her on administrative leave, Rinderle engaged in statutorily protected activity under Title IX, including but not limited to, advocating for the recognition of gender nonconforming and LGBTQ students, reporting incidents that contributed to Due West's hostile environment for LGBTQ and gender nonconforming students to Principal Kale, reading *My Shadow Is Purple* to her class to prevent and curb harassment and discrimination against gender nonconforming and LGBTQ students, and publicly opposing CCSD's deliberate indifference towards the hostile educational environment for LGBTQ and gender nonconforming students, which Rinderle had a good faith and reasonable belief violated Title IX. After she was removed from her classroom and placed on administrative leave, Rinderle engaged in statutorily protected activity under Title IX by directly complaining to Dowd and other CCSD administrators about the anti-LGBTQ harassment that permeated Due West and impacted gender non-conforming and LGBTQ students, and otherwise publicly opposed CCSD's after-the-fact interpretation, application, and enforcement of its Censorship Policies, which Rinderle had a good faith and reasonable belief violated Title IX.

272.   When Rinderle engaged in protected activity under Title IX, she did so under a good faith, reasonable belief that the hostile educational environment for LGBTQ and gender nonconforming students at Due West, CCSD's deliberate indifference towards the hostile educational environment for LGBTQ and gender nonconforming students, as well as CCSD's interpretation and enforcement of its Censorship Policies violated Title IX.

273.   Defendants and other CCSD officials, including but not limited to Principal Kale, knew or should have known of Rinderle's statutorily protected activity, and Defendants' and CCSD's officials' adverse actions against Rinderle were in retaliation for her statutorily protected activity.

274.  Within close temporal proximity to Rinderle's statutorily protected activity, including her public opposition to CCSD's discriminatory interpretation, application, and enforcement of its Censorship Policies, Defendants took adverse action against her, which was discriminatory retaliation.

275.  Defendant Dowd oversaw and engineered an intentionally flawed, biased, and misleading investigation of Rinderle's conduct, which ultimately resulted in her termination, in retaliation for her advocacy for and support of LGBTQ and gender nonconforming students and opposition to CCSD's deliberate indifference towards the hostile educational environment for LGBTQ and gender nonconforming students. Dowd's supervision of the investigation resulted in material witnesses not being interviewed, false claims of dishonesty being raised, and inaccurate reporting of Rinderle's conduct that the Board relied on to later justify Rinderle's termination. Dowd acted under color of law to deprive Rinderle of a federal right by retaliating against her for her statutorily protected activity based on her reasonable, good faith belief that CCSD was discriminating against LGBTQ and gender nonconforming students in violation of Title IX.

276.  Defendants and CCSD's decision-making administrators knew or should have known that terminating Rinderle for her advocacy for and support of LGBTQ and gender nonconforming students and her opposition to CCSD's deliberate indifference towards the hostile educational environment for LGBTQ and gender nonconforming students was unlawful. Defendants and CCSD's decision-making administrators had the authority to reinstate Rinderle and/or otherwise follow customary progressive discipline guidelines and policies, but refused to do so in order to retaliate against Rinderle.

277.  CCSD's retaliatory actions against Rinderle include the Board's vote to terminate her employment contract, despite the Tribunal's findings that CCSD should not terminate Rinderle's contract, based on the Tribunal's express rejection of much of CCSD's evidence and claims against Rinderle. Defendants Scamihorn, Banks, Chastain, and Wheeler knew or should have known that it was unlawful to retaliate against Rinderle for her advocacy for and

support of LGBTQ and gender nonconforming students and her opposition to CCSD's deliberate indifference towards the hostile educational environment for LGBTQ and gender nonconforming students.

278. Rinderle has suffered and will continue to suffer economic and reputational harm because of Defendants' retaliatory actions.

279. Rinderle seeks equitable relief of reinstatement and future treatment free of retaliatory animus as to CCSD and all Defendants in their official capacity.

280. Rinderle also seeks damages against CCSD for its retaliatory acts.

**PRAYER FOR RELIEF**

281. WHEREFORE, Plaintiffs respectfully request that this Court:

a.　Declare the actions complained of herein to violate 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, and Title IX;

b.　Issue preliminary and permanent injunctive relief restraining Defendants, their employees, agents, and successors in office from enforcing Defendants' Censorship Policies, IKB and IFAA, against Plaintiffs in a manner that discriminates on the basis of gender nonconformity, nonbinary gender identity, and stereotypes grounded in gender-based behavioral norms;

c.　Issue preliminary and permanent injunctive relief restraining Defendants, their employees, agents, and successors in office from enforcing Sections B(1), B(2), B(3), B(4), B(5)(a), and B(5)(b) of IKB and from otherwise enforcing these policies against Plaintiffs to prohibit "divisive," "controversial," and "sensitive" topics in a vague and arbitrary manner that deprives them of due process and fair warning of prohibited conduct;

