## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## STATE OF GEORGIA

KATHERINE RINDERLE, *et al.*,

    Plaintiffs,

v.

COBB COUNTY SCHOOL
DISTRICT, *et al.*,

    Defendants.

Civil Action No. 1:24-cv-00656-JPB

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' JOINT MOTION TO DISMISS

For a century, the Supreme Court has recognized the authority of local school officials to manage day-to-day school operations and make vital educational decisions, like choosing what lessons should be taught, what learning materials should be used, and which teachers should be employed. The Plaintiffs aim to wrest that authority from school officials and enlist the judiciary to act as super-censor over what students should and should not be taught in public school. Their claims elide important differences between their constitutional theories and advance novel legal rights that would empower students, parents, and teachers to dictate curricular content. And above all, this suit represents an extraordinary encroachment into educational decisions historically left to school officials, not the students they teach or the teachers they employ.

Despite the weighty issues attending this case, the event giving rise to the litigation is a run-of-the-mill school personnel matter. The Cobb County Board of Education discharged a teacher, Katherine Rinderle, for violating district policies regulating the use of controversial educational materials when she read aloud *My Shadow is Purple*—a children's book espousing the view that gender is non-binary—to her elementary students without first seeking administration approval. Now Rinderle, along with a coalition of former colleagues, students, and related organizations, seize on this isolated incident to fundamentally reshape the relationship between teachers, students, and school administration. The Plaintiffs contend Rinderle's termination somehow violated not only her constitutional rights but also the rights of every teacher in the Cobb County School District, and the rights of hundreds of Cobb County schoolchildren.

Unsurprisingly, no Plaintiff but Rinderle has standing to invoke this Court's jurisdiction because no one except Rinderle has suffered an injury fairly traceable to the Defendants' conduct. Yet even she only has standing to assert her own constitutional rights, not vindicate the rights of her former colleagues and students. And, in any event, the Constitution has nothing to say about Rinderle's termination or the policies she refused to follow. Each claim in the Plaintiffs' sprawling complaint suffers from critical defects that justify dismissal.

Consider the Plaintiffs' defective due process claims. They contend that

school policies regulating the treatment of controversial and divisive issues are too vague to enforce. But any teacher of reasonable intelligence would know that a book espousing the view that gender is non-binary touches on a controversial topic and therefore requires administration approval. So the policies easily satisfy due process notice requirements.

The Plaintiffs' purported equal protection claims are illusory. They contend that treating gender nonconformity as a controversial topic violates equal protection. But they fail to recognize the Equal Protection Clause protects persons, not topics. And none of the Plaintiffs suffered intentional discrimination against *her* based on *her* gender. School policies regulating the treatment of controversial topics simply do not implicate equal protection, even when the topic is gender identity.

Their free speech claims fare no better. The First Amendment does not authorize teachers or students to decide what information gets taught in public school. Curriculum and instructional speech are government speech. And the Free Speech Clause does not limit government speech or require it to be viewpoint-neutral. Even assuming the Plaintiffs had plausibly alleged a constitutional violation, the law governing this area of law is anything but settled in their favor. So qualified immunity provides another hurdle the Plaintiffs cannot clear.

Rinderle's statutory retaliation claim under Title IX also fails. She did not engage in statutorily protected activity because Title IX does not protect her

complaints about sexual orientation, gender identity, or curriculum policies in the first instance. And she did not complain of anything resembling a hostile educational environment under Title IX. Beyond that, by the time Rinderle made an arguably protected disclosure under Title IX, the termination process was well underway. For these reasons, and the reasons discussed below, the Court should dismiss this case.

## BACKGROUND

### I.     The Policies.

The Plaintiffs' suit revolves around two Cobb County Board of Education policies: IFAA-R, titled "Instructional Resources Selection and Acquisition," and IKB-R, titled "Controversial Issues" (collectively, "Policies"). IFAA-R guides CCSD educators in how to select instructional resources, including supplemental learning resources, which are instructional materials not purchased at the "District or local school level." [Doc. 26-2 at 2-5.] Under IFAA-R(II)(A)(3) and (B)(2), supplemental materials must be "supportive of the adopted curriculum," "appropriate for the target audience," and present "concepts, content, and vocabulary" "appropriate for the potential user." [*Id.* at 4-5.] And "topics of a sensitive nature (i.e., social, political, religious)" must be "given a balanced treatment, with both pros and cons represented." [*Id.*]

IFAA-R(C) and (D) set forth rules for previewing supplemental learning resources and obtaining permission for their use. Employees must exercise

"professional discretion" when using supplemental materials that touch on "topics of a sensitive nature as perceived by the community served." [*Id.* at 6.] And IFAA-R(II)(C)(2) states that written parental permission may be required before a child can view a supplemental resource that features content "of a sensitive nature within the school's community or the age group served by the school." [*Id.*] Parents may also ask for an alternative assignment. [*Id.*]

Policy IKB-R governs instruction of "controversial issues." [Doc. 26-1 at 2-3.] The policy prohibits teachers from "using classroom instruction or their relationships with students to influence students, or through them, their parents/guardians, regarding any one political or partisan side of an issue." [*Id.* at 2.] IKB-R(B)(3) affirms that, under state law, "parents have the right to direct the upbringing and the moral or religious training of their children," and that "District employees shall not improperly infringe upon this right." [*Id.*] And IKB-R(B)(5) requires teachers to observe "objectivity on all issues" during instruction, to present "balanced points of view on issues," and "refrain from identifying their personal position on issues or preference regarding political candidates." [*Id.*]

Neither policy prohibits teachers or staff from disciplining students for inappropriate behavior, like bullying and inappropriate language, or intervening to stop such misconduct. Nor has CCSD interpreted the policies to hinder staff members from redirecting students who engage in bullying or harassment. The

Policies also do not apply to student conduct. They instead only regulate staff members' instructional content in the classroom.

## II. The Board terminated Rinderle for violating the Policies.

Katherine Rinderle is a former elementary school teacher. [Doc. 26 ("FAC") ¶¶ 48, 53.] She independently bought a copy of the book *My Shadow Is Purple* and put it in her classroom. [*Id.* ¶ 52, 69; Doc. 26-3.] The book's central conceit is using the characters' shadows to symbolize their genders. For instance, the main character's father and male friends project blue shadows, while the main character's mother and female friends project pink shadows. [Doc. 26-3 at 4, 8, 9.] The main character projects a purple shadow, signifying they do not fit neatly within the pink-blue gender dichotomy. [*Id.* at 6] The book's back cover reads, "This story considers gender beyond binary in a vibrant spectrum of color." [*Id.* at 35.] *My Shadow Is Purple* has never been part of CCSD's approved curriculum. [*See* FAC ¶ 69.]

Rinderle admits *My Shadow Is Purple* was a supplemental resource about gender. [*Id.* ¶¶ 30, 57.] In March 2023, she read the book to her fifth-grade students and led class activities and a discussion about the book's gender-related themes. [*Id.* ¶¶ 74-77.] She never notified parents or offered an alternative assignment. Soon after, CCSD received complaints about Rinderle's lesson. [*Id.* ¶¶ 89, 93.] CCSD later placed Rinderle on administrative leave to investigate the incident. [*Id.* ¶¶ 94.]

After the investigation, CCSD recommended Rinderle's termination on

grounds that her lesson on *My Shadow Is Purple* violated the Policies. [*Id.* ¶ 109.] Rinderle's termination notice stated, "Rinderle's lesson utilizing *My Shadow Is Purple* 'was a controversial subject (gender identity/fluidity) that is not an appropriate school topic for ten and eleven-year-old students.'" [*Id.* ¶ 110.]

CCSD held a termination hearing before a three-member hearing tribunal. [*Id.* ¶¶ 119-120.] After the hearing, the tribunal issued its factual findings and recommendations to the Cobb County Board of Education. [*Id.* ¶ 121; Ex. 1.] The tribunal found that *My Shadow Is Purpose* addressed a sensitive, controversial topic; that Rinderle used poor professional judgment when she read the book; that she was dishonest during CCSD's investigation; and that she violated multiple CCSD policies. [Ex. 1.] Despite those findings, the Tribunal recommended against termination. [FAC ¶ 122.] Even so, the Board of Education later voted to terminate Rinderle's employment based on her policy violations. [*Id.* ¶ 129.]

## III.  Tonya Grimmke and GAE.

Grimmke is a current CCSD elementary school special education teacher. [*Id.* ¶¶ 6, 42, 80.] She does not allege that she has violated the Policies, intends to violate the Policies, or has been accused of violating the Policies. [*See generally* FAC.] Nor does she allege that CCSD has taken or threatened any disciplinary action against her for violating the Policies. [*See generally id.*] She instead worries that she *might* face discipline if she tries to curb student-on-student harassment (conduct not

governed by the Policies) or adds supplemental materials to her classroom library that CCSD does not approve of. [*See id.* ¶¶ 86-88.]

