# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

KATHERINE RINDERLE, et al.,

     *Plaintiffs*,

     v.

COBB COUNTY SCHOOL DISTRICT, et al.,

     *Defendants*.

CIVIL ACTION NO.

1:24-CV-00656-JPB

---

## PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS

Defendants have used two vague policies to justify arbitrary, discriminatory, and retaliatory enforcement, harming students and teachers across Cobb County School District ("CCSD"). Rooted in animus, Defendants all but admit what Plaintiffs will prove in discovery—that Defendants consider gender non-conforming and lesbian, gay, bisexual, transgender, and queer ("LGBTQ") people, identities, and topics to be *per se* "controversial" and "divisive," ignore gender non-conforming and LGBTQ students' needs, and silence any discussion of them. Hardly a "run-of-the-mill school personnel matter" [Doc. 41-1 at 2], this case is about students' freedom to learn and be affirmed in America's public schools—the "nurseries of democracy." *See Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 181 (2021).

Defendants have attacked this freedom with hostility. Defendant Ragsdale described the removal of LGBTQ-themed books as about "good and evil" on more than one occasion, and CCSD employs high-ranking officials affiliated with anti-LGBTQ groups or who have engaged in anti-LGBTQ conduct. [Doc. 26 ¶¶ 143-146] Defendants attempt to disguise their discrimination as lawful discretion and obscure the devastating harm on students and teachers resulting from their conduct.

In the summer of 2022, CCSD amended policies IKB ("Controversial Issues") and IFAA ("Instructional Resources Selection and Acquisition") (collectively, "Censorship Policies" or "Policies"[1]) on the heels of Georgia's newly enacted "divisive concepts" and "parents' bill of rights" legislation. [Doc. 26 ¶¶ 20-22] The open-ended, vague, and ambiguous Censorship Policies vest administrators with unbridled subjective discretion to silence specific content and viewpoint that: (1) discusses gender identity, gender non-conformity, gender expression, or sexual orientation, and (2) affirms gender non-conforming and LGBTQ students and families ("Censored Topics"). Without defining terms or providing meaningful training or enforcement examples, Defendants never gave fair notice that these topics and discussions were off-limits. Instead, Defendants decreed (after Rinderle's

---

[1] References to "Censorship Policies" or "Policies" throughout include Defendants' interpretation and enforcement of them to sweep in all references to LGBTQ and gender non-conforming identities or expression.

termination) that the topics and discussions violate their vague Policies. [Doc. 26 ¶ 39-46] The implementation of the Policies has effectively eliminated discussions of the Censored Topics, excluding LGBTQ and gender non-conforming students and students with family members who share those identities (collectively, "Gender Non-Conforming Students") from receiving a fully inclusive and equal education.

Katherine Rinderle ("Rinderle"), an experienced and exemplary educator at Due West Elementary, was terminated for reading to her class *My Shadow Is Purple* ("*MSP*"), an award-winning children's book featuring a student who does not conform to gender stereotypes. [Doc. 26 ¶¶ 49, 51, 56, 128-129] As a result of the Censorship Policies, A.A., one of Rinderle's former students, and CCSD student members of the Georgia Youth Justice Coalition for Action ("GYJCA"), have been denied their right to receive information and have experienced discrimination resulting in stigmatic, educational, and psychological harms. [Doc. 26 ¶¶ 59, 147-172] Like Rinderle, other CCSD educators, including Tonya Grimmke ("Grimmke") and CCSD members of the Georgia Association of Educators ("GAE"), are prohibited and otherwise limited in their ability to support and advocate for Gender Non-Conforming Students. [Doc. 26 ¶¶ 80-88]

Plaintiffs Rinderle, Grimmke, and GAE ("Educator Plaintiffs") and Plaintiffs A.A. and GYJCA ("Student Plaintiffs") challenge the Censorship Policies, as applied, in violation of the First and Fourteenth Amendments and Title IX. But

3

Plaintiffs need not prove their case here. At this early stage, Defendants bear the burden of showing that the complaint fails to allege a plausible claim and should be dismissed before discovery – a burden they cannot meet.[2] This Court should deny Defendants' Motion to Dismiss.

## <u>LEGAL ARGUMENT AND ANALYSIS</u>

### I.    This Court Should Deny Defendants' Motion to Dismiss Plaintiffs' Due Process Vagueness Claims.

The void-for-vagueness doctrine is crucial to due process, ensuring that everyone knows "what the State commands or forbids." *Lanzetta v. State of New Jersey*, 306 U.S. 451, 453 (1939). Defendants downplay this principle in support of their subjective, standardless application of the Censorship Policies, claiming words with a "common understanding" resolve all constitutional concerns. [Doc. 41-1 at 10-12] However, using "real words found in an English dictionary does not magically extinguish vagueness concerns," *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1281 (N.D. Fla. 2022), as "vague regulations violate" due process by failing to give "fair warning" or by inviting "arbitrary and

---

[2] A complaint should not be dismissed if the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Factual allegations must be enough to raise a right to relief above the speculative level []" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). Courts must "accept [] the facts alleged in the complaint as true, drawing all reasonable inferences in the plaintiff's favor." *See Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010)).

discriminatory enforcement" through a lack of "explicit standards." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The Censorship Policies fail on both counts.

A. The Censorship Policies fail to provide Educator Plaintiffs with fair notice of prohibited conduct.

"In the public employment context . . . the vagueness doctrine is based on fair notice that certain conduct puts persons at risk of discharge." *O'Laughlin v. Palm Beach County*, 30 F.4th 1045, 1055 (11th Cir. 2022) (citations omitted). Courts ask whether it is "sufficiently clear" that a "reasonable person" could foresee the conduct which would put him at risk of discharge. *Id*. at 1221. The Eleventh Circuit looks to several factors to assess fair notice, including the law's plain language, *U.S. v. Wayerski*, 624 F.3d 1342, 1347 (11th Cir. 2010); any accompanying definitions or guidelines, *see Horton v. City of St. Augustine, Fla.*, 272 F.3d 1318, 1329-30 (11th Cir. 2001); the law's surrounding context, *see Leib v. Hillsborough Cty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1310-11 (11th Cir. 2009); and the degree to which the plaintiff's conduct "clearly" fell within the scope of the law, *see Joel v. City of Orlando*, 232 F.3d 1353, 1359 (11th Cir. 2000).

Defendants misstate the facts and minimize their due process obligations. [Doc. 41-1 at 10-11] First, Rinderle did not "teach" that "gender is non-binary" to her students. [Doc. 26 ¶ 76] Instead, she read an award-winning, age-appropriate book (chosen by her students and purchased from a CCSD book fair) to build a respectful and understanding classroom community, recognizing that some children

experience and express their gender differently than sex-based expectations. [Doc. 26 ¶¶ 72-73; Doc. 26-3] Second, a regulation is constitutional only if it "clearly delineates its reach in words of common understanding." *Grayned*, 408 U.S. at 112 (citations omitted); *see also Cameron v. Johnson*, 390 U.S. 611, 616 (1968) (regulations that "clearly and precisely delineates its reach in words of common understanding" are not unconstitutionally vague).[3] Using common words is not enough; the regulation must also be clear and precise in the applied context.

The Censorship Policies fail to delineate their reach clearly and precisely. That people of "ordinary intelligence" may understand the undefined term "controversial" to mean "causing disagreement or discussion"[4] does not mean those same people would know what subjects would cause disagreement or discussion. Other undefined terms like "sensitive," and "divisive," also lack fair warning, especially regarding *MSP*. Rinderle's charge letter did not specify which section of the Policies she allegedly violated and the Policies do not expressly prohibit discussing

---

[3] Defendants also argue that the "vagueness rule is especially lenient when it comes to school rules," [Doc. 41-1 at 10], citing *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 686 (1986). But *Bethel* is about student discipline and says nothing about educator employment.

[4] Cambridge University Press & Assessment. Controversial. *Cambridge Dictionary*. https://dictionary.cambridge.org/dictionary/english/controversial   (last   visited August 17, 2024).

"controversial" or "sensitive" issues.[5] Despite claims that *MSP* violated policies on "objectivity" and balance [Doc. 26-1; Doc. 26-2], in reality, the book presents both gender conforming and non-conforming characters as equally accepted, and promotes the uncontroversial lesson of inclusivity and kindness.[6] "Divisive" is defined in relation to race and excludes the Censored Topics. [Doc. 26 ¶ 20, 33].

The Supreme Court has recognized that these kinds of value-laden terms lack fair notice. *See, e.g.*, *National Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1998) (regulating general standards of "decency and respect" of the public "are undeniably opaque"); *Kolender v. Lawson*, 461 U.S. 352, 353-54 (1983) (statute that failed to clarify terms "credible and reliable" held unconstitutionally vague); *Smith v. Goguen*, 415 U.S. 566, 575 (1974) (prohibition on "contemptuously" treating flag unconstitutional because "language [] sufficiently unbounded"); *Coates v. City of Cincinnati*, 402 U.S. 611, 614, (1971) (law prohibiting "annoying [] persons passing by" was unconstitutionally vague because "conduct that annoys some people does not annoy others."); *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921)

---

[5] The Policies do not exclude discussion of "controversial issues" that are aligned with the "Teaching and Learning Standards and District goals" [Doc. 26-1 at 1], as Rinderle alleges here. [Doc. 26 ¶ ¶68-69]

[6] Defendants' position surely cannot be that a book celebrating gender conforming, non-conforming, heterosexual or homosexual people must also include the view that it is acceptable to condemn those same people.