d.　Issue preliminary and permanent injunctive relief restraining Defendants, their employees, agents, and successors in office from enforcing Sections II(A)(3), II(B)(2)(a), II(B)(10), II(C)(2), and II(D) of IFAA

against Plaintiffs and otherwise enforcing this policy to prohibit "divisive," "controversial," and "sensitive" topics in a vague and arbitrary manner that deprives them of due process and fair notice of prohibited conduct;

e.      Issue preliminary and permanent injunctive relief restoring Plaintiff Rinderle's employment and modifying her employment records to remove any record of discipline and misconduct in relation to her alleged violation of the Censorship Policies;

f.      Award Plaintiff Rinderle nominal, presumed, and actual monetary damages against Defendants CCSD and Ragsdale, Dowd, Scamihorn, Chastain, Wheeler, and Banks in their individual capacities for her loss of employment, emotional distress, humiliation, and damage to her reputation resulting from Defendants' violation of the Equal Protection Clause of the Fourteenth Amendment, enforceable under 42 U.S.C. § 1983;

g.      Award Plaintiff A.A. nominal, presumed, and actual monetary damages against Defendants CCSD and Ragsdale, Dowd, Scamihorn, Chastain, Wheeler, and Banks, in their individual capacities, for her emotional distress, humiliation, and stigmatization resulting from Defendants' violation of the Equal Protection Clause of the Fourteenth Amendment, enforceable under 42 U.S.C. § 1983;

h.      Award Plaintiff Rinderle nominal, presumed, and actual monetary damages against CCSD for Rinderle's loss of employment, emotional distress, humiliation, damage to her reputation resulting from the knowing establishment and enforcement of CCSD's arbitrary and vague Censorship Policies that intentionally deprived Rinderle of due process in violation of the Fourteenth Amendment;

i.      Award Plaintiff A.A. nominal, presumed, and actual monetary damages against Defendants CCSD and Ragsdale, Scamihorn, Chastain, Wheeler, and Banks, in their individual capacities, for her emotional distress, humiliation, stigmatization, and denial of her right to receive information resulting from Defendants' violation of the First Amendment, enforceable under 42 U.S.C. § 1983;

j.      Award Plaintiff Rinderle nominal, presumed, and actual monetary damages against Defendant CCSD for Rinderle's loss of employment, emotional distress, humiliation, damage to her reputation, and for Defendants' violation of Title IX;

k.      Award Plaintiff Rinderle back pay, front pay, and reinstatement of her former CCSD teaching position and remove any record of discipline and misconduct in relation to her alleged violation of the Censorship Policies;

l.      Award Plaintiffs' costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. 1988 and other applicable law; and

m.      Award all other relief that this Court deems just and proper.

Dated this 17th day of May, 2024.

/s/ Craig Goodmark
Craig Goodmark
Georgia Bar No. 301428
GOODMARK LAW FIRM
1425A Dutch Valley Place
Atlanta, Georgia 30324
(404) 719-4848
cgoodmark@gmail.com

/s/ Gerald Weber
Gerald Weber
Georgia Bar No. 744878
LAW OFFICES OF GERRY WEBER, LLC
Post Office Box 5391
Atlanta, Georgia 31107
(404) 522-0507
wgerryweber@gmail.com

/s/ Danielle E. Davis
Alice O'Brien*
Danielle E. Davis*
Nicole B. Carroll*
NATIONAL EDUCATION ASSOCIATION
1201 16th Street, N.W.
Washington, DC 20036-3290
(202) 822-7035
AObrien@nea.org
DDavis@nea.org
NCarroll@nea.org

/s/ Harry Chiu
Harry Chiu*
SOUTHERN EDUCATION FOUNDATION
101 Marietta Street, NW, Ste. 1650
Atlanta, GA 30303
(404) 523-0001
hchiu@southerneducation.org

*Attorneys for Katherine Rinderle,
Tonya Grimmke, and GAE only*

/s/ Michael J. Tafelski
Michael J. Tafelski
Georgia Bar No. 507007
Elizabeth "Beth" Littrell
Georgia Bar No. 454949
Brock Boone*
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Ste. 340
Atlanta, Georgia 30030
(334) 315-0179
michael.tafelski@splcenter.org
beth.littrell@splcenter.org
brock.boone@splcenter.org

*Attorneys for All Plaintiffs*
* Admitted pro hac vice

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have this day caused a true and correct copy of the foregoing to be filed with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

This 17th day of May, 2024.

<u>/s/ Michael J. Tafelski</u>
Michael J. Tafelski
Ga. Bar No. 507007
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Ste. 340
Atlanta, Georgia 30030
(334) 315-0179
michael.tafelski@splcenter.org