GAE is a nonprofit professional association that advocates for teachers. [*Id.* ¶ 7.] In service of its organizational mission, GAE has a legal services program dedicated to suing on behalf of CCSD teachers, with funds designated for hiring outside attorneys when necessary. [*Id.*] GAE has spent some of those funds to bring this suit. [*Id.*] Except for Rinderle, the Plaintiffs identity no GAE members who have been disciplined or face imminent threat of discipline based on violating the Policies.

## IV.   A.A. and the Georgia Youth Justice Coalition for Action.

The Plaintiffs added two new parties in their amended complaint: A.A. and the Georgia Youth Justice Coalition for Action ("GYJCA") (collectively, "Student Plaintiffs"). A.A. is a transgender middle school student who was taught by Rinderle before the 2022-2023 school year and has since received "emotional support and advocacy from her." [*Id.* ¶ 8.] A.A. does not allege CCSD has denied her educational opportunities, closed off access to school-related activities, or disciplined her because of her gender or sexual orientation. Her claims instead are based on her emotional response to CCSD's decision to fire Rinderle. [*See id.* ¶ 155.]

GYJCA is a student-led advocacy group. [*Id.* ¶ 9.] Some of its members include gender-nonconforming and LGTBQ students. [*Id.*] GYJCA does not allege that CCSD has taken tangible action against any of its members based on their

gender identity or sexual orientation. Rather, it joins this suit to demand "immediate access to pedagogy, classroom library materials, supplemental learning resources, informal lessons, advice, and validation from their educators that is inclusive and representative of their identities." [*Id.* ¶ 158.]

## ANALYSIS

The Plaintiffs assert claims under four counts. In Count I, Rinderle, Grimmke, and GAE (collectively, "Educator Plaintiffs") and the Student Plaintiffs challenge the Policies as unconstitutionally vague under the Fourteenth Amendment. [FAC ¶¶ 173-203.] In Count II, the Plaintiffs allege violation of their equal protection rights under the Fourteenth Amendment. [*Id.* ¶¶ 204-250.] In Count III, the Student Plaintiffs allege violation of their free speech rights under the First Amendment. [*Id.* ¶¶ 251-260.] And in Count IV, Rinderle brings a claim for retaliatory termination under Title IX, 20 U.S.C. §§ 1681, *et seq*. [*Id.* ¶¶ 261-280.] This brief will address each count on its own and show why this suit should dismissed in its entirety.

## I.   The Court should dismiss the Plaintiffs' due process claims.

All Plaintiffs challenge CCSD's Policies on due process grounds, alleging the Policies' guidelines on "controversial," "divisive," and "sensitive" topics are unconstitutionally vague because they fail to provide fair warning that they apply to educational materials concerning gender nonconformity. Rinderle complains about how the Policies were applied to her, the Educator Plaintiffs fret about how the

Policies may apply in the future, and (despite their tenuous connection to the Policies) the Student Plaintiffs toss their hats in the ring for good measure. But the Policies easily pass muster.

In rare circumstances, a government policy might be so vague that it violates procedural due process. *Grayned v. City of Rockford*, 408 U.S. 104, 107 (1972). In the public employment context, a policy satisfies due process if it gives fair notice that certain conduct comes with a risk of discipline. *O'Laughlin v. Palm Beach Cnty.*, 30 F.4th 1045, 1055 (11th Cir. 2022). That fair notice standard is met if the policy uses language of "common usage and understanding" that communicates to "ordinary persons using ordinary common sense" that their actions may lead to discharge. *United States v. Powell*, 423 U.S. 87, 94 (1975); *O'Laughlin*, 30 F.4th at 1055; *see also Grayned*, 408 U.S. 112 (recognizing that a regulation is not unconstitutionally vague if it "delineates its reach in words of common understanding."). Even an "imprecise but comprehensible normative standard" satisfies due process. *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). The vagueness rule is especially lenient when it comes to school rules. *See Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 686 (1986).

On the flip side, the criteria for showing a policy to be unconstitutionally vague is exacting. A policy is not void just because (as here) a party strains to inject doubt as to the meaning of words a normal reader would understand. *Powell*, 423

U.S. 894. The policy instead must be so vague and indefinite "that no standard of conduct is specified at all," and a person "of common intelligence" would need to guess at its meaning. *Coates*, 402 U.S. at 614.

Under those principles, courts have upheld a variety of broad, sometimes nebulous, conduct standards for public employees. For instance, in *Logan v. Warren County Board of Education*, the district court held that terms "incompetence," "immorality," and "any good and sufficient cause" under the Georgia Fair Dismissal Act were not impermissibly vague. 549 F. Supp. 145, 149 (S.D. Ga. 1982). And in *Arnett v. Kennedy*, the Supreme Court rejected a vagueness objection to a statute that allowed employees to be fired "for such cause as will promote the efficiency of the service." 416 U.S. 134, 164 (1974); *see also Moms for Liberty - Brevard Cnty., FL v. Brevard Pub. Sch.,* 582 F. Supp. 3d 1214, 1218 (M.D. Fla. 2022), *aff'd*, No. 22-10297, 2022 WL 17091924 (11th Cir. Nov. 21, 2022) (upholding board meeting policy that limited public comments found "abusive, obscene, or irrelevant."). Relevant here, courts have upheld school policies restricting teachers from presenting "controversial" topics in class. *See Bd. of Educ. of Jefferson Cnty. Sch. Dist. R-1 v. Wilder*, 960 P.2d 695, 705 (Colo. 1998) (holding school policy regulating use of "controversial learning resources" not impermissibly vague).

Weighed against those authorities, the Policies are clear enough to satisfy due process. The language the Plaintiffs insist is unknowable—*i.e.*, "divisive,"

"controversial," and "sensitive"—consists of words of "common usage and understanding." *Powell*, 423 U.S. at 93. Those terms are no less clear than the language at issue in *Logan*, *Arnett,* or *Moms for Liberty*. And the Policies are identical in some respects to the policy in *Wilder*. Any reasonable teacher with even a passing understanding of the current political environment and contemporary cultural debates would or should recognize that teaching elementary-school-aged students that gender is non-binary touches on a controversial, sensitive topic on which many people disagree.[1] Accordingly, any reasonable teacher would recognize that discussions of and materials relating to gender-identity topics are subject to the guidelines set forth in the Policies.

The Plaintiffs concede the point in broad daylight. The Educator Plaintiffs claim the Policies will prevent them from discussing and introducing educational materials about gender identity. [FAC ¶ 193.] And the Student Plaintiffs say that the Policies will deprive them of educational materials affirming their gender nonconformity. [*Id*. ¶ 195.] If, as all the Plaintiffs allege, the Policies will apply to discussions and materials concerning gender nonconformity, then the Plaintiffs necessarily have fair warning that the Policies will apply to discussions and material

---

[1] *See, e.g.*, PEW RESEARCH CENTER, *Americans' Complex Views on Gender Identity and Transgender Issues*,
https://www.pewresearch.org/social-trends/2022/06/28/americans-complex-views-on-gender-identity-and-transgender-issues/ (last visited July 26, 2024).

concerning gender nonconformity.[2] All this requires of them is to seek permission before introducing these materials in class.

Pulling back the veil, the Plaintiffs' due process challenge is really a defective free speech claim. The Educator Plaintiffs want to teach about gender nonconformity, and the Student Plaintiffs want to learn about it. To help achieve those goals, they need the Court to intervene. But even if the Plaintiffs have a right to teach about (or learn about) any topic, including gender identity, due process affords them no relief.

## II.   The Court should dismiss the Plaintiffs' equal protection claims.

The Equal Protection Clause generally prohibits intentional discrimination based on a person's suspect characteristics. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The key word is "intentional." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Disparate impact, by itself, is not enough. *Id*. A public official violates equal protection only when he acts "because of, not merely in spite of, its adverse effects upon an identifiable group." *Pers. Adm'r. of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (cleaned up). Although "[e]qual protection jurisprudence is typically concerned with governmental classification" against "identifiable groups," *Corey Airport Servs., Inc. v. Clear*

---

[2] Because the Policies satisfy due process as applied, the Court need not reach any facial challenge (to the extent that the Plaintiffs assert one).

*Channel Outdoor, Inc.*, 682 F.3d 1293, 1296 (11th Cir. 2012), the Supreme Court reminds us that the Fourteenth Amendment "protect[s] *persons*, not *groups*." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995) (emphasis in original). A plaintiff may seek relief under the Equal Protection Clause only if the defendant infringes on her "*personal* right to equal protection." *Id*. (emphasis in original). To state an equal protection claim, then, a plaintiff must plausibly allege facts showing that she is a member of a suspect class and that the defendant intentionally discriminated against her "because of" that membership. *Corey*, 682 F.3d at 1296.