(the term "unjust and unreasonable rate or charge" impermissibly "leaves open …
the widest conceivable inquiry, the scope of which no one can foresee"). The
Censorship Policies are rife with such impermissible value-laden adjectives.

Finally, Defendants' citation of *Bd. of Educ. of Jefferson Cty. Sch. Dist. R-1
v. Wilder*, 960 P.2d 695 (Colo. 1998), overreaches. [Doc. 46-1 at 11] *Wilder* held
that a policy regulating "controversial learning resources" was not "impermissibly
vague as applied" because "[u]nder any rational interpretation, that category
includes a [R-rated] film that exposes students, in a classroom setting, to a significant
amount of nudity, sexual content, and graphic violence." 960 P.2d at 704.
Comparing *MSP*, a picture book without any graphic content, to a violent and
sexually explicit film exposes Defendants' limitless interpretation and enforcement
of the Censorship Policies.

### B. Defendants' enforcement is arbitrary and discriminatory.

A policy invites arbitrary and discriminatory enforcement when it "vests
virtually complete discretion in the hands of [enforcing officials]" to determine
whether someone has violated the policy. *Kolender*, 461 U.S. at 358, 361 (1983);
*see also United States v. Biro,* 143 F.3d 1421, 1426 (11th Cir. 1998) (recognizing
that preventing discriminatory enforcement "is the more important aspect of the
vagueness doctrine"). "What renders a statute vague is not the possibility that it will
sometimes be difficult to determine, but rather the indeterminacy of precisely what

[standard]" the law imposes for finding a violation. *United States v. Williams*, 553 U.S. 285, 306 (2008). That danger is particularly strong when a statute uses terms, as here, incorporating "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Id*. (collecting cases); *see also United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 359 (6th Cir. 1998) ("We have no doubt that standing alone, the term 'controversial' vests the decision-maker with an impermissible degree of discretion."). This is why multiple courts have found school policies unconstitutional that invite arbitrary and discriminatory enforcement. *See, e.g.*, *Burton v. Cascade Sch. Dist. Union High Sch. No. 5*, 353 F. Supp. 254, 255 (D. Or. 1973) *aff'd*, 512 F.2d 850 (9th Cir. 1975) (finding teacher termination for violating school "immorality" rule to be "so broad" such that it subjects " the livelihood of every teacher in the state to the irrationality and irregularity of [the policy enforcers'] judgments"); *Westbrook v. Teton Cty. Sch. Dist. No. 1,* 918 F. Supp. 1475, 1491 (D. Wyo. 1996) (prohibiting school employees from "criticiz[ing] other staff members" held unconstitutional because "employees cannot determine whether the authorities will discipline them because their speech constitutes 'criticism'").

The Censorship Policies applied against Rinderle rely on subjective, undefined terms with unbridled interpretation. Indeed, Defendants here interpreted the Censorship Policies to encompass material well beyond the CCSD curriculum.

[Doc. 41-1 at 19 (Defendants admit *MSP* was "never part of CCSD's curriculum.")]

When asked to define "controversial" in relation to the Policies, CCSD's administrators' testimony reflects their unbridled discretion and breadth:

- Assistant Superintendent Walton: "when there are two sides of [] an issue";

- Principal Kale: when "two people disagree" about an issue; and

- Defendant Dowd: when "an issue that has a lot of feelings depending on the person, depending on the race, depending on the family, depending on their religious background, depending on their moral beliefs."[7]

Indeed, an infraction that depends on whether there are "a lot of feelings" about an issue clearly "leaves open… the widest conceivable inquiry, the scope of which no one can foresee." *Cohen Grocery Co.*, 255 U.S. at 89.

Finally, Defendants' suggestion that Plaintiffs' vagueness claims must fail because *they themselves* now understand that the Censorship Policies restrict gender

---

[7] Plaintiffs append Rinderle's termination hearing transcript ("Transcript"). [Ex. 1] While "it is generally true that the scope of the review must be limited to the four corners of the complaint," the Eleventh Circuit recognizes that it "is well settled that [i]n ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cty., Fla.*, 48 F.4th 1222, 1232 (11th Cir. 2022) (internal quotations omitted). The Transcript is central to Rinderle's claims challenging her termination, as it includes sworn testimony on Defendants' motivations, actions, and interpretation of the Policies. The Transcript, prepared by CCSD's court reporter, is indisputably authenticated.

identity and non-conformity ignores the timing of their actions. Rinderle had no fair notice because the subsequent interpretations of the Policies "impermissibly delegat[ed] basic policy matters to [their officials] for resolution on an ad hoc and subjective basis." *Grayned,* 408 U.S. at 108.[8]

C. <u>The Censorship Policies are subject to heightened vagueness scrutiny but fail even the lowest level of scrutiny.</u>

The level of permissible vagueness varies with "the nature of the enactment." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982). Higher scrutiny applies when regulations "inhibit" constitutionally protected freedoms, *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964), lack a scienter requirement, *Colautti v. Franklin*, 439 U.S. 379, 395 (1979), and impose severe civil penalties. *See Vill. of Hoffman,* 455 U.S. at 499. Stricter tests are applied to regulations that strip individuals of professional licenses and livelihoods. *See Sessions v. Dimaya*, 584 U.S. 148, 184-85 (2018) (Gorsuch, J., concurring in part).

---

[8] Defendants' argument that there is no ambiguity and "[a]ny adult with reasonable intelligence . . . would understand those words and know how to apply them," [Doc. 46-1 at 9-10], proves Plaintiffs' point. As set out in the First Amended Complaint, none of these veteran Educator Plaintiffs knew that a book about acceptance of gender expressions and identities would violate the Censorship Policies – and still do not know what content or conversation will subject them to termination. [Doc. 26 ¶¶ 41, 47, 68-71, 84]

The Eleventh Circuit applies a more exacting standard when a civil law yields particularly severe professional consequences. *See Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1311, 1323 (11th Cir. 2017) (heightened scrutiny where "devastating consequences attach to potential violations" for doctors being "hauled before disciplinary boards, their reputations finished, and their medical careers tarnished"). Courts also apply the "most exacting vagueness review" when a law censoring classroom instruction subjects teachers to harsh professional consequences without a scienter requirement. *Local 8027 v. Edelblut,* 651 F. Supp. 3d 444, 460 (D.N.H. 2023). Exacting review is applicable here, where the Censorship Policies impose severe professional consequences, lack a scienter requirement, and burden students' right to receive information, *see infra,* Sec. III.

Even so, the Supreme Court has often found that vague laws are constitutionally infirm even where heightened scrutiny does not apply, including those involving economic regulation, civil penalties, and penalties against public educators. *See Ashton v. Kentucky*, 384 U.S. 195, 200 (1966) (collecting cases); *Cohen Grocery Co.*, 255 U.S. at 89; *Ga. Pacific Corp. v. Occupational Safety and Health Rev. Comm'n*, 25 F.3d 999, 1005-06 (11th Cir. 1994); *Edelblut*, 651 F. Supp. 3d at 462.

D. Plaintiffs satisfy standing requirements.

Grimmke and GAE member educators[9] have standing to bring vagueness claims where they seek to support Gender Non-Conforming Students with non-curricular speech, but the vague policies chill them from doing so.[10] Similarly, Student Plaintiffs have suffered an injury to their liberty interests where they seek to receive a public education free from differential treatment, *see infra* Sec. II, and a First Amendment right to receive information, *see infra* Sec. III, but are unable to engage in this constitutionally protected activity because their teachers are chilled from providing the information as a result of the vague Censorship Policies.

The Eleventh Circuit permits such pre-enforcement claims. *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1350 (11th Cir. 2011) (affirming standing when a "litigant is chilled from engaging in constitutionally protected

---

[9] Defendants do not challenge Rinderle's standing to sue over her individual claims related to her termination, only her third party standing on behalf of students. [Doc. 46-1 at 39]

[10] Binding precedent holds "that classroom discussion is protected activity" under the First Amendment. *Kingsville Independent Sch. Dist. v. Cooper*, 611 F.2d 1109, 1113 (5th Cir. 1980). To the extent *Kingsville* has been "called into question," "noncommittal observations in footnotes do not overrule cases." *Falls v. Desantis,* 2022 WL 19333278, at *3 (N.D. Fla. July 8, 2022). *Kingsville* "remains binding on this Court" and the Court "cannot ignore it, even if it believes that the en banc Eleventh Circuit or Supreme Court might go in a different direction if deciding the issue today." *Id.* The First Amendment protects classroom discussion in this Circuit, including the speech at issue here.

activity"). Plaintiffs must show that: (1) they "seriously" wish to engage in speech, (2) speech "would arguably be affected by" vague rules, and (3) there is "a minimal probability" of enforcement. *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). If these conditions are met, they claim an ongoing, "irreparable" injury to their First Amendment rights.