The Plaintiffs have not met their pleading burdens. None plausibly alleges membership in a suspect class or intentional discrimination "because of" that membership. Each seeks relief based on the Defendants' alleged misconduct against third parties. And all try to recast their defective free speech claims as equal protection violations.

### A.    Rinderle has not pled an equal protection violation.

"Defining an 'identifiable group' that has been discriminated against is critical to establishing a claim under the Equal Protection Clause." *Corey*, 682 F.3d at 1296-1297. Groups with well-defined "immutable characteristics" like race and sex invoke equal protection, while groups based on ill-defined "idea-based characteristics" do not. *Id*. at 1298. "Whatever may be the precise meaning of a

'class,' the class cannot be defined simply as the group of victims of the protested action." *Id.* at 1299 (citation omitted).

Rinderle's proposed group—"a class of teachers who seek to provide age-appropriate information about gender nonconformity" [FAC ¶ 241]—lacks the required attributes. Her cluster of like-minded teachers exemplifies an ill-defined "idea-based" group. The sole characteristic binding the members is disagreement with CCSD's alleged treatment of certain topics in the classroom. In other words, Rinderle's crew is simply "the group of victims" of CCSD's policies.

To be sure, sex is a suspect class. But Rinderle does not allege discrimination based on her sex. She does not contend that the Defendants treated her differently because she is a woman, or that they treated similarly situated men more favorably than her. Instead, she alleges discrimination based on her support for gender-nonconforming students.[3]

Rinderle confuses allyship with protected status. They are not the same thing. *Dean v. Warren*, 12 F.4th 1248 (11th Cir. 2021), illustrates the point. In *Dean*, a group of cheerleaders kneeled during the national anthem at a university football game to protest police brutality against African Americans. *Id*. at 1252. The university responded by prohibiting cheerleaders from taking the field before the

---

[3] To the extent that Rinderle seeks to assert the students' purported equal protection rights, she lacks standing to do so. *See* Standing Discussion; *see also Adarand*, 515 U.S. at 227 (reminding us that equal protection is a "personal right").

national anthem was played. *Id*. The group of kneeling cheerleaders filed suit alleging intentional discrimination based on their membership in a "class of people protesting police brutality against African Americans." *Id*. at 1254. The Eleventh Circuit rejected that theory because the cheerleaders' group was merely "defined by the conduct the defendants oppose." *Id*. at 1263. Under *Dean*, advocacy for a protected class does not confer protected status.

The same principle applies here. Rinderle's opinions and advocacy do not grant her special status under the Equal Protection Clause. Nor can they prop up an equal protection claim.

Rinderle's purported equal protection claim is really a faulty free speech claim. She contends CCSD discriminated against her for reading *My Shadow is Purple* to her classroom because CCSD disapproved the "message" it "communicates." [FAC ¶ 240.] But "discrimination" against a person for expressive conduct is not discrimination at all; at best, it's retaliation. *See Sheba Ethiopian Rest., Inc. v. DeKalb Cnty., Georgia*, No. 21-13077, 2023 WL 3750710, at *7 (11th Cir. June 1, 2023) ("a retaliation claim is based on conduct… but discrimination is based on [sex]"). And the Equal Protection Clause provides no cause of action for retaliation. *Watkins v. Bowden*, 105 F.3d 1344, 1355 (1997). To the extent that Rinderle contends that her instructional speech caused her firing, equal protection

provides her no shelter.[4]

## B. **The Student Plaintiffs have not pled an equal protection claim, either.**

The Eleventh Circuit has expressed "grave doubt" that transgender students belong to a suspect class for equal protection purposes. *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 803 n. 5 (11th Cir. 2022) (en banc); *see also Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1230 (11th Cir. 2023) ("We similarly reject the United States' view that section 4(a)(1)–(3) is subject to heightened scrutiny because it classifies on the basis of transgender status[.]"). And while disparate treatment based on gender nonconformity may constitute sex-based discrimination in the workplace, *see Bostock v. Clayton Cnty.,* 590 U.S. 644, 659 (2020), *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011), this Circuit has refused to extend the same principle in the school context. *See Adams*, 57 F.4th at 808 (distinguishing *Bostock* and *Brumby* because "the school is not the workplace"); *see also Eknes-Tucker*, 80 F.4th at 1229 (refusing to extend *Bostock* or *Brumby*

---

[4] The complaint does not expressly launch a facial attack on the Policies under equal protection. But even if it did, the Policies would easily survive. The Policies apply to all teachers regardless of sex, gender, or gender conformity, so they are not subject to heightened scrutiny. *See Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1228 (11th Cir. 2023) (holding policy satisfies equal protection because it "applies equally to both sexes" and "does not prefer one sex to the detriment of the other"). And the Policies' treatment of controversial topics is substantially related to CCSD's legitimate pedagogical interest in regulating the presentation of controversial topics to schoolchildren. *See* discussion, *infra*. So the Policies would survive rational or heightened scrutiny.

beyond "gender stereotyping in the context of employment discrimination"). Accordingly, the Equal Protection Clause provides no cause of action for students alleging discrimination based on gender nonconformity in the schoolhouse.

In any event, the Student Plaintiffs have not plausibly alleged intentional discrimination based on gender nonconformity. Nowhere in the sprawling amended complaint do the Plaintiffs allege any student experienced any adverse action—like a suspension or bad grades—based on gender stereotypes. *C.f. Roy ex rel. Roy v. Fulton Cnty. Sch. Dist.*, 509 F. Supp. 2d 1316, 1323 (N.D. Ga. 2007) (holding plaintiff stated equal protection claim by alleging suspension based on plaintiff's race); *Williams v. Hillman*, No. CV 08-0081-KD-C, 2008 WL 11425746, at *6 (S.D. Ala. June 17, 2008) (holding plaintiff stated equal protection claim by alleging bad grades based on plaintiff's sex).

Instead, the Student Plaintiffs base their equal protection claim on the downstream effects of the Defendants' enforcement of the Policies against Rinderle. They claim the Defendants violated the students' equal protection rights by depriving them of an ally and curricular materials affirming their gender identities. This legal theory faces several insurmountable hurdles.

*First*, the Policies govern educator conduct, not student conduct. Educators are subject to disciplinary action for violating the Policies, not students. So the students lack standing to challenge the Policies themselves or the Defendants'

enforcement actions against teachers. *See* Standing Discussion; *see also Adarand* (reminding us that equal protection is a "personal right"). *Second*, the allegation that the Defendants' conduct deprived them of gender-identity-confirming curriculum is not well pled. *My Shadow is Purple* was never part of CCSD's curriculum. Enforcing the controversial issue Policies as to Rinderle has not changed the students' curriculum even a little. *Third*, creating an equal protection remedy for students upset about a teacher's firing would lead to an absurd scenario in which students possess a judicially enforced heckler's veto over a school district's personnel decisions. The absurdity lands with extra force for A.A., whose connection to Rinderle's termination hangs by the finest of threads. She was not Rinderle's student and was not present when Rinderle read *My Shadow is Purple*. And it's not clear that any GYJCA member has a closer connection to the canon event than A.A. does.

Finally, a school district's treatment of gender issues in educational materials and classroom discussion does not imply intentional discrimination against gender nonconforming students. *See PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, --- F. Supp. 3d ----, 2024 WL 133213, at *3 (N.D. Fla. Jan. 12, 2024) ("targeting books addressing minority or LGBTQ issues is [not] the same as targeting minority or LGBTQ persons"). Inferring intentional discrimination in these circumstances is a bridge too far. *Id.* at *3 ("[I]t requires far too many inferences to conclude that removal or restriction of a book about a particular subject constitutes intentional

discrimination against an individual in a particular protected class.").

By focusing on the "message" CCSD is allegedly sending and that students are allegedly receiving, the Student Plaintiffs' purported equal protection claim is, once again, really a defective free speech claim. As with Rinderle, the Student Plaintiffs cannot repackage their free speech claims as equal protection violations and hope for a different result.

## III.   The Court should dismiss the Student Plaintiffs' First Amendment claim.

The Student Plaintiffs claim CCSD infringed on their supposed First Amendment right to receive information and ideas from their public-school teachers by limiting what instructional content may be used in classrooms. That is not the law. Instructional speech is government speech. And "[i]t is the very business of government to favor and disfavor points of view" when it speaks. *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009) (citation omitted). The government-speech doctrine dooms the Student Plaintiffs' First Amendment claim.