Grimmke and other GAE educators have standing under *Harrell.* They seek to provide age-appropriate non-curricular information and engage in non-curricular discussion that addresses recognition of gender non-conforming and LGBTQ identities and to support their students by addressing bias-based bullying.[11] [Doc. 26 ¶ 86-87] Their speech is "affected by the rules," which are "*arguably vague.*" *Harrell*, 608 F.3d at 1254 (emphasis in original). *Harrell* also allows "intent to enforce" to "be inferred" when a rule is "recently enacted" or defended in court, as these policies, modified in 2022, are being defended in this suit. *Id.* at 1258. And Rinderle's termination demonstrates and underscores the likelihood of enforcement.

---

[11] Plaintiffs also allege that educators will need to intervene in anti-LGBTQ bullying, or respond to anti-LGBTQ insults, at least several times per year, which is sufficiently imminent for standing. [Doc. 26 ¶¶ 58, 86-88] *Cf. Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 212 (1995) (finding allegations of imminent injury sufficient where company was "very likely to bid" on each contract that the state issues annually).

Similarly, Student Plaintiffs allege the Policies abridge their right to receive information, s*ee infra* Sec. III, because the vague Policies chill teachers from providing such information. [Doc. 26 ¶ 251-260]; *see also Arce v. Douglas,* 793 F.3d 968, 977-81 (9th Cir. 2015) (citing *Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 621 n.5 (1976) (holding that students had standing to raise a vagueness claim to a statute aimed at others that inhibited their right to receive information)).

## II.   This Court Should Deny Defendants' Motion to Dismiss Plaintiffs' Equal Protection Claims.

Contrary to Defendants' mischaracterization of their Equal Protection claim, Student Plaintiffs allege that Defendants' discriminatory interpretation and enforcement of the Censorship Policies subject Gender Non-Conforming Students, including themselves, to unconstitutional, differential treatment. That *MSP* was "never part of CCSD's curriculum" is inconsequential. [Doc. 41-1 at 19] Plaintiffs have sufficiently alleged a plausible claim that the Policies result in differential treatment by their teachers as compared to their gender conforming peers, causing them harm without substantial relation to a legitimate, much less important, governmental justification. At base, Plaintiffs have alleged all that is required at this stage: a "plausible" Equal Protection violation, including allegations of intentional

discrimination, and sufficient facts to establish the Policies would not survive even the minimum scrutiny.[12]

A.   Censorship Policies discriminate against Student Plaintiffs.

"The Equal Protection Clause is 'essentially a direction that all persons similarly situated should be treated alike.'" *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cty.*, 57 F.4th 791, 800 (11th Cir. 2022) (citations omitted). "When a state distributes benefits unequally, the distinctions it makes are subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment." *Hooper v. Bernalillo Cty. Assessor*, 472 U.S. 612, 618 (1985). At the pleading stage, it is enough to "allege that the plaintiff was a member of an identifiable group and that there was differential treatment 'based on their membership of that very group.'" *Glenn v. Brumby*, 632 F. Supp. 2d 1308, 1314 (N.D. Ga. 2009) (citations omitted). Here, Student Plaintiffs easily meet their obligations by alleging facts that the differential treatment caused by the Policies is intentional and causes them direct and disparate harms by creating a broad, content and viewpoint based limit on non-curriculum discussion about a specific topic. *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) (school regulation allowing labor picketing, but not other

---

[12] The level of scrutiny to apply or whether the policies can withstand such scrutiny are fact-dependent inquiries unsuitable for resolution at the pleading stage. *See Duronslet v. Cty. of Los Angeles*, 266 F. Supp. 3d 1213, 1223 (C.D. Cal. 2017).

picketing violates First Amendment and Equal Protection). [Doc. 26 ¶ 99, 100, 116, 123, 126, 141-145, 147-156, 157-158]

Defendants fail to recognize that Student Plaintiffs,[13] on behalf of a class of Gender Non-Conforming Students, allege the Censorship Policies intentionally discriminate *against them* by inflicting *on them* harms that the Policies do not inflict on gender conforming students. Specifically, the Policies require CCSD teachers to withhold any discussion, information, and support relevant to the identities of Gender Non-Conforming Students, deeming such speech "controversial" and "divisive," in contrast to materials that support the identities of gender conforming students. Student Plaintiffs also sufficiently plead many attendant harms resulting from their differential treatment. [Doc. 26 ¶¶ 147-156]; *see generally Arce,* 793 F.3d at 977-81 (triable issues of fact existed for an as-applied equal protection claim on behalf of students alleging discriminatory motive in removing access to information). Student Plaintiffs have met their pleading burden.

Defendants' argument that the Censorship Policies do not govern student conduct misses the point. [Doc. 41-1 at 18-19] The Policies govern teacher conduct that severely limits discussion, engagement, and fair treatment that Student Plaintiffs

---

[13] Although Plaintiffs alleged Equal Protection violation on behalf of a class of teachers, [Doc. 26 ¶ 241] they do not seek to further pursue that claim. Plaintiffs' Equal Protection claim is based on the unequal treatment of students, not teachers.

receive from their teachers compared to their gender conforming peers. For example, under the Policies, a CCSD teacher can intervene on behalf of a gender conforming student for harassment based on his gender expression or heterosexuality by sending a message to all students that such bias-based harassment will not be tolerated. Yet, the Policies bar that teacher from responding in the same way on behalf of a Gender Non-Conforming Student. Defendants thus convey to one class of students that they are 'normal' and superior; and that the other class are outcasts and inferior. Defendants also allow teachers to provide gender conforming students with information recognizing, reflecting and supporting their existence. The Policies deny Gender Non-Conforming Students similar access, and teachers cannot even hint at providing them the same support. Such dramatically differential treatment violates Equal Protection.

Defendants overstate a plaintiff's burden at the pre-discovery stage with respect to motive. First, Plaintiffs do not rely on the school district's treatment of gender issues to "imply" intentional discrimination. [Doc. 41-1 at 19] Instead, Plaintiffs allege that Defendants interpret and enforce the Policies with discriminatory intent against gender non-conforming people – and *not* simply topics [Doc. 26 ¶¶ 207, 213-214, 219-221, 229] – which need only be a "motivating factor," not the "dominant" or "primary" one to show an Equal Protection violation. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 265–66 (1977)).

Second, discriminatory intent may be established by a variety of factors, many of which are alleged here and all of which are more appropriately decided after discovery. [Doc. 26 ¶¶ 90-92, 95, 108-9, 118, 128-9] Among those factors are "[t]he historical background of the decision, [t]he specific sequence of events leading up [to] the challenged decision, [d]epartures from the normal procedural sequence, and contemporary statements by members of the [Legislature], minutes of its meetings, or reports. *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021) (internal quotations and citations omitted).[14] Defendants' suggestion that Plaintiffs' claim fails without 'smoking gun' allegations showing motive is not supported in law. [Doc. 41-1 at 19]

---

[14] Plaintiffs allege facts similar to those in *Arce*, *supra*. There, the court reversed summary judgment dismissing students' Equal Protection challenge to the elimination of a Mexican American Studies ("MAS") program. Citing *Arlington Heights*, the court recognized that whether the policy was "enacted and/or enforced with discriminatory intent" was a disputed fact considering these allegations: (1) the disparate impact on Mexican American students; (2) school superintendent statements hostile to MAS content; (3) political statements hostile to Mexican Americans, and (4) substantial "departures from normal procedures or substantive conclusions." *Id.* at 976-81. Similarly, here, Plaintiffs allege, *inter alia*, key decision-makers testified that their enforcement of the Policies was motivated by hostility against gender nonconforming people, [Doc. 26 ¶¶ 99, 110, 146], disparate impact on Student Plaintiffs based on a protected characteristic, *see* Student Standing Discussion at II(C), and Rinderle's termination hearing substantially departed from normal procedures. [Doc. 26 ¶¶ 90-92, 95, 108-9, 118, 128-9]

B. <u>Plaintiffs sufficiently allege that the Censorship Policies fail to satisfy any level of scrutiny.</u>

Deciding whether a claim survives a particular level of scrutiny is premature on a motion to dismiss. *See*, *e.g.*, *Operation Par, Inc. v. Hernando Cty.,* No. 8:11-cv-2679, 2012 WL 13106401, at *2 (M.D. Fla. Feb. 6, 2012) (deferring application of rational-basis review, "which is best addressed on a complete record, not the bare pleadings"); *Hassan v. City of N.Y.*, 804 F.3d 277, 306 (3d Cir. 2015), as amended (3d Cir. 2016) ("[T]he burden of producing evidence to overcome heightened scrutiny's presumption of unconstitutionality is that of the City and must be met after its Motion to Dismiss.") (cleaned up). Even so, Defendants' attempts to bat away Plaintiffs' allegations that the Policies lack a sufficient governmental interest fail.