### A.   <u>The Free Speech Clause does not regulate government speech.</u>

The Free Speech Clause restricts how the government regulates private speech but does not control government speech itself. *Summum*, 555 U.S. at 467. So when the government speaks for itself—deciding which monuments belong in a public park, funding certain programs over others, and, as argued below, choosing what to teach in public schools—it may lawfully quell private citizens' attempts to alter its

message. *Id.* at 472, 481;  *Rust v. Sullivan*, 500 U.S. 173, 178 (1991). In other words, private individuals cannot use the Free Speech Clause to force the government to say what it does not want to say.

Government speech also need not maintain viewpoint-neutrality. "When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Texas Div., Sons of Confederate Veterans, Inc.,* 576 U.S. 200, 207 (2015). The government is free to "speak for itself," "say what it wishes,"  and "select the view that it wants to express." *Summum*, 555 U.S. at 468 (punctuation and citations omitted).

The government-speech doctrine thus yields a critical proposition: If selecting what may be taught in CCSD classrooms is government speech, then the Student Plaintiffs lose. In that event, their only recourse would be the political process, not the courts. *Mech v. Sch. Bd. of Palm Beach Cnty., Fla.,* 806 F.3d 1070, 1074 (11th Cir. 2015) ("Government speech is regulated primarily by 'the political process,' not the Constitution.").

## B. <u>Instructional speech in the classroom is government speech.</u>

Several circuits have had no trouble concluding public-school instructional content is government speech. *See Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007) ("the first amendment does not entitle primary and secondary teachers, when conducting the education of captive audiences, to cover

topics, or advocate viewpoints, that depart from the curriculum adopted by the school system."); *Chiras v. Miller*, 432 F.3d 606, 616 (5th Cir. 2005) ("[S]chools engage in government speech when they set and implement education policy through the curriculum."); *see also Griswold v. Driscoll*, 616 F.3d 53, 58-59 (1st Cir. 2010) (Souter, J.) (holding states have broad "curricular discretion" free from viewpoint-neutrality requirements under the First Amendment). Those decisions dovetail with the Supreme Court's contemporary government-speech caselaw and should guide the analysis here.[5]

Consistent with those decisions, the Eleventh Circuit's general government-speech framework also easily leads to the conclusion that instructional speech is government speech unconstrained by the Free Speech Clause. Speech is government

---

[5] More than three decades ago in *Virgil v. Sch. Bd. of Columbia Cnty., Fla.*, 862 F.2d 1517, 1521-23 (11th Cir. 1989), the Eleventh Circuit analyzed the removal of a textbook from a school's curriculum by applying the "legitimate pedagogical concern" test announced in *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). The Student Plaintiffs mechanically recite this standard in their Amended Complaint. [FAC ¶ 257.] But this standard does not apply for two reasons. First, CCSD did not remove materials from the curriculum. And unlike *Hazelwood*, this case involves no student speech. The Plaintiffs instead only allege CCSD regulated a *supplemental material*, which Rinderle bought on her own without approval and brought inside the classroom to be taught. Second, *Virgil* was decided before (and conflicts with) *Summum, Walker, Rust, Rosenberger*, and other more recent Supreme Court decision that defined the modern government-speech doctrine. Finally, even if *Hazelwood* does supply the governing standard, then the Defendants have met that standard because regulating instructional content to avoid "associate[ing] the school with any position other than neutrality on matters of political controversy" is a legitimate pedagogical goal. *Hazelwood*, 484 U.S. at 272.

speech when (1) it has historically been communicated by the government, (2) the public closely associates the speech with the government, and (3) the government directly controls the messages the speech conveys. *See Mech*, 806 F.3d at 1075-76 (citing *Summum*, 555 U.S. at 470–72). On those factors, the Eleventh Circuit held that advertisement banners on school fences are government speech because "the banners bear the imprimatur of the schools and the schools exercise substantial control over the messages that they convey." *Id.* at 1075. All three factors show that instructional speech is also government speech.

Start with the history factor. Public-school curriculum in Georgia has always been chosen and presented by the government. *Gwinnett Cnty. Sch. Dist. v. Cox*, 289 Ga. 265, 266 (2011) (recognizing that under the Georgia Constitution, local school officials have exclusive authority to provide an "adequate public education for the citizens.") (citing Ga. Const. art. VIII, § 1, ¶ I).

Beyond that, for a century, the U.S. Supreme Court has continuously recognized school officials' "broad discretion in the management of school affairs." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 863 (1982). In fact, "[n]o single tradition in public education is more deeply rooted than local control over the operation of schools." *Milliken v. Bradley,* 418 U.S. 717, 741–42 (1974). Judicial deference to school authorities is at its zenith in disputes about instructional content. The Court expressly characterized instructional speech as

government speech in *Rosenberger v. Rector & Visitors of Univ. of Virginia*:

> When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message.

515 U.S. 819, 833 (1995). Before then, the Court acknowledged "[t]he State's *undoubted right* to prescribe the curriculum for its public schools." *Epperson v. State of Ark.*, 393 U.S. 97, 107 (1968) (emphasis added). [6] It also listed "a public school prescribing its curriculum" as an example of government speech free from viewpoint-neutrality strictures. *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674 (1998). And more recently, the Court established that a school employee expresses government speech when he engages in speech he was "expected to deliver in the course of carrying out his job." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 529 (2022). Altogether, those authorities leave little doubt that instructional speech meets the history component of the government-speech test.

Instructional speech also satisfies the government endorsement and control factors. The materials and information that make up public school curricula are "from beginning to end" selected by the government and controlled by state law or school district policy. *See Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 560

---

[6] *Epperson* shows government speech must still comply with the Establishment Clause. This exception is irrelevant here because the Student Plaintiffs do not assert an Establishment Clause challenge.

(2005). Indeed, by definition, nothing becomes part of a curriculum unless the government wants to include it. And because the whole point of public-school curriculum is to communicate messages from the government to students, the public mind closely associates instructional content with the government. When teachers teach the curriculum, they are acting as the school district's mouthpieces. *See Mayer v. Monroe Cnty. Cmty. Sch. Corp.,* 474 F.3d 477, 479 (7th Cir. 2007) ("[T]he school system does not 'regulate' teachers' speech as much as it hires that speech.").

The bottom line is that the Free Speech Clause has no control over what CCSD allows to be taught in its classrooms. And for good reason. A school district could not design a functional curriculum if it were forced, under threat of damages and equitable penalties, to yield to students' boundless spectrum of preferences about what they "should" be taught. In the same sense that "a math teacher can't decide that calculus is more important than trigonometry and decide to let Hipparchus and Ptolemy slide in favor of Newton and Leibniz," *Mayer,* 474 F.3d at 479, students don't get to pick what they hear in the classroom. When the government chooses its instructional content, it speaks for itself, and when the government speaks, it gets to say it what it wants.

## IV.    Qualified immunity protects the individual Defendants.

"The doctrine of qualified immunity protects government officials from liability for damages insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (cleaned up). The "clearly established rights" requirement "seeks to ensure that defendants reasonably can anticipate when their conduct may give rise to liability." *United States v. Lanier*, 520 U.S. 259, 270 (1997). For a right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012).

The Eleventh Circuit employs a burden-shifting regime to resolve qualified immunity defenses. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004). The defendant must first establish that he was acting in his discretionary authority. *Id*. The burden then shifts to the plaintiff to show a violation of her clearly established rights. *Id*. To meet that burden, a plaintiff must ordinarily point to materially similar case law from the U.S. Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court holding the defendant's specific conduct unlawful. *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022). In the rare "obvious clarity" case, a plaintiff may show that the constitutional text or a broader principle in case law clearly established a violation without reference to materially similar case law. *Id*. at 921. "Obvious clarity," however, "is a narrow exception" to the rule

that only materially similar precedent can clearly establish the law. *Id*.

The Defendants easily carry their initial burden. The complaint alleges that each Defendant's alleged conduct arose from his role in the adoption and enforcement of the Policies. [*See* FAC ¶¶ 11-14.] Adopting and enforcing school policies falls within the scope of each Defendant's discretionary authority. The amended complaint makes that clear. [*See id.*][7] So the burden shifts to Rinderle and A.A. (the Plaintiffs seeking damages) to show that their rights were clearly established at the time of the alleged misconduct. They cannot carry this burden.