1. *Plaintiffs allege facts showing that the Policies are a sex-based classification whose justifications fail heightened scrutiny.*

For "sex-based classifications, a policy will pass constitutional muster only if it satisfies intermediate scrutiny," requiring the government to "show that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Adams*, 57 F.4th at 801 (citations and internal quotations omitted). In the Eleventh Circuit, intermediate scrutiny applies to policies that distinguish based on sex, including those impacting transgender and gender non-conforming students and minors. *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1226 (11th Cir. 2023)

20

(explaining that "a government policy that distinguishes on the basis of sex is permissible under the Equal Protection Clause only if it satisfies intermediate scrutiny") (internal quote omitted); *see also Bostock v. Clayton Cty.,* 590 U.S. 644, 656 (2020); *Adams*, 57 F.4th at 803 ("[B]ecause th[at] policy … classifies on the basis of [sex assigned at birth], it is subject to intermediate scrutiny."). [15]

The Censorship Policies differentiate on the basis of sex. For example, whether a student may learn, ask, or initiate a classroom discussion about a character or person who, like themselves, wears makeup and skirts depends on the sex of that student. If the student's birth assigned sex is female, the answer is yes; if their birth assigned sex is male, the answer is no. In the same vein, whether a student may learn, ask, or initiate a classroom discussion with a teacher about an issue, character or person whose gender expression or identity is similar to their own depends on whether they conform to sex stereotypes. If the answer is yes, they have access to information and support, and can feel validated, valued and welcomed by the teacher. If the answer is no, that same student – similarly situated in every way

---

[15] Defendants' references to the footnoted dicta in *Adams* expressing doubts as to whether transgender people constitute a quasi-suspect class [Doc. 41-1 at 17] is inapposite—Plaintiffs do not assert a challenge based on transgender status. Nothing in *Adams*, nor in *Eknes-Tucker*, suggests that transgender or gender non-conforming people are excluded from protection based on sex or sex-stereotypes.

except for their failure to conform to sex stereotypes – is classified as too "controversial" to receive the same benefits from their teachers.

Defendants argue that *Bostock* is irrelevant because it concerns Title VII, not the Equal Protection Clause, relying on *Eknes-Tucker*. But *Eknes-Tucker* holds only that classifications based on transgender status do not *necessarily* violate Equal Protection, not that the but-for test in *Bostock* is inapplicable to sex-based distinctions. 80 F.4th at 1227. Indeed, it is precisely because the court concluded that the Alabama statute was not sex-based discrimination that it reversed the preliminary injunction. *Id.* at 1227-28. Here, Student Plaintiffs have sufficiently alleged a sex-based discrimination claim, not a transgender-based claim. [Doc. 26 ¶¶ 1-5, 8-41, 44-131, 139-172, 206-217] And in *Glenn v. Brumby,* the court held that discrimination against a transgender woman was unconstitutional sex-based discrimination. 663 F.3d 1312, 1316 (11th Cir. 2011) ("discriminating against someone on the basis of his or her gender non-conformity constitutes sex-based discrimination under the Equal Protection Clause."). So too here.

Further illustrating this point, Defendants' testimony at Rinderle's hearing focused on sex. Two of CCSD's witnesses testified that it was the character's non-traditional choice of dress – the "boy [sic] wears a skirt[,]" so "traditional female garb [below with] traditional male garb up top," – that made *MSP* so "controversial," "political," and "age-inappropriate." [Doc. 26 ¶¶ 105, 107] By extension, so too are

students who identify with such characters. Defendants' decision to deny Student Plaintiffs access to pedagogy and educational content reflective of their identities, including *MSP,* and to fire Rinderle for reading the book cannot be accomplished without reference to sex and sex-stereotypes.[16] These allegations are sufficient to support a plausible claim that the Policies discriminate against Student Plaintiffs on the basis of sex.

"For a governmental objective to be important, it cannot 'rely on overbroad generalizations about the different… preferences of males and females." *Adams*, 57 F.4th at 801 (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). It "must be genuine, not hypothesized or invented post hoc in response to litigation." *Virginia*, 518 U.S. at 533. And "the classification must substantially serve an important governmental interest *today*, for 'in interpreting [Equal Protection guarantee, we have] recognized that new insights and societal understandings can reveal unjustified inequality … that once passed unnoticed and unchallenged.'"

---

[16] Defendants wrongly claim that *Eknes-Tucker* overturned *Glenn* or limited it to employment discrimination cases. It did not, and could not, without explicitly so holding. Instead, *Eknes-Tucker* explained that "*Brumby* concerned … the Equal Protection Clause … as applied to ... an employer [who] fired an employee for failing to adhere to certain expectations and stereotypes associated with the employee's sex." Far from overturning *Glenn* and holding that sex stereotyping is constitutionally permitted, *Eknes-Tucker* applied *Glenn* and reaffirmed its continuing binding force.

*Morales-Santana*, 582 U.S. at 59 (quoting *Obergefell v. Hodges*, 576 U.S. 644, 673 (2015)) (emphasis in original).

Defendants' *only* justification is the general statement that "the Policies' treatment of controversial topics is substantially related to CCSD's legitimate pedagogical interest in regulating the presentation of controversial topics to schoolchildren." [Doc. 41-1 at n.4] Such an overly broad justification falls well short of an important governmental interest. Avoiding "controversy" (without more), especially where subsequently defined solely by the ability for a topic to generate disagreement, cannot be a "genuine" interest given that Defendants' schools teach topics where people disagree, from the Civil War to the shape of the Earth.[17] *See supra* Sec. I. Although Defendants have discretion to determine which topics to

---

[17] Defendants fail to offer any explanation to show why gender non-conformity is controversial, political, one-sided, or violative of parental rights but, according to their publicly available curriculum information, scores of other topics fitting their broad definitions of these terms are allowed – e.g., capitalism, the Civil Rights Movement, women's suffrage, religion's role in societies, use of technology, and more. And any argument that Rinderle was fired for failing to present both sides of a "sensitive" issue is belied by the fact that all the other characters *were* gender conforming and equally as accepted. Finally, any broad 'parental rights' justification runs afoul of the Constitution. *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) (quoting *Palmer v. Thompson*, 403 U.S. 217, 260–261 (1971) (White, J., dissenting)) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.").

teach and which to avoid, they may not exercise this discretion without legitimate bases or to create classifications targeting a protected class for differential treatment.

To the extent Defendants imply age-appropriateness falls within the ambit of "legitimate pedagogical interest," it similarly fails for being so overbroad as to dilute any importance. For instance, *MSP* lacks violence, sexual explicitness, strong language, or any other traditional indicia of age-inappropriateness. [Doc. 26 ¶¶ 56-57; Doc. 26-3] Defendants' position that discussing the very existence of gender non-conforming people – like Student Plaintiffs – is *per se* age-inappropriate is the kind of "overbroad generalization" which intermediate scrutiny prohibits.

### 2. Allegations are sufficient to show Policies fail rational basis review.

A regulation that discriminates between groups must have a "rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993); *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985) ("where individuals in the group affected by a law have distinguishing characteristics" Equal Protection requires "a rational means to serve a legitimate end"). Student Plaintiffs have sufficiently alleged an Equal Protection violation that would fail even rational basis review because the Censorship Policies impose a disadvantage upon Gender Non-Conforming Students, including themselves, without a legitimate government justification. That is all that is required at this stage. *See Smith v. Hamm,* No. 2:22-

CV-497-RAH, 2023 WL 4353143, at *13 (M.D. Ala. July 5, 2023) ("it is more appropriate to consider arguments as to the rational basis prong of the [E]qual [P]rotection claim at the summary judgment stage following discovery and further factual development.").

Here, Plaintiffs allege that the Policies were motivated by a desire to discriminate against Gender Non-Conforming Students. [Doc. 26 ¶ 229] Even the most deferential rational basis review cannot be premised on "irrational prejudice" or a "desire to harm a politically unpopular group." *U.S. Dept. of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).[18] Here, as in *Romer v. Evans*, the disjunction between the "[s]weeping and comprehensive" classification imposed by the regulations and the asserted bases for the classification reveals the constitutional defect. 517 U.S. at 627; *see also City of Cleburne*, 473 U.S. 432.[19] The circumstances here require similar

_____

[18] The "rational basis inquiry is 'not a toothless one' and there are limits to the latitude afforded states." *Dean v. Egleston*, 597 F. 3d 1223 (11th Cir. 2010) (citing *Schweiker*, 450 U.S. 221, 234 (1981)).

[19] Here, as in *Moreno, Cleburne*, and *Romer*, Plaintiffs have sufficiently alleged that the regulations are: (1) aimed at excluding a group from a benefit, (2) without proper justification, and (3) notwithstanding a proffered governmental interest. *See Moreno*, 413 U.S. at 537-38, (regulation excluding homes with unrelated individuals unconstitutional); *Cleburne*, 473 U.S. at 450 (zoning regulation excluding people with mental health disabilities unconstitutional); *Romer* 517 U.S. at 635 (amendment excluding LGBTQ people from anti-discrimination laws unconstitutional).

scrutiny and result. Discriminating against Student Plaintiffs to avoid a topic that may spark disagreement is not rationally related to a legitimate interest.