### A.    <u>Equal Protection.</u>

The Educator Plaintiffs cannot point to materially similar precedent from the Supreme Court or the Eleventh Circuit clearly establishing the principle that terminating a teacher for reading aloud a book about gender identity without first seeking permission from school administration violates the teacher's equal protection rights. Likewise, the Student Plaintiffs cannot identify binding precedent clearly establishing the principle that school officials violate a student's equal protection rights by adopting or enforcing a policy guiding the presentation of gender identity topics in the classroom. And this is not a rare case in which the Defendants'

---

[7] Rinderle alleges that "Ragsdale is a final policymaker and decisionmaker responsible for implementing the Board's policies[.]" [FAC ¶ 11.] "Scamihorn, Wheeler, Chastain, and Banks, as members of the board, establish, maintain, and enforce local policies[.]" *Id*. ¶ 12. "Dowd is a final policymaker responsible for enforcing CCSD's vague censorship policies." *Id*. ¶ 14.

conduct so obviously violates the law that materially similar case law is unnecessary. After all, the Eleventh Circuit has cast doubt on the proposition that gender-nonconforming students belong to a suspect class and has suggested that classifications based on gender nonconformity in the schoolhouse satisfy equal protection. *Adams*, 57 F.4th at 803 n. 5. Meanwhile, persuasive authority holds that regulating educational materials addressing gender identity does not imply animus toward gender nonconforming students. *See PEN Am.*, --- F. Supp. 3d ----, 2024 WL 133213, at *3 (dismissing students' equal protection claim because "targeting books addressing minority and LGBTQ issues is not the same as targeting minority and LGBTQ persons"). The development of this area of the law has only just begun.

### B.    <u>Free Speech.</u>

Neither the Supreme Court nor the Eleventh Circuit has held the First Amendment entitles students to receive "information about LGBTQ people, characters, and ideas about gender identities and expressions that do not conform to traditional gender roles and sex stereotypes…" [FAC ¶ 254.] And to be clear, the Student Plaintiffs do not allege CCSD has removed information from or otherwise modified its curriculum. Rather, they contend they have a First Amendment right to have new LGBTQ- and gender-related instructional content *introduced* into the curriculum on demand but without CCSD's consent. No binding authority supports that novel right.

The Supreme Court, in fact, has said the opposite. *See Rosenberger*, 515 U.S. at 833. On top of that pronouncement, the government-speech factors set out in *Summum*, 555 U.S. at 470–72, and the Eleventh Circuit's application of those factors in *Mech*, 806 F.3d at 1075, establish instructional speech is government speech beyond the First Amendment's reach. After all, if speech displayed on a banner outside a school building is government speech, then surely instruction within the classroom—the very speech schools exist to deliver in the first place—is also government speech. Ragsdale, Scamihorn, Wheeler, Chastain, and Banks's alleged decisions about CCSD's curricular content are in harmony with those decisions.

For these reasons, qualified immunity shields the individual defendants from Rinderle's and A.A.'s claims for damages.

## V.     The Court should dismiss Rinderle's Title IX retaliation claim.

Title IX prohibits discrimination "on the basis of sex" in public school districts. 20 U.S.C. § 1681(a). Title IX also includes an implied right of action for damages where a school district retaliates against an employee for complaining of prohibited sex discrimination. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005). To state a retaliation claim, the employee must plead three elements: (1) she made a statutorily protected complaint; (2) she suffered an adverse employment action; and (3) there is a causal link between the complaint and the adverse action. *Saphir by and through Saphir v. Broward Cnty. Pub. Schs.*, 744 F.

App'x 634, 639 (11th Cir. 2018). Rinderle has not pled the first or third elements.

## A.   Rinderle engaged in no statutorily protected activity.

To engage in protected activity, the employee must have had an objectively reasonable belief that she complained of a Title IX violation. *Terry v. Young Harris Coll.*, 106 F. Supp. 3d 1280, 1297 (N.D. Ga. 2015). Courts assess the objective reasonableness of that belief by applying the controlling law to the alleged facts. *Kocsis v. Fl. St. Univ. Bd. of Trustees*, 788 F. App'x 680, 687 (11th Cir. 2019).

Rinderle's factual allegations do not square with the controlling law. She alleges that she complained of three alleged categories of Title IX violations: (i) a hostile educational environment for LGBTQ and gender-nonconforming students; (ii) CCSD's alleged deliberate indifference toward that alleged hostile educational environment; and (iii) CCSD's interpretation, application, and enforcement of the Policies. [FAC ¶ 271.] But those alleged complaints did not implicate Title IX, for three reasons. First, Title IX, as it stands now, does not cover gender nonconformity or sexual orientation. Second, the Policies' subject matter is exempt from Title IX. Third, Rinderle did not complain about an actionable hostile educational environment.

### 1.   Title IX does not cover gender identity or sexual orientation.

Rinderle wrongly assumes that Title IX extends protections based on gender identity and sexual orientation. Title IX prohibits discrimination "on the basis of

sex" within CCSD's educational programs and activities. 20 U.S.C. § 1681(a).

Though Title IX does not specifically define "sex," the prevailing dictionaries when

Congress enacted the statute defined the term to mean biological sex. *Adams*, 57

F.4th at 812. And the surrounding statutory provisions conceptualize "sex" in terms

of a biological, male-female binary.[8] On the subject of sex discrimination, Title IX

says nothing about gender identity or sexual orientation. *See generally* 20 U.S.C. §§

1681, *et seq.* And as the Supreme Court has recognized, "homosexuality and

transgender status are distinct concepts from sex. . . ." *Bostock*, 590 U.S. at 669.

Thus, the Eleventh Circuit has interpreted Title IX to prohibit discrimination

based on only biological sex—not gender identity. *Adams*, 57 F.4th at 812. Under

that binding precedent, at least one district court in this circuit has held that Title IX

does not prohibit discrimination based on sexual orientation. *C.W. by and through*

*his next friend Mary Doe v. Smith*, No. 1:23-cv-368-CLM, 2024 WL 3333024, at *8

---

[8] *See, e.g.*, 20 U.S.C. § 1681(a)(2) (referencing institutions "which admit[] only of one sex" and those "which admit[] students of both sexes"; *id.* § 1681(a)(5) (referencing institutions with a traditional "policy of admitting only students of one sex"); *id.* § 1681(a)(8) ("this section shall not preclude father-son or mother-daughter activities . . . , but if such activities are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex"); *id.* § 1681(a)(9) (referencing beauty pageants "in which participation is limited to individuals of one sex only"); *id.* § (clarifying that institutions need not "grant preferential treatment or disparate treatment to the members of one sex on accounting of an imbalance which may exist with respect to the total number or percentage of persons of that sex participating in" the educational programs and activities); *id.* § 1686 (allowing funding recipients to "maintain[] separate living facilities for the different sexes").

(N.D. Ala. July 8, 2024). In the same vein, other courts have preemptively enjoined the U.S. Department of Education's ("DOE") new Title IX regulation that newly interprets the meaning of "sex" to cover gender identity and sexual orientation.[9] And still other courts have rejected the DOE's expanded definition when construing the Affordable Care Act's prohibition on sex discrimination.[10]

As these recent decisions confirm, Title IX did not protect Rinderle's alleged complaints, all of which concerned the alleged treatment of students based on their sexual orientation or gender identity. Rinderle never claimed students were treated differently based on their biological sex. She therefore lacked an objectively reasonable basis to believe the conduct she complained of violated Title IX. As a result, she cannot satisfy the first element of her retaliation claim.

### 2. Title IX also does not cover the Policies or supplemental teaching materials like *My Shadow Is Purple*.

Title IX also did not protect Rinderle's complaints about the Policies. The DOE's Title IX regulations provide, "Nothing in this regulation shall be interpreted

---

[9] *See Arkansas v. U.S. Dep't of Educ.*, No. 4:24 CV 636 RWS, 2024 WL 3518588, at *17, 23 (E.D. Mo. July 24, 2024) (slip opinion); *Kansas v. U.S. Dep't of Educ.*, — F. Supp. 3d —, 2024 WL 3273285, at *8-13, 22 (D. Kan. July 2, 2024); *Tennessee v. Cardona*, — F. Supp. 3d —, 2024 WL 3019146, *3-5, 8-15, 44 (E.D. Ky. June 27, 2024); *Texas v. Cardona*, — F. Supp. 3d —, 2024 WL 2947022, at *29-40 (N.D. Tex., June 11, 2024).