E. <u>Student Plaintiffs' alleged injuries confer standing.</u>

At the pleading stage, "a plaintiff may establish standing based on general factual allegations of injury." *Miccosukee Tribe of Indians v. S. Everglades Restoration All.*, 304 F.3d 1076, 1080 (11th Cir. 2002). Injuries alleged show that the Censorship Policies and Defendants' enforcement of them directly inflict harm in at least three ways. First, they brand these students as inferior. Second, they directly deny them access to an inclusive education. Third, as set out above, they prohibit teachers from creating a safe and inclusive school environment.[20] These harms are not hypothetical, remote, or "downstream" from the Censorship Policies

---

[20] Although a recognition of GYJCA's associational standing will moot, to some extent, the need for Rinderle to pursue third party standing claims, she nonetheless has alleged sufficient facts to sustain Equal Protection claims on behalf of unidentified Gender Non-Conforming Students because she satisfies the criteria set out in *Young Apartments, Inc. v. Town of Jupiter, FL*, 529 F.3d 1027 (11th Cir. 2008) (upholding landlord's standing on behalf of tenants). She has "suffered an 'injury-in-fact,'" giving her "a 'sufficiently concrete interest' in the outcome of the issue in dispute"; has "a close relation to the third part[ies]" who are hindered in their "ability to protect his or her own interests" based on age, vulnerability and the inability to bring claims without a next friend. *Id*. 529 F.3d at 1041-42 (citations omitted). Rinderle's allegations of injury and her pursuit of economic damages and reinstatement give her third-party standing to bring an Equal Protection claim on behalf of her Gender Non-Conforming Students. Based on page limitations, Plaintiffs reserve the right to seek leave to provide a fulsome argument on this issue.

given that Defendants do not deny that a teacher will be terminated for treating Gender Non-Conforming Students equally. Rinderle's termination proves this point.

The Policies and their requirement that teachers treat Gender Non-Conforming Students differently from their gender-conforming peers stigmatizes Student Plaintiffs. The Policies single out Gender Non-Conforming Students as "controversial," "divisive," and "inappropriate." [Doc. 26 ¶156-158] *See*, *e.g.*, *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023) ("*SFFA*") (finding that even well-intentioned categorization of people based on a defining characteristic is stigmatizing and unconstitutional in holding that race-based admissions promote "offensive and demeaning" stereotypes of students forbidden by the Equal Protection Clause); *Obergefell,* 576 U.S. at 674 (recognizing "invidious sex-based classifications in marriage" that "denied the equal dignity of men and women" as unconstitutional), *and see id*., at 671-72 (recognizing marriage bans "impose stigma and injury of the kind prohibited by our basic charter"). Moreover, the Policies put "the imprimatur of the State itself" to demean the protected class. In fact, the stigmatizing message of Defendants' Policies is clearer than in both *Obergefell* and *SFFA*, as it explicitly singles out Gender Non-Conforming Students as *per se* "controversial," "age inappropriate," and "divisive."

Second, Gender Non-Conforming Students are injured by being denied an education inclusive of their expression and identities. [Doc. 26 ¶195-201] These

28

harms are not hypothetical, remote, or "downstream." As Plaintiffs allege, A.A. was denied an inclusive education when Defendants removed *MSP* – to which A.A. had access – and terminated Rinderle, the teacher who provided her with the most support and validation for her gender identity.[21] [Doc. 26 ¶¶ 59, 64-66, 155] Similarly, reflecting both intentional discrimination and direct harm, the Policies have led to suppressed discussions about LGBTQ and gender non-conforming people, denial of a proposed Gay-Straight Alliance as "too divisive,"[22] censored LGBTQ content from school libraries, and caused teachers to self-censor for fear of employment discipline, to the detriment of Student Plaintiffs. [Doc. 26 ¶¶ 159-163]

Finally, Defendants harm students by denying teachers the ability to create safe and inclusive classrooms by prohibiting them: (1) from intervening in bullying or harassment directed at a student based on anti-LGBTQ prejudice or based on students' gender identities or expression in a way that would stem such bullying;[23]

---

[21] Defendants' argument that students seek a hecklers veto over personnel decisions grossly misstates the claims.

[22] *See Gay-Straight All. of Yulee High Sch. v. Sch. Bd. of Nassau Cty.*, 602 F. Supp. 2d 1233, 1235 (M.D. Fla. 2009) (denial of Gay-Straight Alliance application likely violates First Amendment).

[23] The Censorship Policies deny Gender Non-Conforming Students – and no other group – *equal* protection from identity-based harassment and bullying. Consider that a student faced with harassment based on any number of characteristics, e.g., disability, size, religion, race, can receive protection from educators that

and (2) providing classroom information they claim would, at minimum, mitigate a hostile school climate. [Doc. 26 ¶¶157-158, 162, 195-196, 225] Injury, causation, and redressability [Doc. 26 ¶¶ 88, 163, 233, 245] are sufficiently alleged.

### III. This Court Should Deny Defendants' Motion to Dismiss Plaintiffs' First Amendment Claims.

Student Plaintiffs' First Amendment right is established under applicable case law and sufficiently alleged to create a plausible claim. The Constitution protects a First Amendment right to receive information, *Stanley v. Ga.*, 394 U.S. 557, 564 (1969), including for public school students. *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 866-68 (1982); *see also Epperson v. Arkansas*, 393 U.S. 97, 107-108 (1968) (striking down law banning the teaching of evolution in public schools); *Meyer v. Nebraska*, 262 U.S. 390, 403 (1923) (invalidating a statute prohibiting teaching of foreign languages in public schools).

Defendants take the absolutist position that no one has standing to bring First Amendment claims related to classroom speech and students have no enforceable rights to speech involving access and educational material. By Defendants' logic, schools can enforce orthodoxy well beyond curriculum. A teacher could be fired for

---

prophylactically protects the victim by informing all students in earshot that discrimination based on different ability/body sizes/religion/race, is unacceptable. An educator who says the very same in defense of a Gender Non-Conforming Student does so at peril of termination.

allowing students to read about Judaism or conduct a school project on climate change, or, as here, allowing access to information that violates Defendants' preferred sex stereotypes. Defendants' extreme position is contrary to law.

In *Pico*, a plurality of the Supreme Court acknowledged that "the right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom" and determined that students are protected from having their access to information restricted for illegitimate reasons, such as enforcing "political orthodoxy." *Id.* at 867, 875. Later, the Supreme Court ruled that schools cannot restrict students' access to information for reasons not connected to "a legitimate pedagogical" interest. *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988). The Eleventh Circuit subsequently reiterated that any restriction on school-sponsored speech must be "reasonably related to legitimate pedagogical concerns." *Bannon v. Sch. Dist. of Palm Beach Cty.*, 387 F.3d 1208, 1214 (11th Cir. 2004).

Here, Defendants do not identify any pedagogical concerns other than a general interest in avoiding "controversy." [Doc. 41-1 at n.5] Such a justification as legitimate or pedagogical would permit complete censorship of any topic or idea with which some people – including school officials – "disagree." Lacking a

legitimate pedagogical interest, Defendants seek to eliminate the *Hazelwood* test, hitching their claim to previously rejected arguments.[24]

Recently, the Northern District of Florida rejected a similar argument that "the content of school libraries is 'government speech' that is not subject to any constitutional constraints." *PEN Am. Ctr., Inc. v. Escambia Cty. Sch. Bd.*, No. 3:23cv10385-TKW-ZCB, 2024 WL 133213, at *2 (N.D. Fla. 2024) (no "reasonable person would view the contents of the school library (or any library for that matter) as the government's endorsement of the views expressed in the books on the library's shelves."). The court noted that "the factors that the Eleventh Circuit has used to determine whether something is government speech—e.g., history, endorsement, control. . . are fact-intensive and generally not amenable to resolution at the motion to dismiss stage." *Id.* Here, Defendants argue that "instructional speech is government speech" [Doc. 46-1 at 22], and public schools have full authority over

---

[24] Defendants inaccurately claim that *Hazelwood* does not apply to (1) materials outside of the curriculum and (2) cases where no student speech is at issue. [Doc. 41-1 n.5] First, in *Bannon*, the restriction clearly involved materials outside of the curriculum with "students [participating in an activity who] were not required to participate, they received no grade or credit for participation," and it was "a Saturday outside of school hours," but the *Hazelwood* standard still applied. *Bannon* at 1215. Second, *Hazelwood*'s application to right to receive information claims has not been rejected in the Eleventh Circuit. *See, e.g., ACLU of Fla., Inc. v. Miami–Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1202 (11th Cir. 2009); *Virgil v. Sch. Bd. of Columbia Cty.*, 862 F.2d 1517, 1522 (11th Cir. 1989).

all books, pedagogy, information, and, as here, supplemental materials and the ability to respond to student questions and requests for support, even when the suppression is based on political orthodoxy. [Doc. 46-1 at 25] Defendants' claim that they can suppress and censor all and any information to which students have access is simply wrong.