[10] *See Tennessee v. Becerra*, — F. Supp. 3d —, 2024 WL 3283887, at *5-10, 14 (S.D. Miss. July 3, 2024); *Florida v. Dep't of Health and Human Servs.*, No. 8:24-cv-1080-WFJ-TGW, [Doc. 41] at *20- 26 (M.D. Fla. July 3, 2024) (unreported). A copy of the *Florida v. HHS* decision is attached as **Exhibit 2**.

as requiring or prohibiting or abridging in any way the use of particular textbooks or curricular materials." 34 C.F.R. § 106.42. In explaining the rationale for this regulation, the DOE said, "There is no evidence in the legislative history that the proscription in title IX against sex discrimination should be interpreted as requiring, prohibiting, or limiting the use of any such material." 40 Fed.Reg. 24135 (1975). The DOE did not want to assume the role of regulating what teaching materials could and could not be used in classrooms, so it categorically exempted "textbooks and curricular materials" from Title IX's regulatory scope. *Id.*

At least one court held that, based on 34 C.F.R. § 106.42, "a Title IX claim stemming from the school's choice of curriculum materials is not actionable." *Shorter v. St. Cloud State Univ.*, No. Civ. 00-1314RHK/RLE, 2001 WL 912367, *at 10 (D. Minn. Aug. 14, 2001). And in *Adams*, the Eleventh Circuit gave similar effect to a regulatory carve-out under Title IX. 57 F.4th at 791. There, a transgender student challenged a school board's bathroom policy that was not gender-neutral. *Id.* at 797-98. The court rejected that claim because a regulation exempted restroom facilities from Title IX coverage. *Id.* at 811-812 (citing 34 C.F.R. § 106.33).

A similar rationale applies here. Under 34 C.F.R. § 106.42, CCSD's curriculum policies (including what employees may and may not teach) fall beyond Title IX's reach. The Policies merely regulate what curricular materials teachers may present to students, and establish the need for administrative approval and notice to

parents so that they can opt their children out of certain lessons. In complaining about or defying the Policies, Rinderle simply thought she should have unilateral discretion to teach *My Shadow Is Purple* without administrative oversight or parental approval. That position was not objectively reasonable given 34 C.F.R. § 106.42.

### 3. Rinderle did not report a hostile educational environment.

Putting aside those defects, Rinderle's retaliation claim also fails because she complained of nothing resembling an actionable hostile educational environment for students. In *Davis Next Friend LaShonda D. v. Monroe County Board of Education*, the Supreme Court recognized that student-on-student sexual harassment could sometimes create a hostile educational environment that violated Title IX. 526 U.S. 629, 636 (1999). "[I]n the school setting, students often engage in insults, banter, teasing, shoving, pushing, and gender-specific conduct that is upsetting to the students subjected to it." *Id.* at 651-52. But behavior only becomes actionable when it is "so severe, pervasive, and objectively offensive that it denie[d] its victims the equal access to education that Title IX" protects. *Id.* at 652.

In its 2020 Title IX regulations, the DOE hewed to the *Davis* standard in defining the types of "sexual harassment" that Title IX prohibits and that school districts must remedy. 34 C.F.R. § 106.30 (defining "sexual harassment"). If a school district has actual notice of such "sexual harassment," then it must "respond promptly in a manner that was not deliberately indifferent." 34 C.F.R. § 106.44(a).

-34-

A school district is considered deliberately indifferent only if its response is "clearly unreasonable in light of the known circumstances." *Id.*; *Davis*, 526 U.S. at 648.

Under that controlling law, Title IX did not protect Rinderle's alleged complaints about CCSD's deliberate indifference to an alleged hostile educational environment. Rinderle alleges that some LGBTQ and gender-nonconforming students have experienced slurs, derogatory language, and isolation. [FAC ¶ 86.] But those allegations do not show the alleged harassment was "severe, pervasive, and objectively offensive" or that it had a systemic effect of depriving LGBTQ and gender-nonconforming students equal access to CCSD's educational programs or activities. *See Davis*, 526 U.S. at 651-52. The Plaintiffs do not clarify what the "slurs" and "derogatory language" consisted of, when or how often they happened, or in what context they arose. Nor do they allege that any affected student lost access to CCSD's educational programs and activities as a result. For those reasons, even if Rinderle genuinely thought she complained of a Title IX violation, that belief was not objectively reasonable under the law.

That is not all. Rinderle also has not shown that CCSD had actual notice of the alleged verbal misconduct, much less that CCSD responded in a manner that was clearly unreasonable under the known circumstances. The Amended Complaint is too vague to glean what Rinderle thinks the "known circumstances" even were.

At bottom, Rinderle's conclusory allegations of "deliberate indifference" and

a "hostile educational environment" [*See* FAC ¶¶ 114, 117, 141, 152, 266, 271-272, 275-277] are not enough to plausibly suggest she had an objectively reasonable basis to think she complained of a Title IX violation. *See Iqbal*, 556 U.S. at 678.

### B.    Rinderle has not pled retaliatory causation.

To satisfy the causation element, the employee must show that a pertinent decisionmaker within the school district knew of her protected activity, and "that the protected activity and the adverse actions were not wholly unrelated." *Doe v. Gwinnett Cnty. Sch. Dist.*, No. 1:18-CV-05278-SCJ, 2021 WL 4531082, at *15 (N.D. Ga. Sept. 1, 2021). For two reasons, Rinderle cannot make that showing. First, no pertinent decisionmaker knew of her disclosures before Rinderle was placed on administrative leave. Second, CCSD was already considering her termination before her post-leave complaints.

### 1.    No decisionmaker knew of Rinderle's pre-leave complaints.

The Eleventh Circuit has long recognized the "common-sense" notion that "[a] decision-maker cannot have been motivated to retaliate by something unknown to him." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). The knowledge of one employee may not be imputed to the decisionmaker who took the adverse action. *Id.* at 800. And temporal proximity between the protected activity and the adverse action is not enough to infer decisionmaker knowledge. *Id.* Thus, to plead retaliatory causation, the plaintiff must allege facts showing that the person

who took the adverse action knew of the plaintiff's protected activity. *Uppal v. Hosp. Corp. of Am.*, 482 F. App'x 394, 397 (11th Cir. 2012).

Though Rinderle contends she engaged in statutorily protected activity before CCSD placed her on administrative leave, she has not alleged that a pertinent decisionmaker knew of that activity. She claims she complained to her school principal [FAC ¶ 271], but omits facts showing her principal played a role in the disciplinary decisions that followed. Rinderle instead alleges Dowd and Ragsdale set those wheels in motion. [*Id.* ¶¶ 11, 14, 51, 95, 110-111, 275.] But she does not allege Dowd or Ragsdale knew of her complaints to her principal. Rinderle therefore cannot sue based on complaints that pre-dated her administrative leave.

### 2. Rinderle's post-leave activity could not have motivated adverse actions CCSD was already considering.

In some cases, temporal proximity between the protected conduct and the adverse employment action might be enough to suggest retaliation causation. *Doe*, 2021 WL 4531082, at *15. But "when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity . . . does not suffice to show causation." *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006). For instance, in *Clark County School District v. Breeden*, the plaintiff argued there was temporal proximity between her filing of suit and the adverse employment transfer in question. 532 U.S. 268, 272 (2001). The Supreme Court found temporal proximity "immaterial" because the defendant was

considering the transfer "before it learned of suit." *Id.* A defendant need not suspend previously planned actions upon discovering that a plaintiff has engaged in protected activity, "and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Id.*

Measured against that principle, the temporal proximity between Rinderle's termination and post-leave complaints does not plausibly suggest retaliatory motive. By the time Rinderle made those complaints, disciplinary action was already underway. That chronology precludes any inference that her alleged complaints motivated CCSD to terminate her employment. *See Drago*, 453 F.3d at 1308.

## VI.   The Plaintiffs lack constitutional standing.

Under Rule 12(b)(1), this Court must dismiss all claims for lack of subject-matter jurisdiction, except for Rinderle's due process, equal protection, and Title IX claims.[11] Article III of the U.S. Constitution requires litigants to have standing before suing in federal court. *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1347 (11th Cir. 1999). To establish standing, the plaintiff must satisfy three elements: (1) "she has suffered or will likely suffer an injury in fact"; (ii) "the injury was caused or will be caused by the defendant"; and (iii) "the injury likely would be redressed by the requested judicial relief." *F.D.A. v. Alliance for Hippocratic Med.*, 602 U.S.

---

[11] Even still, Rinderle lacks standing to pursue her claims to the extent they arise from purported harm suffered by any students.

367, 380 (2024).

To satisfy the injury-in-fact requirement, the alleged injury must be "concrete," "real," and "particularized," affecting "the plaintiff in a personal and individual way." *Alliance for Hippocratic Med.*, 602 U.S. at 381. A "generalized grievance" is insufficient. *Id.* "The injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon." *Id.* If the plaintiff "seeks prospective relief like an injunction, the plaintiff must establish a sufficient likelihood of future injury." *Id.*

This requirement "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action." *Id.* "For example, a citizen does not have standing to challenge a government regulation simply because the plaintiff believes that the government is acting illegally." *Id.* "A citizen may not sue based solely on an asserted right to have the Government act in accordance with law." *Id.* (internal quotation marks omitted). "Nor may citizens sue merely because their legal objection is accompanied by a strong moral, ideological, or policy objection to a government action." *Id.*

Plaintiffs lack constitutional standing. Grimmke and A.A. have no cognizable injury. Though Rinderle has standing to challenge her termination, she may not sue over alleged violations of her former students' constitutional rights. And GAE and GYJCA cannot establish the requirements for organizational standing.