The Eleventh Circuit has also addressed the right to receive information. When a state makes decisions about books, information, and pedagogy that implicate students' First Amendment interests, the state must have legitimate reasons for the imposed limitation on students' access to information. *See, e.g., ACLU of Fla., Inc. v. Miami–Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1206 (11th Cir. 2009) (removal of book because ideas were disliked or to prescribe political orthodoxy violates First Amendment); *Virgil v. Sch. Bd. of Columbia Cty.*, 862 F.2d 1517, 1522 (11th Cir. 1989) (rejecting that school officials have an unfettered right to remove a book from curriculum but upholding actions based on vulgarity and sexual explicitness). Even if a state demonstrates a legitimate interest, a plaintiff may establish a First Amendment violation by proving that the reasons offered mask other illicit motivations. *See Pico*, 457 U.S. at 870-72 (Illegitimate motives include "narrowly partisan or political" interests, "racial animus," or a desire to "deny [students] access to ideas with which [the school] disagree[s].")

33

Though Defendants admit that the Censorship Policies reach well beyond curriculum to interactions and discussion, even their argument that all school curriculum "is quintessential government speech" is dead on arrival. *Walls v. Sanders*, No. 4:24-CV-00270-LPR, 2024 WL 2127044, at *17-18 (E.D. Ark. May 7, 2024). The *Walls* court pointed to Eighth Circuit precedent which, like the Eleventh Circuit, holds that any restriction on school-sponsored speech must be "reasonably related to legitimate pedagogical concerns." *Id.*; *Bannon v. Sch. Dist. of Palm Beach Cty.*, 387 F.3d 1208, 1214 (11th Cir. 2004). Defendants rely on out-of-circuit government speech doctrine cases[25] to avoid acknowledging that A.A. and GYJCA have a First Amendment right to receive information. Defendants cannot show the repudiation of this right in this circuit; their obfuscation about "government speech" must be disregarded. *Walker v. S. Co. Servs.*, 279 F.3d 1289, 1293 (11th Cir. 2002) ("only the Supreme Court or this court sitting en banc can judicially overrule a prior panel decision") (citing *Cargill v. Turpin*, 120 F.3d 1366, 1386 (11th Cir. 1997) (internal citations omitted)).

Student Plaintiffs have pled facts showing injuries to their First Amendment rights caused by the Policies which can be redressed by a favorable decision. [Doc.

---

[25] *Mayer v. Monroe Cty. Cmty. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007); *Chiras v. Miller*, 432 F.3d 606, 616 (5th Cir. 2005); *Griswold v. Driscoll*, 616 F.3d 53, 58-59 (1st Cir. 2010).

26 ¶ ¶155, 158-160, 163, 257]; *Miccosukee Tribe of Indians*, 304 F.3d at 1080.

Student Plaintiffs also allege that the restrictions are for impermissible "narrowly partisan or political" interests, including sex stereotypes and animus towards the LGBTQ community. [Doc. 26 ¶ 254-56] Defendants' animus was so egregious they fired a ten-year teacher with excellent performance reviews for reading one age-appropriate book at the request of her class. Accepting the allegations as true, Student Plaintiffs establish a First Amendment claim and Defendants fail to offer a legitimate pedagogical justification for their anti-LGBTQ motivated restrictions.

## IV.   Individual Defendants Are Not Shielded by Qualified Immunity

As a threshold issue, Defendants do not argue or suggest that the policy/practice requirements preclude damages as to CCSD. However, Individual Defendants deploy qualified immunity to insulate themselves from damages.[26] [Doc. 41-1 at 25-29] Although qualified immunity is a defense to discretionary actions, these Defendants had "fair warning" of the unlawfulness of their conduct. *See Hope v. Pelzer*, 536 U.S. 730, 741-42 (2002). Qualified immunity only shields officers from civil liability as long "as their conduct does not violate clearly established

---

[26] In Count Two, Plaintiffs Rinderle and A.A. seek damages against certain Board Members Dowd, Ragsdale and CCSD, for violation of the Equal Protection Clause. [Doc. 26 ¶¶ 239, 250] In Count Three, A.A. seeks damages against Board Members, Ragsdale and CCSD for violation of the First Amendment. [*Id.* ¶ 260] In Count Four, Rinderle seeks damages against CCSD for violation of Title IX. [*Id.* ¶ 280] Defendants assert qualified immunity only as to claims two and three.

statutory or constitutional rights of which a reasonable person would have known." *Carruth v. Bentley*, 942 F.3d 1047, 1053 (11th Cir. 2019) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal citations omitted)).

In this Circuit, a "right can be clearly established in one of three ways." *Gilmore v. Georgia Dep't of Corr.*, 23-10343, 2024 WL 3559728, at *10 (11th Cir. 2024) (citations omitted). A plaintiff "must point to either (1) 'case law with indistinguishable facts,' (2) 'a broad statement of principle within the Constitution, statute, or case law,' or (3) 'conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.'" *Id.* (quoting *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291-92 (11th Cir. 2009)). When officials have fair notice that their conduct is unconstitutional, a prior decision with similar facts is not required. *Coffin v. Brandau*, 642 F.3d 999, 1014-15 (11th Cir. 2011). A "broad ... principle within the Constitution, statute, or case law" can suffice. *Gilmore,* 2024 WL 3559728 at *10. Officials only need "reasonable warning that their conduct violated constitutional rights." *Smith v. LePage*, 834 F.3d 1285, 1291 (11th Cir. 2016) (internal citation omitted).[27] Defendants had such warning here.

---

[27] Plaintiffs' rights were clearly established by the Constitution and/or case law. As well, conduct "so egregious that a constitutional right was clearly violated" pierces qualified immunity even in the absence of similar past precedent. *Lewis*, 561 F.3d at 1292. As the Eleventh Circuit held: "we need no longer focus on whether the facts

36

At the motion to dismiss stage, qualified immunity is often premature because all factual allegations are presumed true. *Williams v. Fulton Cty. Sch. Dist.*, 181 F. Supp. 3d 1089, 1138 n.28 (N.D. Ga. 2016). If the complaint plausibly suggests that qualified immunity can be defeated, discovery is necessary to develop the facts, especially when immunity may depend on disputed facts. *See Kirby v. Sheriff of City of Jacksonville, Florida*, 22-11109, 2023 WL 2624376, at *3 (11th Cir. 2023) (quoting *Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002) (cases will proceed past dismissal if the complaint does not clearly establish immunity)).

A.   Defendants' actions violated clearly established Equal Protection Law.

Under Supreme Court precedent, the Equal Protection Clause, like the First Amendment, prohibits some classifications within local policies that permit some speech/materials and prohibit others. *See Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) (school regulation allowing labor picketing, but not other picketing violates First Amendment and Equal Protection). As *Mosley* held:

> [U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not

---

of a case are 'materially similar to prior precedent'" but instead, "[a] constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action [] has not previously been held unlawful." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1278 (11th Cir. 2004) (cleaned up) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

> select which issues are worth discussing or debating in public facilities. There is an 'equality of status in the field of ideas,' and government must afford all points of view an equal opportunity to be heard.

*Id*. at 96 (internal citation omitted). Defendants argue that no factually similar case and no constitutional principle supports Equal Protection claims. [Doc. 41-1 at 27-28] Yet, barring only one side of an issue is never permitted, *id.,* nor is unjustified discriminatory treatment of students. *See supra* Sec. II. Further, Defendants can articulate no governmental justification that would pass constitutional muster for a blanket ban against information reflecting gender non-conformity or even views that suggest support for Gender Non-Conforming Students (i.e., the existence of "gender identity beyond the binary"). [Doc. 41-1 at 27-28]

Here, Plaintiffs allege (1) a ban on discussion, instruction, and materials regarding such gender identity is all-encompassing, (2) designed to silence such speech, that (3) fails to show either a rational basis or survive intermediate scrutiny. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (recognizing "class of one" Equal Protection Claims when intentional differential treatment without a rational basis); *Glenn*, 632 F. Supp. 2d at 1313; *supra* Section II. If proven, Plaintiffs present an obvious violation of Equal Protection. Whether discrimination is "purposeful" and the full extent of the ban on discussion and written materials must be developed in discovery to inform the application of qualified immunity. *See Johnson*, 280 F.3d at 1317.

38

B.  Defendants' actions violated clearly established First Amendment law.

The Eleventh Circuit confirms that government may not violate students' constitutional right to receive information and that viewpoint discrimination is broadly unlawful across factual contexts. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."). This Circuit has held that the right to be free from viewpoint discrimination applies "with obvious clarity . . . even though the very action in question has [not] previously been held unlawful." *Holloman*, 370 F.3d at 1278 (quotations omitted); *see also id.* ("Holloman had the right to be free from viewpoint discrimination, and that right was clearly established[.]"). Further, as Justice Scalia observed decades ago, "hostility—or favoritism—towards the underlying message expressed" may not be the basis for regulating speech. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992); *Rosenberger*, 515 U.S. at 829–830 (describing viewpoint discrimination as an "egregious form of content discrimination" and "presumptively unconstitutional"); *see also Pico*, 457 U.S. at 866-68 (1982).