A.   <u>**Grimmke and A.A. lack individual standing.**</u>

To satisfy Article III's injury requirement, the plaintiff's alleged injury "must arise out of the invasion of a legally protected interest that is sufficiently concrete and particularized rather than abstract and indefinite." *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1273-74 (11th Cir. 2001). And when bringing a constitutional challenge, "the plaintiff's complaint must fall within the zone of interests protected by the . . . constitutional provision at issue." *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1270 (11th Cir. 2006) (cleaned up). Because Grimmke and A.A. have not alleged a cognizable injury, they both lack standing.

1.   **Grimmke's allegations of future harm are too speculative.**

For claims seeking declaratory or injunctive relief, the issue is whether a future injury is imminent—*i.e.*, whether "there is a sufficient likelihood that [the plaintiff] will be affected by the allegedly unlawful conduct in the future." *Sierra v. City of Hallandale Beach, Fla.*, 996 F.3d 1110, 1113 (11th Cir. 2021). A litigant lacks standing to seek prospective relief if the alleged future harm is "hypothetical or speculative." *Salcedo v. Hanna*, 936 F.3d 1162, 1167 (11th Cir. 2019). Though Grimmke alleges the Policies threaten her property interest in continued employment [FAC ¶¶ 4, 7, 23, 190], she does not allege that she has violated or will violate the Policies, that CCSD thinks she has violated the Policies, or that any disciplinary action is imminent or under consideration. Her due process instead rests on a

generalized prediction that someday, for some reason, CCSD will find she violated the Policies and threaten her employment. To the extent that she fears punishment for curbing student-on-student harassment, she may rest easy: the Policies prohibit no such action. Her abstract fear that she might be subject to discipline for some unknown conduct does not confer standing to seek prospective relief under the due process clause. *See Salcedo*, 936 F.3d at 1167.

> **2.      A.A. has not suffered an invasion of a legally protected interest under any of the three constitutional provisions she identifies.**

To challenge the constitutionality of a government policy, the plaintiff must show that her conduct falls within the scope of the challenged policy's prohibitions. *Pernell v. Fla. Bd. of Governors of St. Univ. Sys.*, 641 F. Supp. 3d, 1218, 1249 (N.D. Fla. 2022). A.A. claims that CCSD's enforcement of the Policies has injured her by resulting in Rinderle's firing and limiting her classroom access to *My Shadow Is Purple*. [FAC ¶¶ 195-202, 221, 225, 228-229, 232-234, 237-239, 254, 260.] But these alleged injuries do not implicate the Fourteenth or First Amendments.

Begin with the due process claim. As the Eleventh Circuit has recognized, "An abstract allegation of inadequate process is not a legally cognizable Article III injury." *Worthy v. City of Phoenix City, Ala.*, 930 F.3d 1206, 1215 (11th Cir. 2019). A.A. has not shown how CCSD's enforcement of the Policies puts any cognizable property interest at risk. Even if the Policies were "vague," as A.A. alleges, it makes

no difference, because the Policies do not apply to students. Since A.A. cannot violate the Policies, she is not at risk of suffering a due process injury from CCSD's enforcement of the Policies.

A.A. fares no better with her equal protection claim. As discussed above, the Plaintiffs have not pled facts showing intentional discriminatory treatment based on a suspect trait. The challenged Policies do not apply to students, much less single them out based on their gender or sexual orientation. A.A. thus cannot claim that the Policies somehow inflict an equal protection injury on her.

Lastly, A.A. has not pled an invasion of her free speech rights. To determine whether a plaintiff has standing to bring a free-speech challenge, the Eleventh Circuit "ask[s] whether the operation or enforcement of the government policy would cause a reasonable would-be speaker to self-censor." *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1120 (11th Cir. 2022) (cleaned up). The challenged policy must "objectively chill[] protected expression." *Id.* (cleaned up). And if the plaintiff seeks to enjoin the policy, she must show a likelihood that the challenged policy will be enforced against her. *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305-06 (11th Cir. 2004).

Again, A.A. cannot make that showing because the Policies do not apply to her (or any student's) speech. And as shown in the First Amendment discussion above, her complaints amount only to a challenge to governmental speech. In other

words, A.A. does not seek to redress an injury to *her* First Amendment rights. She aims to infringe on CCSD's.

Because A.A. has not pled an injury to her due process, equal protection, or free speech rights, she has not alleged a cognizable injury under Article III.

**B.** **Rinderle lacks third-party standing to sue over her students' rights.**

Though Rinderle has standing to sue over her termination, she lacks standing to bring a claim based on the alleged violation of her students' equal protection rights. [*See* FAC ¶¶ 216, 248.] To have standing to prosecute a claim, an individual plaintiff "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Litigants may only seek relief for injuries that affect them "in a personal and individual way." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1317 (11th Cir. 2021). Thus, under § 1983, a plaintiff cannot state an actionable claim based on the alleged violation of someone else's constitutional rights. *Chandler v. Sec. of Fla. Dep't of Transp.*, 695 F.3d 1194, 1201 n.5 (11th Cir. 2012) (recognizing that plaintiffs "cannot rely on an allegation that others' rights were violated to establish their own constitutional injury").

Courts have recognized that individual litigants might have third-party standing to sue for injuries to another, but only if three requirements are met: (i) the litigant herself suffered an injury-in-fact; (ii) she has a "close relation to the third party"; and (iii) there is a "hindrance to the third party's ability to protect his or her

own interests." *Harris v. Evans*, 20 F.3d 1118, 1122 (11th Cir. 1994). Though Rinderle appears to pay lip service to those formal labels [*see* FAC ¶¶ 216, 248], she cannot satisfy the second or third requirements.

Under the second requirement, the litigant's interest in redressing her own injury must be so aligned with the third party's right that she is "fully, or very nearly, as effective a proponent of the" third party's right as the third party would be. *Powers v. Ohio*, 499 U.S. 400, 413 (1991). In the rare exceptions when such a "close relationship" exists, the litigant usually has some sort of privileged or fiduciary duty to the third party (such a doctor-patient or attorney-client) or a mutual business interest (as with a vendor-vendee). *See Harris*, 20 F.3d at 1123 (surveying cases). Rinderle has no such relationship with her former students. She is no longer a CCSD teacher. Most CCSD students are complete strangers to her. That she shares some ideological values with some of her former students is not enough to give her third-party standing. *See id.* at 1122.

The third requirement is even more problematic. To meet this element, Rinderle "must show that the rights of" her former students "will be diluted or infringed if [she] is not permitted to enforce" their alleged constitutional rights. *United States v. Baxter*, 566 F. App'x 830, 833 (11th Cir. 2014). But Rinderle alleges no facts suggesting they cannot sue on their own behalf if they so choose. Indeed, Plaintiffs rounded up one of Rinderle's former students, A.A., to file suit. Though

A.A. lacks constitutional standing, she is ready, willing, and able to be a named plaintiff. There is no impediment to other students also suing.

### C.  **GAE and GYJCA lack organizational standing.**

As with individuals, "an organization may not establish standing simply based on the intensity of the litigant's interest or because of strong opposition to the government's conduct, no matter how longstanding the interest and no matter how qualified the organization." *Alliance for Hippocratic Medicine*, 602 U.S. at 393 (cleaned up).The Eleventh Circuit has recognized that an organizational plaintiff can establish standing under two theories: (i) diversion of resources; and (ii) associational standing. *Arcia v. Fl. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014). GAE and GYJCA cannot establish standing under either theory.

### 1.  **No diversion of resources.**

In general, a diversion-of-resources theory allows an organization to sue on its own behalf "when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Id*. But the organization "must show far more than simply a setback to" its "abstract social interests." *Alliance for Hippocratic Medicine*, 602 U.S. at 393. Instead, the organization must allege facts showing it "suffered concrete and demonstrable injury" to its activities with a "constant drain on the organization's resources." *In re Equifax, Inc. Customer Data Security Breach Litigation*, 371 F. Supp. 3d 1150, 1165 (N.D. Ga. 2019).