Plaintiffs allege that the Censorship Policies banning "controversial," "divisive," and other undefined terms have been interpreted and used to broadly prohibit any discussion (let alone instruction) that (1) gender non-conforming,

including transgender and non-binary, persons exist, (2) can be recognized and (3) should not be subject to negative treatment.

Against the backdrop of universal disfavor for viewpoint discrimination and prior restraints, Defendants seek to narrowly frame the issue as to existing case law regarding whether "the First Amendment entitles students to receive 'information about LGBTQ people…'" [Doc. 41-1 at 28] Yet, viewpoint-driven prior restraints on speech are so clearly unlawful that no reasonable government official could believe otherwise. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). As the Supreme Court has unequivocally and repeatedly held for over fifty years, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Mosley,* 408 U.S. at 95; *Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1226 (11th Cir. 2017); *N.Y. Times v. United States*, 403 U.S. 713, 714 (1971) (prior restraints of expression bears heavy presumption against its constitutional validity, and government carries heavy burden of showing justification for imposition of such a restraint). Defendants have "fair warning" that eliminating all information from the classroom questioning traditional views of gender expectations is an impermissible and viewpoint based prior restraint. And Rinderle's termination illustrates the breadth of that prior restraint. The unconstitutionality of prior restraints, clear and consistent for decades, negates Defendants' claim of qualified immunity.

## V.   This Court Should Deny Defendants' Motion to Dismiss Title IX Claims.

A. <u>Rinderle has sufficiently pled that Defendants violated Title IX.</u>

Title IX permits a retaliation claim if an employee complains about sex discrimination. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005). The Eleventh Circuit aligns Title IX retaliation claims with Title VII's framework. *Kocsis v. Fla. State Univ. Bd. of Trustees*, 788 F. App'x 680, 686 (11th Cir. 2019). A plaintiff must allege that they engaged in (1) protected expression, (2) suffered an adverse action, and (3) a causal connection exists between the two. *Whitaker v. Bd. of Regents of Univ. Sys. of Georgia*, No. 20-13618, 2021 WL 4168151, at *3 (11th Cir. 2021).

>    *1.   Rinderle engaged in statutorily protected activity, and she suffered adverse action.*

Under Title IX, like Title VII, individuals engage in protected expression when they oppose unlawful practices under these statutes. *Kocsis*, 788 F. App'x at 686. Title IX protects students from being "excluded from participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination" under any CCSD program or activity "on the basis of sex." 20 U.S.C. § 1681(a). The Supreme Court has long interpreted discrimination "on the basis of sex" as encompassing "the entire spectrum of disparate treatment of men and women resulting from sex stereotypes."

41

*Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (quoting *Los Angeles Dept. of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978)).

Defendants selectively cite *Bostock* and *Adams* but fail to engage with their reasoning. [Doc. 41-1 at 31] In citing *Bostock*, Defendants ignore a sentence they quote: "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second." 590 U.S. 644, 669 (2020). *Adams* involved the "the converse of that statement—whether discrimination based on [sex assigned at birth] necessarily entails discrimination based on transgender status." *Adams v. Sch. Bd. of St. Johns Cty.*, 57 F. 4th 791, 809 (11th Cir. 2022). Relying on the statutory and regulatory carve-outs that allow for certain situations when classifications may be made based on sex assigned at birth, *Adams* held that Title IX does not encompass all discrimination based on gender identity. *Id.* at 811-13. However, *Adams* specifically noted that sex stereotyping arguments were not relevant because the bathroom policy at issue classified students by sex assigned at birth and not sex stereotypes. *Id.* at 809-10, 813.[28]

---

[28] Defendants overstate another holding, claiming that "at least one district court in this circuit has held that Title IX does not prohibit discrimination based on sexual orientation." Doc. 41-1 31. The Title IX claim in *C.W. v. Smith* was dismissed because the plaintiff did not plead plausible facts showing that his hazing was related to his sex or sex stereotypes, rather than anti-freshman football player bias. *C.W. v. Smith*, No. 1:23-cv-368-CLM, 2024 WL 3333024, at *5-9 (July 8, 2024).

In contrast, Plaintiffs allege that CCSD has a pattern and practice of classifying students based on sex stereotypes and showed deliberate indifference towards discrimination against Gender Non-Conforming Students *because* those students do not adhere to sex stereotypes. Rinderle's reports of discrimination included incidents involving A.A., a transgender girl (then a non-binary child) who wore rainbow sneakers and grew out her hair. [Doc. 26 ¶ 59-66, 271] CCSD's decision to remove Rinderle from the classroom because she read a book featuring a child who does not adhere to sex stereotypes reinforced Rinderle's perception of a hostile educational environment. [Doc. 26 ¶ 105, 107, 129-30, 160-61, 271] CCSD then terminated Rinderle after she publicly spoke out about CCSD's discrimination against students who did not adhere to sex stereotypes. [Doc. 26 ¶ 114, 129-30]

Moreover, Defendants' focus on Title IX's regulatory carve-out of "textbooks or curricular materials" misconstrues Rinderle's actual Title IX allegations. [Doc. 41-1 at 33] Defendants admit *MSP* was "never part of CCSD's curriculum." *Id.* at 19. Rinderle never alleged that Title IX *required* CCSD to allow Rinderle to read *MSP* to her gifted fifth-grade class. Instead, Rinderle alleges that CCSD retaliated against her by terminating her after she read a book (chosen by her students and purchased from a CCSD book fair) featuring a child who does not adhere to sex stereotypes in order to support her gender non-conforming students and after she reported and spoke out about discriminatory incidents against Gender Non-

Conforming Students at Due West. [Doc. 26 ¶ 71-72, 114, 129-30] Rinderle further alleges that the hostile educational environment for Gender Non-Conforming Students, and CCSD's deliberate indifference towards it, predated her reading *MSP*, as evidenced by reports to Principal Kale of comments she heard and incidents she observed. [Doc. 26 ¶ 271]. The prohibition against the reading of *MSP* was just one event in a series of events to be developed in discovery, which contributed to Rinderle's reasonable belief that CCSD's actions were in contravention of Title IX.

Rinderle's belief that CCSD violated Title IX was also reasonable in light of simultaneous actions taken by the U.S. Department of Education's Office for Civil Rights ("OCR"). In May of 2023, OCR issued a public letter to nearby Forsyth County Schools ("FCS"), detailing the outcome of an investigation into "[w]hether the District's removal of books from schools created a hostile environment for students based on sex, in violation of Title IX and its implementing regulation."[29] OCR announced a Resolution Agreement with FCS the same day, where the district agreed to publicly confirm that books were not removed on the basis of sexual orientation or gender identity and that the environment surrounding the removal of books may have impacted students.[30] FCS was required to assess the prevalence of

---

[29] *U.S. Dep't of Educ., Office of Civil Rights*, OCR Complaint No. 04-22-1281 (May 19, 2023), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/04221281-a.pdf.

[30] *Id*.

harassment based on sex and comply with other imposed reporting requirements. *Id.* at 2-4. Like here, the Title IX issue was not the removal of books, but the message sent to students and the district's failure to respond to known harms to students. Knowing of the FCS resolution, Rinderle publicly spoke out about (1) CCSD's failure to address bullying targeting Gender Non-Conforming Students, (2) how her removal communicated that CCSD did not support Gender Non-Conforming Students, and (3) the loss of educational benefits for Gender Non-Conforming Students, including A.A., because of CCSD's deliberate indifference toward this hostile educational environment. [Doc. 26 ¶¶ 65, 103, 114-15, 150-54, 266]

## 2. *Rinderle has sufficiently pled retaliatory causation.*

This Circuit requires proof that retaliation was the "but-for cause" of the adverse action in Title IX claims,[31] with causation potentially inferred from "close temporal proximity between the protected activity and the adverse action." *Bowers v. Bd. of Regents of Univ. Sys. of Georgia*, 509 F. App'x 906, 911 (11th Cir. 2013)). Given the temporal proximity of her termination to the alleged harassment, Rinderle has sufficiently pled retaliatory causation.

Pre-discovery, Rinderle already alleges that she witnessed Due West students, teachers and administrators openly use anti-LGBTQ slurs and exclude and bully

---

[31] *Kocsis*, 788 F. App'x at 686 (quoting Univ. *of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013)).