As the U.S. Supreme Court recently explained in *F.D.A. v. Alliance for Hippocratic Medicine*, an organization does not have standing simply by "divert[ing] it resources in response to a defendant's actions" or "expending money to gather information and advocate against the defendant's action." 602 U.S. at 394-95. There, a pro-life advocacy organization challenged the FDA's relaxed regulatory requirements for an abortion drug, claiming the organization had incurred substantial costs in challenging the FDA's actions, diverting resources that would otherwise be available for its advocacy mission. *Id.* at 395. The Supreme Court rejected that argument, explaining that what matters is whether the defendant's actions have caused the organization to divert resources from its core business activity. *Id.* Because the organization's central purpose was advocacy for its members, it had suffered no cognizable Article III injury. *Id.*

That binding authority precludes GAE and GYJCA from establishing standing under a diversion-of-resources theory. GAE's sole purpose is to advocate on behalf of its teacher-members. [FAC ¶ 7.] It even has a legal services program and budget to engage attorneys on behalf of its members and file lawsuits. [*Id.*] Similarly, GYJCA's sole purpose is to advocate on behalf of its members: students in the LGBTQ+ community. [*Id.* ¶ 9.] GAE and GYJCA describe no organizational purpose other than challenging policies and laws that they think are harmful to their members' interests. [*Id.* ¶¶ 7, 9.]

-46-

So neither organization can claim that CCSD's actions have forced it to divert resources away from its core business activities. Lawsuits, like this one, *are* GAE and GYJCA's core business activities. Like the organizational plaintiff in *Alliance for Hippocratic Medicine*, GAE and GYJCA cannot "manufacture standing" by spending money in their advocacy against CCSD. *See Alliance for Hippocratic Med.*, 602 U.S. at 395.

### 2.    No associational standing.

Associational standing is a form of third-party standing. *Id.* at 398 (Thomas, J., concurring).[12] To have associational standing, the organization must satisfy three requirements: (i) "its members would otherwise have standing to sue in their own right"; (ii) "the interests" the organization "seeks to protect are germane to the organization's purpose"; and (iii) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). GAE and GYCA cannot satisfy the third element.[13]

---

[12] CCSD recognizes that associational standing remains theoretically viable. But for reasons explained in Justice Thomas's concurrence in *Alliance for Hippocratic Medicine*, the doctrine does not satisfy Article III's case-and-controversy requirement and should be struck down. *Alliance for Hippocratic Med.*, 602 U.S. at 397-405. CCSD therefore preserves this issue for appeal. *Id.* at 405.

[13] To satisfy the first element, the organization must show that at least one of its members "faces a realistic danger" of suffering an injury. *Arcia*, 772 F.3d at 1342. As discussed in Section VI.A. above, neither Grimmke nor A.A. have individual standing. GAE and GYJCA therefore cannot establish associational standing based

When relying on associational standing, the organization has the burden of proving that its claims require no individual member participation. *Amnesty Intern., USA v. Battle*, 559 F.3d 1170, 1178 (11th Cir. 2009). To make that showing, the organization's claim must raise a "pure question of law" that is not dependent on individual circumstances of members. *Int'l Union, United Auto., Aerospace and Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 287-88 (1986). An organization cannot satisfy the third requirement if it presses a claim that requires resolution of fact-specific issues peculiar to individual members' claims. *Id.*; *Friends for Am. Free Enterprise Ass'n v. Wal-Mart Stores, Inc.*, 284 F.3d 575, 577 (5th Cir. 2002).

Court routinely reject associational standing claims that depend on subjectivity or require individualized inquiry. *See, e.g.*, *Rivell v. Private Health Care Sys., Inc.*, 887 F. Supp. 2d 1277, 1289 (S.D. Ga. 2012); *Minor I Doe ex rel. Parent I Doe v. Sch. Bd. for Santa Rosa Cnty., Fla.*, 264 F.R.D. 670, 688 (N.D. Fla. 2010). For instance, in *Minor I Doe ex rel. Parent I Doe v. School Board for Santa Rosa County, Florida*, the court held that an organization lacked standing to bring a First Amendment claim based on an alleged chilling of its members' free speech rights. 264 F.R.D. at 688. As the court explained, "The nature of any claim that the [challenged] consent decree in fact chills private First Amendment free speech is

---

on the membership of Grimmke or A.A., respectively. As a result, GYJCA lacks associational standing altogether, and GAE's hopes hinge on Rinderle.

highly dependent on a showing of individual and particularized factual circumstances that are not common to all of [the organization's] members or shared in equal degree among them." *Id.*

Similarly, in *Rivell v. Private Health Care Systems, Inc.*, the court rejected an associational standing claim based on a violation of members' privacy rights. 887 F. Supp. 2d at 1289. To prevail on the claim, the organizational plaintiff had to prove that the defendant appropriated the members' names or likenesses without those members' consent. *Id.* at 1290. Because consent is a particularized, fact-intensive question, the organization could not prove that element of the claim without the affected members' individual participation in the lawsuit. *Id.* at 1291. Though "some of the questions raised by [the organization's] claim [were] common to its members," the "answers to those questions [were] not." *Id.*

So too here. GAE and GYJCA cannot prosecute their claims without heavy involvement of their individual members, given the inherently individualized nature of their members' alleged injuries. Both GAE and GYJCA claim that CCSD violated their members' due process rights by enforcing the Policies. [FAC ¶¶ 3-4, 7, 9, 193, 201-202.] GYJCA separately claims that CCSD violated its student-members' (i) equal protection rights by allowing an alleged hostile educational environment for LGBTQ+ students, and (ii) free speech rights by removing four sexually explicit books from school libraries. [FAC ¶¶ 46, 198, 253.]

As *Minor I v. School Board* and *Rivell* show, those alleged injuries are too subjective and individualized to support associational standing. For an alleged hostile environment to be actionable, the plaintiff must have personally found it unwelcome, abusive, or harassing. *See Freeman v. City Of Riverdale*, 330 F. App'x 863, 865 (11th Cir. 2009). And with a free speech claim, the plaintiff must have self-censored out of fear of the challenged government action. *See Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998). Though both claims also have objective requirements, it is their inherently subjective elements that demand individual members' participation here. Because GAE and GYJCA must depend on heavy member involvement to prove those subjective elements, they cannot satisfy the third requirement for associational standing.

## <u>CONCLUSION</u>

For all these reasons, this Court should GRANT Defendants' Motion to Dismiss, and dismiss this action, with prejudice.

This 29th day of July, 2024.

*/s/ Brandon O. Moulard*
Brandon O. Moulard
Georgia Bar No. 940450
Bennett D. Bryan
Georgia Bar No. 157099
Jeffrey R. Daniel
Georgia Bar No. 949075
*Counsel for Defendants*

PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street NE, Suite 1500
Atlanta, GA 30309
Telephone: 678.690.5750
Facsimile: 404.869.6972
brandonmoulard@parkerpoe.com
bennettbryan@parkerpoe.com
jeffdaniel@parkerpoe.com

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing was prepared using Times New Roman font, 14-point type, which is one of the font and print selections approved by the Court in L.R. 5.1(C).

This 29th day of July, 2024.

<u>*/s/ Brandon O. Moulard*     </u>
Brandon O. Moulard
Georgia Bar No. 940450
Bennett D. Bryan
Georgia Bar No. 157099
Jeffrey R. Daniel
Georgia Bar No. 949075
*Counsel for Defendants*

PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street NE, Suite 1500
Atlanta, GA 30309
Telephone: 678.690.5750
Facsimile: 404.869.6972
brandonmoulard@parkerpoe.com
bennettbryan@parkerpoe.com
jeffdaniel@parkerpoe.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have this day I filed this MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS with the Clerk of Court using the CM/ECF electronic filing system, which will send an electronic copy to:

Alice O'Brien, Esq.
Danielle E. Davis, Esq.
Nicole B. Carroll, Esq.
NATIONAL EDUCATION ASSOCIATION
1201 16th Street, NW
Washington, DC 20036

Michael J. Tafelski, Esq.
Elizabeth Littrell, Esq.
Brock Boone, Esq.
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Avenue
Suite 340
Atlanta, GA 30030

Gerald Weber, Esq.
LAW OFFICES OF GERRY WEBER, LLC
P.O. Box 5391
Atlanta, GA 31107

Harry Chiu, Esq.
SOUTHERN EDUCATION FOUNDATION
101 Marietta Street, NW
Suite 1650
Atlanta, GA 30303

Craig Goodmark, Esq.
GOODMARK LAW FIRM
1425A Dutch Valley Place
Atlanta, GA 30324

This 29th day of July, 2024.

/s/ Brandon O. Moulard
Brandon O. Moulard
Georgia Bar No. 940450
Bennett D. Bryan
Georgia Bar No. 157099
Jeffrey R. Daniel
Georgia Bar No. 949075
*Counsel for Defendants*

PARKER POE ADAMS & BERNSTEIN LLP
1075 Peachtree Street NE, Suite 1500
Atlanta, GA 30309
Telephone: 678.690.5750
Facsimile: 404.869.6972
brandonmoulard@parkerpoe.com
bennettbryan@parkerpoe.com
jeffdaniel@parkerpoe.com