Gender Non-Conforming Students in school. [Doc. 26 ¶¶ 58, 63-65, 102-03, 142] She further alleges that this conduct was so severe and pervasive that it affected students' educational experience and well-being. [Doc. 26 ¶¶ 63-65, 141, 154] Rinderle also alleges that CCSD had actual notice of discrimination against Gender Non-Conforming Students because of her reports to Principal Kale and other CCSD administrators before and during the investigation, which Principal Kale acknowledged, and her public communications. [Doc. 26 ¶¶ 102-103, 114-17, 271] In addition, Rinderle alleges that students and other community members spoke at a public school board meeting before her termination to further call attention to the pervasive discrimination against CCSD's Gender Non-Conforming Students and the effect of her removal from the classroom on those students. [Doc. 26 ¶¶ 123-127]

Defendants' assertion that Rinderle must show that Defendants Dowd or Ragsdale knew of her complaints to Principal Kale defies logic. The complaint alleges that Principal Kale forwarded the first parent complaint directly to CCSD's central office within an hour of receiving it. [Doc. 26 ¶ 90] And Rinderle was removed from her classroom and placed on administrative leave within days. [Doc. 26 ¶ 93-94] Principal Kale played a role in the disciplinary actions taken against Rinderle—but for Principal Kale forwarding the complaints directly to CCSD's central office, Rinderle would not have been removed from the classroom and placed on administrative leave. [Doc. 26 ¶ 90-94] Nor would Defendant Dowd have

initiated an investigation into whether Rinderle violated CCSD's Censorship Policies. [Doc. 26 ¶ 95]. Rinderle has sufficiently pled temporal proximity by alleging that she reported incidents of discrimination against LGBTQ and gender non-conforming students to Principal Kale *before* the investigation. [Doc. 26 ¶¶ 102-03, 114-17] Thus, CCSD's retaliation was motivated by Rinderle's public comments and internal complaints before CCSD's investigation.

### VI.  Plaintiffs Have Sufficiently Pled Organizational Standing.

#### A.  GAE and GYJCA have associational standing.

When declaratory and injunctive relief is sought, "individual participation of the organization's members is not normally necessary." *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1336 (N.D. Ga. 2018) (*citing Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008)). The only issue is whether the members of the organization themselves have standing. *Arcia v. Fla Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014). Because injunctive relief is prospective, an organization need only show that its members "face [] a probability of harm in the near and definite future." *Browning*, 522 F.3d at 1160.

Both GAE and GYJCA have alleged that "at least one member faces a realistic danger of suffering an injury." *Arcia,* 772 F.3d at 1342. *Id.* at 1163. Plaintiffs allege that the Censorship Policies caused the termination of one GAE member, placed another GAE member in imminent danger of discipline, and placed other GAE

members in fear of discipline causing them to self-censor, harming GAE's members and interests. [Doc. 26 ¶ 7] And CCSD's enforcement of its Policies has resulted in discriminatory, stigmatic, educational, and psychological harms to GYJCA's gender non-conforming and LGBTQ student members in CCSD. [Doc. 26 ¶ 9]

B.   GAE and GYJCA have standing due to diversion of resources.

GAE and GYJCA have sufficiently pled facts to demonstrate diversion of resources. [Doc. 26 ¶¶ 7, 9, 132-38] An organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379 (1982). *F.D.A. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 395 (2024) clarified that standing requires that a defendant's actions directly interfere with an organizational plaintiff's "core business activities." *Id.*

Defendants incorrectly claim that the sole purpose of both GAE and GYJCA is member advocacy.[32] [Doc. 46-1 at 46] Unlike the plaintiffs in *Hippocratic Medicine*, GAE is not simply an issue-advocacy organization; its core business activities involve educating members about various issues. GAE is a 501(c)(6) trade association and its annually described purpose on its IRS Form 990 is "(A) to

---

[32] Defendants also mistakenly claim that GYJCA's members are all students in the LGBTQ+ community. [Doc. 46-1 at 46]

promote quality education for all students in GA, (B) to provide for professional development enhancing the quality of education in GA, [and] (C) to protect and strengthen employment, human, and civil rights of all members."[33] GAE's program service include "professional development training and workshops," "informing and training members in educational issues," and "conferences [that] bring members together to educate them in current education and employment issues."[34] Thus, GAE, is like the organizational plaintiff in *Havens*, which "was an issue advocacy organization, but also operated a housing counseling service." *Havens*, 455 U.S. at 368; *see also Hippocratic Medicine*, 602 U.S. at 395; *League of Women Voters of Ohio v. LaRose*, No. 1:23-cv-02414, 2024 WL 3495332, -- F. Supp. 3d --, at *5 n.3 (N.D. Ohio July 24, 2024) (finding organizational injury because "it is a voter-advocacy organization whose core mission is to educate and assist voters.")

Similarly, Defendants ignore that GYJCA has sufficiently pled diversion of resources from "GYJCA's work on behalf of other organizational causes, members, and communities." [Doc. 26 ¶ 9] Only "[o]ne of GYJCA's core goals and mission is

---

[33]*Hippocratic Medicine* was decided on June 13, 2024, after Plaintiffs filed their First Amended Complaint. Plaintiffs submit this additional publicly available information, which can be converted to a formal declaration, to further support Plaintiffs' standing allegations. *ProPublica Non-profit Explorer*, GAE, https://projects.propublica.org/nonprofits/organizations/581086686/202001959349 303345/full (last visited Aug. 19, 2024).
[34] *Id.*

to advocate for inclusive, supportive, and equitably-funded public schools that welcome all students"; its mission also includes advocacy around redistricting, affordable higher education, and equal ballot access issues.[35] Nor is advocacy on behalf of LGBTQ members the extent of GYJCA's core business activities. Among other work that GYJCA has had to divert resources from are its "regular training programs focused on organizing skills, the history of movement work, and legislative advocacy."[36] Finally, "GYJCA has been forced to incur substantial costs to mitigate the harms of CCSD's actions against students." [Doc. 26 ¶ 9]

## CONCLUSION

Plaintiffs' well pled facts, accepted as true, sufficiently support Plaintiffs' standing and Defendants' plausible liability. Defendants' motion to dismiss should be denied accordingly.

Respectfully submitted this 19th day of August, 2024.

---

[35] Plaintiffs submit this publicly available information for the same reasons articulated *supra* n.34. *Our Wins,* Georgia Youth Justice Coalition for Action, https://www.georgiayouthjustice.org/our-wins (last visited August 19, 2024).

[36] *Id.*

50

/s/ Craig Goodmark
Craig Goodmark
Georgia Bar No. 301428
GOODMARK LAW FIRM
1425A Dutch Valley Place
Atlanta, Georgia 30324
(404) 719-4848
cgoodmark@gmail.com

/s/ Gerald Weber
Gerald Weber
Georgia Bar No. 744878
LAW OFFICES OF GERRY WEBER, LLC
Post Office Box 5391
Atlanta, Georgia 31107
(404) 522-0507
wgerryweber@gmail.com

/s/ Danielle E. Davis
Alice O'Brien*
Danielle E. Davis*
Nicole B. Carroll*
NATIONAL EDUCATION ASSOCIATION
1201 16th Street, N.W.
Washington, DC 20036-3290
(202) 822-7035
aobrien@nea.org
ddavis@nea.org
ncarroll@nea.org

/s/ Harry Chiu
Harry Chiu*
SOUTHERN EDUCATION FOUNDATION
101 Marietta Street, NW, Ste. 1650
Atlanta, GA 30303
(404) 523-0001
hchiu@southerneducation.org

/s/ Michael J. Tafelski
Michael J. Tafelski
Georgia Bar No. 507007
Elizabeth "Beth" Littrell
Georgia Bar No. 454949
Brock Boone*
Pichaya Poy Winichakul
GA Bar No. 246858
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Ste. 340
Decatur, Georgia 30030
(334) 315-0179
michael.tafelski@splcenter.org
beth.littrell@splcenter.org
brock.boone@splcenter.org
poy.winichakul@splcenter.org

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| KATHERINE RINDERLE, et al., | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | |
| | : | 1:24-CV-00656-JPB |
| COBB COUNTY SCHOOL DISTRICT, et al., | : | |
| | : | |
| *Defendants*. | : | |

---

**CERTIFICATE OF COMPLIANCE**

---

I hereby certify that the foregoing was prepared using Times New Roman font, 14-point type, which is one of the fonts and print selections approved by the Court in L.R. 5.1(C).

Respectfully submitted this 19th day of August, 2024.

/s/ Michael J. Tafelski
Michael J. Tafelski
Georgia Bar No. 507007
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Ste. 340
Atlanta, Georgia 30030
(334) 315-0179
michael.tafelski@splcenter.org

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| KATHERINE RINDERLE, et al., | : | |
| | : | |
| *Plaintiffs*, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | |
| | : | 1:24-CV-00656-JPB |
| COBB COUNTY SCHOOL DISTRICT, et al., | : | |
| | : | |
| *Defendants*. | : | |

---

## CERTIFICATE OF SERVICE

---

I have on this date served counsel of record with a true and complete copy of *Plaintiffs' Opposition to Motion to Dismiss* through the Court's electronic filing system.

Respectfully submitted this 19th day of August, 2024.

/s/ Michael J. Tafelski
Michael J. Tafelski
Georgia Bar No. 507007
SOUTHERN POVERTY LAW CENTER
150 E. Ponce de Leon Ave., Ste. 340
Atlanta, Georgia 30030
(334) 315-0179
michael.tafelski@splcenter.org
