# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| KATHERINE RINDERLE; et al., | |
| *Plaintiffs*, | |
| v. | CIVIL ACTION NO.: 1:24-cv-00656-JPB |
| COBB COUNTY SCHOOL DISTRICT; et al., | |
| *Defendants*. | |

# BRIEF OF THE DISTRICT OF COLUMBIA, NEW JERSEY, CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW YORK, OREGON, AND VERMONT AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION AND INTEREST OF AMICI ........................................ 1

SUMMARY OF ARGUMENT ............................................................... 4

ARGUMENT .................................................................................... 5

    I.    Amici States' Experiences Undermine Defendants' Contention That Its Extreme Actions Have A Legitimate Pedagogical Purpose. ...................................................................................... 5

        A.    Unlike CCSD's Censorship Policies, Amici States' education policies serve the legitimate pedagogical purpose of including and protecting LGBTQ people. ............... 6

        B.    Instead of censoring or restricting speech as CCSD does, Amici States equip educators to appropriately address LGBTQ topics. ........................................................................ 10

    II.    CCSD's Censorship Policies Stigmatize LGBTQ Youth In Georgia, And Its Stigmatic Harms Extend To Amici States ............... 16

        A.    CCSD's enactment and enforcement of the Censorship Policies stigmatize LGBTQ youth. ........................................... 17

            1.    Educational decisions that stigmatize LGBTQ youth directly harm mental health and educational outcomes. ........................................................................ 17

            2.    The Censorship Policies will increase anti-LGBTQ bias. ..................................................................................... 20

        B.    The Censorship Policies' harms extend beyond Georgia and may require Amici States to expend additional funds. ....... 22

CONCLUSION ............................................................................... 25

# TABLE OF AUTHORITIES

## *Cases*

*Bannon v. Sch. Dist. of Palm Beach Cnty.*, 387 F.3d 1208 (11th Cir. 2004) .......... 5

*Bd. of Educ. v. Pico*, 457 U.S. 853 (1982) ................................................................. 1

*City of Ocala, Fla. v. Rojas*, 143 S. Ct. 764 (2023) ................................................. 15

*Epperson v. Arkansas*, 393 U.S. 97 (1968) ................................................................ 1

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) ............................................ 6

*Gonzalez through Gonzalez v. Sch. Bd. of Okeechobee Cnty.*,
   571 F. Supp. 2d 1257 (S.D. Fla. 2008) ................................................................ 15

*Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260 (1988) ................................... 5, 6

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) ..................................... 15

*Lee v. Weisman*, 505 U.S. 577 (1992) ...................................................................... 15

*Leebaert ex rel. Leebaert v. Harrington*,
   193 F. Supp. 2d 491 (D. Conn. 2002) .................................................................... 9

*Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32 (1928) ................................... 3

*Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 141 S. Ct. 2038 (2021) .............. 1, 15

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719 (2018) .......... 6

*McCarthy v. Fletcher*, 254 Cal. Rptr. 714 (Ct. App. 1989) .................................... 11

*Obergefell v. Hodges*, 576 U.S. 644 (2015) .............................................................. 8

*Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008) ....................................................... 10

*Romer v. Evans*, 517 U.S. 620 (1996) ................................................................. 3, 16

*Searcey v. Harris*, 888 F.2d 1314 (11th Cir. 1989) ............................................ 5, 10

*United States v. Alvarez*, 567 U.S. 709 (2012) ........................................................ 3

*Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517 (11th Cir. 1989) ................. 10

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) .................................... 1

*Statutes and Regulations*

Cal. Educ. Code § 200 ............................................................................................... 7

Cal. Educ. Code § 220 ............................................................................................... 7

Cal. Educ. Code § 234.1 ............................................................................................ 7

Cal. Educ. Code § 48907 ......................................................................................... 11

Cal. Educ. Code § 51101 ......................................................................................... 14

Cal. Educ. Code § 51204.5 ........................................................................................ 8

Cal. Educ. Code §§ 51930-51939 ........................................................................... 10

Colo. Rev. Stat. § 22-1-104 ....................................................................................... 8

Conn. Gen. Stat. § 10-15c ......................................................................................... 7

Conn. Gen. Stat. § 10-25b .......................................................................................... 8

Conn. Gen. Stat. § 10-222d ........................................................................................ 7

D.C. Code § 2-1402.41 ............................................................................................... 7

D.C. Code § 2-1535.01 ............................................................................................... 7

D.C. Code § 2-1535.03 ............................................................................................... 7

GA Code § 20-1-11 *et seq.* ......................................................................................... 2

GA Code § 20-2-786 ................................................................................................... 2

105 Ill. Comp. Stat. § 5/27-21 .................................................................................... 8

105 Ill. Comp. Stat. § 5/27-23.7....................................................................... 7

775 Ill. Comp. Stat. § 5/1-103........................................................................... 8

775 Ill. Comp. Stat. § 5/5-101........................................................................... 8

775 Ill. Comp. Stat. § 5/5-102........................................................................... 8

Mass. Gen. Law ch. 71, § 37O.......................................................................... 7

Mass. Gen. Law ch. 76, § 5............................................................................... 7

Md. Code Ann., Educ. § 7-424 .......................................................................... 7

Mich. Comp. Laws Ann. § 380.1137 ............................................................... 14

Minn. Stat. § 120B.20 .................................................................................... 14

Minn. Stat. § 121A.031 .................................................................................... 7

Minn. Stat. § 363A.03 ...................................................................................... 7

Minn. Stat. § 363A.13 ...................................................................................... 7

N.J. Stat. Ann. § 18A:35-4.35........................................................................... 8

N.J. Stat. Ann. § 18A:37-14.............................................................................. 7

N.J. Stat. Ann. § 18A:37-15.............................................................................. 7

N.J. Stat. Ann. § 10:5-4.................................................................................... 7

N.J. Stat. Ann. § 10:5-5.................................................................................... 7

N.Y. Educ. Law § 12 ........................................................................................ 7

N.Y. Exec. Law § 296....................................................................................... 7

Nev. Rev. Stat. § 388.122 ................................................................................. 7

Nev. Rev. Stat. § 388.132 ................................................................................. 7

Nev. Rev. Stat. § 388.133 ......................................................................... 7

Nev. Rev. Stat. § 389.061 ......................................................................... 8

Nev. Rev. Stat. § 651.070 ......................................................................... 7

Or. Rev. Stat. § 329.045 ........................................................................... 8

Or. Rev. Stat. § 339.351 ........................................................................... 7

Or. Rev. Stat. § 339.356 ........................................................................... 7

Or. Rev. Stat. § 659.850 ........................................................................... 7

5-E DCMR § 2401.2 ............................................................................... 11

8 N.Y.C.R.R. § 100.2 ............................................................................... 7

Conn. Agencies Regs. § 10-145d-400a ................................................... 11

Md. Code Regs. § 13A.01.06.03 .............................................................. 7

Md. Code Regs. § 13A.01.06.04 .............................................................. 7

Nev. Admin. Code § 388.880 ................................................................. 13

*Administrative Guidance*

Cal. Dep't of Educ., *Frequently Asked Questions - School Success and Opportunity Act (AB 1266)* (Sept. 16, 2021) .................................... 12

Cal. Dep't of Educ., *Legal Advisory Regarding Application of California's Antidiscrimination Statutes to Transgender Youth in Schools* (Sept. 16, 2021) .............................................................................. 12

Cobb County Sch. Dist., IKB-R, *Controversial Issues* (Jul. 1, 2022) ..................... 2

Cobb County Sch. Dist., IFAA-R, *Instructional Resources Selection and Acquisition* (Jul. 1, 2022) ........................................................................ 2

Conn. State Dep't of Educ., *Guidance on Civil Rights Protections and Supports for Transgender Students: Frequently Asked Questions* (Sept. 2017) ................................................................................ 12

D.C. Pub. Schs., *Transgender and Gender-Nonconforming Policy Guidance* (Jun. 2015) .......................................................................... 12, 14

State Bd. of Educ., Washington, DC K-12 Social Studies Standards (Jun. 2023) ..................................................................................................... 8

Haw. Dep't of Educ., *Guidance on Supports for Transgender Students* (Jul. 25, 2016) ................................................................................... 13

Ill. Inclusive Curriculum Advisory Council, *Inclusive Curriculum Implementation Guidance: Condensed Edition* .................................... 8

Ill. State Bd. of Educ., *Non-Regulatory Guidance: Supporting Transgender, Nonbinary, and Gender Nonconforming Students* (Mar. 1, 2020) .................... 12

Me. Dep't of Educ., *LGBTQ+ Studies* ..................................................... 8

Md. State Dep't of Educ., *Providing Safe Spaces for Transgender and Gender Non-conforming Youth: Guidelines for Gender Identity Non-discrimination* (Oct. 2015) ................................................................ 12

Mass. Dep't of Elementary & Secondary Educ., *Defending Democracy at Home: Advancing Constitutional Rights, Obergefell v. Hodges (2015) Same-Sex Marriage* (Oct. 2018) ............................................................ 8

Mass. Dep't of Elementary & Secondary Educ., *Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment* (Oct. 28, 2018) ................................................................................................. 12

Mich. C.R. Comm'n, *Interpretive Statement 2018-1* (May 21, 2018) ..................... 7

Mich. Dep't of Educ., *Creating Safe Schools for Sexual Minority Youth* .............. 14

Mich. Dep't of Educ., *Michigan Department of Education's Lesbian, Gay, Bisexual, Transgender and Questioning (LGBTQ+) Students Project at a Glance* ........................................................................................... 18

Mich. State Bd. of Educ., *Model Anti-Bullying Policy* (Dec. 8, 2020) ................... 7

Mich. State Bd. of Educ., *Statement and Guidance on Safe and Supportive Learning Environments for Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) Students* (Sept. 14, 2016) ............................................ 12

Minn. Dep't of Educ., *A Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students* (Sept. 25, 2017) ......... 13, 14

Nev. Dep't of Educ., *Supporting Sex/Gender Diverse Students* ........................... 13

N.J. Dep't of Educ., *Transgender Student Guidance for School Districts* ............. 13

N.Y. State Educ. Dep't, *Guidance to School Districts for Creating a Safe and Supportive School Environment for Transgender and Gender Nonconforming Students* (Jul. 2015) ................................................................. 13

Or. Dep't of Educ., *Guidance to School Districts: Creating a Safe and Supportive School Environment for Transgender Students* (May 5, 2016) ...... 13

Vt. Agency of Educ., *Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming Students* (Feb. 23, 2017) ............... 12

## Other Authorities

Am. Pub. Health Servs. Ass'n, *ICPC FAQ's* ........................................................ 25

April J. Ancheta, Jean-Marie Bruzzese, & Tonya L. Hughes, *The Impact of Positive School Climate on Suicidality and Mental Health Among LGBTQ Adolescents: A Systematic Review* (Apr. 2021) ................................................. 18

Kellan Baker et al., Ctr. for Am. Progress, *The Medicaid Program and LGBT Communities: Overview and Policy Recommendations* (Aug. 9, 2016) ........... 23

Commonwealth of Mass., *The Safe Spaces for LGBTQIA+ Youth Program Engage Youth Who Are LGBTQIA+* ................................................................. 24

GLSEN, *GLSEN Research Brief: Laws Prohibiting "Promotion of Homosexuality" in Schools: Impacts and Implications* (2018) ......................... 20

Guttmacher Inst., *Sex and HIV Education* (Jul. 1, 2022) ...................................... 14

*Hearing on H.B. 6619 Before the Joint Comm. on Educ.*, 2021 Sess. 1 (Conn. 2021) (statement of Rep. Geoff Luxenberg) ........................................... 9

HiTops, *About Us* ...................................................................................... 24

Laura Kann et al., Ctrs. for Disease Control & Prevention, *Sexual Identity, Sex of Sexual Contacts, and Health-Related Behaviors among Students in Grades 9–12 — United States and Selected Sites, 2015* (2016) ....................... 17

Joseph G. Kosciw et al., GLSEN, *The 2019 National School Climate Survey: The Experience of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* (2020) ......................................................... 19

Marlene Matarese et al., *The Cuyahoga Youth Count: A Report on LGBTQ+ Youth Experience in Foster Care* (2021) ........................................... 25

Movement Advancement Project, *Equality Maps: Safe Schools Laws* .................... 7

Madeleine Roberts, *New CDC Data Shows LGBTQ Youth Are More Likely to Be Bullied Than Straight Cisgender Youth*, Hum. Rts. Campaign (Aug. 26, 2020) ................................................................................. 18

Theo G.M. Sandfort, *Experiences and Well-Being of Sexual and Gender Diverse Youth in Foster Care in New York City: Disproportionality and Disparities* (2020) .............................................................................. 25

Cady Stanton, *As 'Don't Say Gay' and Similar Bills Take Hold, LGBTQ Youths Feel They're 'Getting Crushed'*, USA Today (May 9, 2022) ............... 19

Heather Steed et al., *Only 17 States and DC Report LGBTQ-Inclusive Sex Ed Curricula in at Least Half of Schools, Despite Recent Increases*, Child Trends (Oct. 6, 2021) ........................................................................... 9

Deborah Temkin et al., *Most State Policies That Address LGBTQ+ Students in Schools Are Affirming, Despite Recent Trends Toward Exclusion*, Child Trends (Mar. 22, 2022) ......................................................................... 7

The Trevor Project, *Issues Impacting LGBTQ Youth: Polling Analysis* (Jan. 2022) .......................................................................................... 22

What We Know Project, Cornell Univ., *What Does the Scholarly Research Say About the Effects of Discrimination on the Health of LGBT People?* (2019) ................................................................................................................. 17

Jo Yurcaba, *California Budget Includes $3 Million to Train Teachers on LGBTQ Issues*, NBC News (Jul. 16, 2021) ...................................................... 13

## INTRODUCTION AND INTEREST OF AMICI

The District of Columbia, New Jersey, California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New York, Oregon, and Vermont (collectively, "Amici States") file this brief as amici curiae in support of plaintiffs in their opposition to the motion to dismiss.

The responsibility for public education lies with the states, *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968), and encompasses several "important" duties, *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 637 (1943).  One is to "prepare[] students for active and effective participation in [our] pluralistic . . . society." *Bd. of Educ. v. Pico*, 457 U.S. 853, 868 (1982) (plurality op.).  Another is to "protect" students from harm.  *Mahanoy Area Sch. Dist. v. B.L. ex rel. Levy*, 141 S. Ct. 2038, 2046 (2021).  States must perform these educational duties "within the limits of" the Constitution.  *Barnette*, 319 U.S. at 637.

In carrying out those duties, Amici States work to create an educational environment that is inclusive of everyone—including those who identify as LGBTQ. Indeed, Amici States strongly support the right of LGBTQ people to feel welcomed and to be treated equally in the school community.  And Amici States have sought to make curricular decisions that embrace, rather than stifle, the free expression of students and teachers.  In short, Amici States have an interest in the protection of

LGBTQ students, their parents, and teachers, and given Amici States' expertise in education policy, they can offer a range of experiences on the available tools to do so.

Amici States' experiences make clear that the recent actions plaintiffs allege were taken by defendant Cobb County School District ("CCSD") are far outside the bounds of ordinary educational decision-making.  In early 2022, Georgia passed the Protect Students First Act, GA Code § 20-1-11, and the Parents' Bill of Rights, *id.* § 20-2-786.  These two laws together prohibit advocating "divisive concepts," *id.* § 20-1-11(c)(2), and reserve to parents the "right to direct the upbringing and the moral or religious training of [their] minor child," *id.* § 20-2-786(e)(1)(A).  Soon after, CCSD incorporated these new state laws into local administrative rules entitled IKB-R, *Controversial Issues* (Jul. 1, 2022), and IFAA-R, *Instructional Resources Selection and Acquisition* (Jul. 1, 2022) (collectively, "Censorship Policies").  The Censorship Policies ban CCSD employees from using classroom instruction to "espouse personal political beliefs" about "divisive concepts."  Pl. Compl. Exhibit 1, ECF No. 26-1.  The Censorship Policies also prohibit CCSD employees from "improperly infring[ing] upon" the right of parents "to direct the upbringing and the moral or religious training of their children."  *Id.*

These policies do not explicitly mention sexual orientation or gender identity. *See id.*; Pl. Compl. Exhibit 2, ECF No. 26-2.  However, in August 2023, plaintiffs

allege that the Cobb County Board of Education terminated the employment contract of fifth-grade teacher Katherine Rinderle for reading a book containing LGBTQ themes in an effort to address bullying at school.  The book centers around a transgender child's experience at a school dance wearing a suit jacket made by his father and a skirt made by his mother, which the Board claimed violated the Censorship Policies' ban on controversial issues.  On administrative appeal, the Georgia State Board of Education affirmed the decision.

Defendants' enactment and enforcement of the Censorship Policies make it an outlier.  No educational law in Amici States' school districts would broadly permit censorship or allow for targeted enforcement of the LGBTQ community in the same way.  That undermines any genuine assertion that the Censorship Policies further educational goals.  Said another way, the Censorship Policies' "unusual character"—unique in its breadth and failure to meaningfully advance legitimate pedagogical goals—provides an additional indication that the policies are constitutionally suspect.  *Romer v. Evans*, 517 U.S. 620, 633 (1996) (quoting *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37-38 (1928)); *accord United States v. Alvarez*, 567 U.S. 709, 722 (2012) ("[T]he sweeping, quite unprecedented reach of the statute puts it in conflict with the First Amendment.").  Moreover, Amici States' own evidence reveals the "immediate, continuing, and real injuries" the Censorship Policies will inflict, and those harms "outrun and belie any legitimate

3

justifications." *Romer*, 517 U.S. at 635.  In light of the serious constitutional issues raised by CCSD's extreme approach, plaintiffs' allegations that Defendants' actions are unconstitutional are more than sufficient to survive a motion to dismiss.

## SUMMARY OF ARGUMENT

1.   Amici States' experiences reveal that the Censorship Policies' ban of LGBTQ topics in classrooms lacks a legitimate pedagogical purpose, rendering it constitutionally suspect.  Amici States' policies, although they differ from one another in particulars, consistently allow (or even require) educators to address LGBTQ issues, underscoring both that there is no legitimate reason to ban mentioning such topics outright and that there are ways to address CCSD's alleged concern in ensuring parental input in education without targeting a vulnerable group of students.  The experience of Amici States thus makes clear that CCSD's approach is an unreasonable way to advance its professed interests.

2. The Censorship Policies will stigmatize and harm LGBTQ youth in Cobb County, Georgia and in Amici States.  Research shows that a failure to provide LGBTQ-inclusive classroom instruction adversely affects LGBTQ students' mental health and learning outcomes and results in increased anti-LGBTQ bias.  Further, the harms stemming from CCSD's Censorship Policies extend beyond Georgia's borders.  The Censorship Policies harm children from Amici States who are placed with families in Georgia pursuant to the Interstate Compact for the Placement of

Children ("ICPC"). And Amici States will need to devote resources to counteract the Censorship Policies' harmful effects, particularly the stigmatization of LGBTQ people, including by increasing funding for programs that work to ensure the health and well-being of LGBTQ students in Amici States.

## ARGUMENT

### I.   Amici States' Experiences Undermine Defendants' Contention That Its Extreme Actions Have A Legitimate Pedagogical Purpose.

To pass constitutional muster, Defendants must show that their Censorship Policies are "reasonably related to legitimate pedagogical concerns." *Bannon v. Sch. Dist. of Palm Beach Cnty.*, 387 F.3d 1208, 1213-14 (11th Cir. 2004) (per curiam). As the Eleventh Circuit has made clear, this requirement applies not only to student speech but also to restrictions by a school on non-student speech. *See Searcey v. Harris*, 888 F.2d 1314, 1319-20 (11th Cir. 1989) (applying "legitimate pedagogical concerns" test to school's denial of a peace organization's request to present at career day). Defendants contend that "regulating instructional content to avoid '[associating] the school with any position other than neutrality on matters of political controversy is a legitimate pedagogical goal.'" Defs.' Mot. to Dismiss ("CCSD Br.") 22 n.5 (quoting *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 272 (1988)). But contrary to Defendants' assertion, there is nothing "neutral" about their censorship of LGBTQ topics—as evidenced by the allegations in this case. Instead, this censorship of LGBTQ topics under the guise of avoiding "divisiveness"

both impermissibly and "unduly constrain[s] [schools] from fulfilling their role as 'a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment.'" *Hazelwood*, 484 U.S. at 272 (quoting *Brown v. Board of Education*, 347 U.S. 483, 493 (1955)).

Additionally, Defendants' attempt to justify their policies as necessary to further legitimate pedagogical interests is especially unpersuasive because the Censorship Policies stand in stark contrast to other states' educational policies, which achieve pedagogical goals without harming children. As explained below, Amici States' education policies include and protect LGBTQ students and equip teachers to address LGBTQ topics, while still accommodating parental choices. Amici States' experiences show that states have an interest in including—rather than excluding—LGBTQ people, and they undermine Defendants' assertions that the Censorship Policies are reasonably related to any legitimate pedagogical purpose.

**A.    Unlike CCSD's Censorship Policies, Amici States' education policies serve the legitimate pedagogical purpose of including and protecting LGBTQ people.**

Recognizing that LGBTQ Americans "cannot be treated as social outcasts or as inferior," *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1882 (2021) (quoting *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1727 (2018)), Amici States' policies foster an educational environment that is inclusive and

respectful of LGBTQ people.  As a general matter, many states have inclusive or affirming education policies relating to LGBTQ Americans.  Deborah Temkin et al., *Most State Policies That Address LGBTQ+ Students in Schools Are Affirming, Despite Recent Trends Toward Exclusion*, Child Trends (Mar. 22, 2022), https://tinyurl.com/3atccep3.  Amici States have advanced LGBTQ inclusivity and protections in schools in a few key ways.

Most fundamentally, Amici States protect LGBTQ students by statute, regulation, and agency action.  Amici States prohibit discrimination in schools on the basis of sexual orientation or gender identity.[1]  They also prohibit bullying on the basis of sexual orientation or gender identity, or require or urge schools to adopt policies to that effect.[2]

---

[1]    *See, e.g.*, Cal. Educ. Code §§ 200, 220; Conn. Gen. Stat. § 10-15c(a); D.C. Code  § 2-1402.41(1); 775 Ill. Comp. Stat. §§ 5/1-103(O-1), 5/5-101(A)(11), 5/5-102(A); Mass. Gen. Law ch. 76, § 5; Md. Code Regs. §§ 13A.01.06.03(B)(5)(d), (j), 13A.01.06.04; Mich. C.R. Comm'n, *Interpretive Statement 2018-1* (May 21, 2018), https://tinyurl.com/yckmrn3z; Minn. Stat. §§ 363A.03(44), 363A.13(1); Nev. Rev. Stat. §§ 388.132(6)(a), 651.070; N.J. Stat. Ann. §§ 10:5-4, 10:5-5(*l*); N.Y. Exec. Law § 296(4); Or. Rev. Stat. § 659.850; Movement Advancement Project, *Equality Maps: Safe Schools Laws*, https://tinyurl.com/3hn9hh8r (compiling laws of all states under "nondiscrimination" tab) (last visited Dec. 13, 2022).

[2]    *See, e.g.*, Cal. Educ. Code § 234.1(a)-(c); Conn. Gen. Stat. § 10-222d(a)(1), (b); D.C. Code §§ 2-1535.01(2)(A)(i), 2-1535.03; 105 Ill. Comp. Stat. § 5/27-23.7(a); Mass. Gen. Law ch. 71, § 37O(d)(1), (3); Md. Code Ann., Educ. §§ 7-424.1, 7-424(a)(2)(i)(1), (b)(1); Mich. State Bd. of Educ., *Model Anti-Bullying Policy* (Dec. 8, 2020), https://tinyurl.com/mttsrte3; Minn. Stat. § 121A.031(2)(g), (3); Nev. Rev. Stat. §§ 388.122(1)(c), 388.133; N.J. Stat. Ann. §§ 18A:37-14,

Amici States also recognize the indisputable fact that LGBTQ people are part of American life and therefore include LGBTQ experiences and contributions in history and social studies education.   By statute, seven Amici States have promulgated history or social studies curricular requirements relating to LGBTQ Americans.[3]  Other Amici States have undertaken similar efforts to update curricular standards to include LGBTQ people.  *E.g.*, D.C. State Bd. of Educ., *Washington, DC K-12 Social Studies Standards* (Jun. 2023), https://tinyurl.com/mr2e3fx4.   Still others encourage and allow teachers to provide lessons that comprehensively cover the American experience, including that of LGBTQ people.[4]  At bottom, these efforts aim to "offer[] public school students a more accurate, complete, and equitable picture of American society," Ill. Inclusive Curriculum Advisory Council, *Inclusive Curriculum Implementation Guidance: Condensed Edition* 1,

---

18A:37-15; N.Y. Educ. Law § 12(1); 8 N.Y.C.R.R. § 100.2(jj)(2), (3)(i); Or. Rev. Stat. §§ 339.351(3), 339.356; Movement Advancement Project, *supra* (compiling laws for all states under "anti-bullying" tab).

[3]      Cal. Educ. Code § 51204.5; Colo. Rev. Stat. § 22-1-104(1)(a); Conn. Gen. Stat. § 10-25b(b); 105 Ill. Comp. Stat. § 5/27-21; Nev. Rev. Stat. § 389.061(1)(b); N.J. Stat. Ann. § 18A:35-4.35; Or. Rev. Stat. § 329.045(1)(b)(B)(vi) (effective 2026).

[4]      *See, e.g.*, Me. Dep't of Educ., *LGBTQ+ Studies*, https://tinyurl.com/2p9793vf (last visited Jul. 30, 2024) (listing resources for teachers); Mass. Dep't of Elementary & Secondary Educ., *Defending Democracy at Home: Advancing Constitutional Rights, Obergefell v. Hodges (2015) Same-Sex Marriage* (Oct. 2018), https://tinyurl.com/2zh9p3ej (providing a model lesson plan on the history of *Obergefell v. Hodges*, 576 U.S. 644 (2015), to teach students about constitutional rights and the judiciary).

https://tinyurl.com/4pn8yt94 (last visited Jul. 30, 2024), and prepare them to live in the contemporary United States, *Hearing on H.B. 6619 Before the Joint Comm. on Educ.*, 2021 Sess. 1 (Conn. 2021) (statement of Rep. Geoff Luxenberg), https://tinyurl.com/2rsxc7fs.

In addition to teaching academic subjects, states have an "interest in preparing children to lead responsible, healthy lives." *Leebaert ex rel. Leebaert v. Harrington*, 193 F. Supp. 2d 491, 497 (D. Conn. 2002), *aff'd*, 332 F.3d 134 (2d Cir. 2003). To that end, an increasing number of schools have established health instruction to ensure that all students, including LGBTQ students, have crucial health information at their disposal. *See* Heather Steed et al., *Only 17 States and DC Report LGBTQ-Inclusive Sex Ed Curricula in at Least Half of Schools, Despite Recent Increases*, Child Trends (Oct. 6, 2021), https://tinyurl.com/58zpj9kw ("From 2016 to 2018, 27 states and the District of Columbia reported increases . . . in the percentage of schools offering sex-ed materials that are inclusive of LGBTQ youth."); *see also* The California Healthy Youth Act, Cal. Educ. Code §§ 51930-51939 (2016) (requiring that all instruction and materials in grades K-12 must be inclusive of LGBTQ students).

Instead of including LGBTQ people in the school community, however, CCSD's Censorship Policies act to exclude them, which runs counter to constitutional principles. States have a "legitimate . . . interest in seeking to

9

eradicate bias against same-gender couples," and other LGBTQ people, "and to ensure the safety of all public school students." *Parker v. Hurley*, 514 F.3d 87, 102 (1st Cir. 2008); *see also Doe by and through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 529 (3d Cir. 2018) (school district has a "compelling state interest in protecting transgender students from discrimination").  As Amici States' efforts reflect, LGBTQ people are part of American history and society, and "in the preparation of students for citizenship," it is "entirely rational" for schools to include their experiences in an age-appropriate manner. *Id.* at 95.  Conversely, states and schools do not have a legitimate pedagogical interest in excluding LGBTQ people and their experiences from the curriculum by prohibiting or limiting discussion about their identities.

### B. Instead of censoring or restricting speech as CCSD does, Amici States equip educators to appropriately address LGBTQ topics.

While CCSD interprets and enforces its Censorship Policies to restrict LGBTQ topics, Amici States approach these issues in more tailored and effective ways.  The experience of other states confirms that CCSD's extreme approach to LGBTQ issues is unjustifiable and thus violates the First Amendment. *See Searcey*, 888 F.2d at 1322 ("It is the total banning of a group . . . that we find to be unreasonable."); *cf. Virgil v. Sch. Bd. of Columbia Cnty.*, 862 F.2d 1517, 1525 (11th Cir. 1989) (considering, when upholding the removal of texts from a required reading list, that they "have not been banned from the school" and "[n]o student or

teacher is prohibited from assigning or reading these works or discussing the themes contained therein in class or on school property").

At the outset, Amici States do not impose a blanket restriction on "divisive" or "controversial" topics from being discussed in schools, whether it is by banning such topics outright or by requiring teachers to seek administrative permission each time.  To the contrary, Amici States have codified protections for the free exchange of ideas in schools.  The District of Columbia, for instance, protects a student's "right to voice his or her opinions." 5-E DCMR § 2401.2.  Likewise, Connecticut's Code of Professional Responsibility for Teachers states that teachers shall "[e]ngage students in the pursuit of truth, knowledge and wisdom and provide access to all points of view" and "[n]urture in students lifelong respect and compassion for themselves and other human beings regardless of . . . sexual orientation."  Conn. Agencies Regs. § 10-145d-400a(b)(1)(B), (C).  And the California Legislature has enacted explicit protection for students' freedom of speech.  Cal. Educ. Code § 48907(a).  Indeed, California's Constitution has been interpreted to encompass "students' right to receive information and ideas through classroom teaching and reading." *McCarthy v. Fletcher*, 254 Cal. Rptr. 714, 721, 723 fn. 3 (Ct. App. 1989) (interpreting Cal. Const., art. I, § 2).  This access may not be restricted based on policymakers' intent to "'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'  In other words, school authorities cannot

substitute rigid and exclusive indoctrination for the mere exercise of their prerogative to make educational choices." *Id.* at 723 (internal citations omitted).

Moreover, Amici States understand that the way to address LGBTQ-related topics that inevitably arise in schools is to equip teachers and schools to handle them directly and compassionately. For example, it is understandable that "questions arise for . . . school staff when considering the best supports for transgender and gender nonconforming students." Vt. Agency of Educ., *Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming Students* 1 (Feb. 23, 2017), https://tinyurl.com/243yhrax. Thus, Amici States have issued guidance to schools to address these questions rather than restrict what teachers can say.[5] Such

---

[5] *E.g.*, Cal. Dep't of Educ., *Legal Advisory Regarding Application of California's Antidiscrimination Statutes to Transgender Youth in Schools* (Sept. 16, 2021), https://tinyurl.com/mr282sf9; Cal. Dep't of Educ., *Frequently Asked Questions - School Success and Opportunity Act (AB 1266)* (Sept. 16, 2021), https://tinyurl.com/2t4ncmsd; Conn. State Dep't of Educ., *Guidance on Civil Rights Protections and Supports for Transgender Students: Frequently Asked Questions* (Sept. 2017), https://tinyurl.com/24vuawfy; D.C. Pub. Schs., *Transgender and Gender-Nonconforming Policy Guidance* (June 2015), https://tinyurl.com/tatd3ncu; Ill. State Bd. of Educ., *Non-Regulatory Guidance: Supporting Transgender, Nonbinary, and Gender Nonconforming Students* (Mar. 1, 2020), https://tinyurl.com/2p8ehwz6; Md. State Dep't of Educ., *Providing Safe Spaces for Transgender and Gender Non-conforming Youth: Guidelines for Gender Identity Non-discrimination* (Oct. 2015), https://tinyurl.com/48by45jn; Mass. Dep't of Elementary & Secondary Educ., *Guidance for Massachusetts Public Schools Creating a Safe and Supportive School Environment* (Oct. 28, 2018), https://tinyurl.com/2p836nrh; Mich. State Bd. of Educ., *Statement and Guidance on Safe and Supportive Learning Environments for Lesbian, Gay, Bisexual,*

guidance can helpfully identify scenarios a teacher or administrator may encounter, such as when a student begins to dress in a gender-nonconforming way, and explain best practices. *See, e.g.,* Haw. Dep't of Educ., *Guidance on Supports for Transgender Students* 6-11 (July 25, 2016), https://tinyurl.com/3bra5kjn; N.Y. State Educ. Dep't, *Guidance to School Districts for Creating a Safe and Supportive School Environment for Transgender and Gender Nonconforming Students* 5-10 (July 2015), https://tinyurl.com/2p8mk97k.

Amici States also invest in training for educators so they can meet the needs of LGBTQ students, their parents, and teachers. For example, in 2021, California allocated "$3 million for LGBTQ cultural competency training for public school teachers." Jo Yurcaba, *California Budget Includes $3 Million to Train Teachers on LGBTQ Issues*, NBC News (July 16, 2021), https://tinyurl.com/mrx84bnb. Nevada requires that teachers "receive annual training concerning the requirements and needs of persons with diverse gender identities or expressions." Nev. Admin. Code § 388.880(2)(a). And Michigan developed a workshop for educators on LGBTQ

---

*Transgender, and Questioning (LGBTQ) Students* (Sept. 14, 2016), https://tinyurl.com/yetpukkh; Minn. Dep't of Educ., *A Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students* (Sept. 25, 2017), https://tinyurl.com/zr6r3j89; Nev. Dep't of Educ., *Supporting Sex/Gender Diverse Students*, https://tinyurl.com/3sv5tyrp (last visited Dec. 13, 2022); N.J. Dep't of Educ., *Transgender Student Guidance for School Districts*, https://tinyurl.com/mry8rsns (last visited Dec. 13, 2022); Or. Dep't of Educ., *Guidance to School Districts: Creating a Safe and Supportive School Environment for Transgender Students* (May 5, 2016), https://tinyurl.com/36ecxvuf.

issues.  Mich. Dep't of Educ., *Creating Safe Schools for Sexual Minority Youth*, https://tinyurl.com/4yesvp2e (last visited Jul. 30, 2024).

Amici States recognize that parental concerns may arise over instructional choices.  However, rather than requiring teachers to obtain written permission before discussing any supplemental material that may be deemed "sensitive" or "controversial" by a subset of parents, Amici States have developed more targeted ways to accommodate these concerns.  Some Amici States have provided guidance to teachers on how to handle parental perspectives on LGBTQ topics, including sample letters.  *See, e.g.*, D.C. Pub. Schs., Transgender and Gender-Nonconforming Policy Guidance, *supra*, at 31-36; Minn. Dep't of Educ., Toolkit, *supra*, at 6-7. Other Amici States allow parents to review curriculum and instructional material if they request it.   Cal. Educ. Code § 51101(a)(8); Mich. Comp. Laws Ann. § 380.1137(1)(a).  Minnesota encourages parents who object to certain instruction to "make reasonable arrangements with school personnel for alternative instruction." Minn. Stat. § 120B.20.  And when it comes to the most sensitive topics, like health or sex education, 36 states and the District include these topics in their curriculum but provide some type of parental opt-out option. Guttmacher Inst., Sex and HIV Education (Jul. 1, 2022), https://tinyurl.com/r259h2d2.  Through these tailored mechanisms, teachers and schools accommodate parental choices without barring educators from discussing these topics altogether with their students.

14

All these efforts comport with the constitutional principle of a "free exchange" of ideas. *Mahanoy*, 141 S. Ct. at 2046. In contrast, CCSD's Censorship Policies seek to restrict LGBTQ-related topics from schools entirely because— purportedly—some parents may find these issues offensive. CCSD Br. 3. But as the Supreme Court has recognized, "[i]n a large and diverse country, offense can be easily found." *City of Ocala, Fla. v. Rojas*, 143 S. Ct. 764, 765 (2023). CCSD's ban on the classroom discussion of LGBTQ issues, simply because those topics may engender disagreement, contravenes "a long constitutional tradition under which learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2431 (2022) (quoting *Lee v. Weisman*, 505 U.S. 577, 590 (1992)); *see also Gonzalez through Gonzalez v. Sch. Bd. of Okeechobee Cnty.*, 571 F. Supp. 2d 1257, 1269 (S.D. Fla. 2008) ("Ensuring that [the] minority of students [whose sexual identity is distinct from the majority] are afforded meaningful expression secures the precept of freedom . . . exalted by the founders."). This clear censorship of LGBTQ-related topics from CCSD's educational materials breaks so significantly from reasonable alternatives and established tradition that it undermines any claim that it is motivated by a legitimate effort to accommodate parents and their concerns about limiting inappropriate sexual content in schools.

\* \* \*

In short, the extreme nature of CCSD's approach confirms the absence of a legitimate pedagogical purpose, rendering its restrictions on speech and targeting of a vulnerable group of students highly suspect.  And Amici States' experiences show that reasonable policies are available that include LGBTQ people, foster free speech, and accommodate parents.  CCSD's decision to instead restrict speech and target LGBTQ students supplies additional evidence of the unconstitutionality of Defendants' actions.  *See Romer*, 517 U.S. at 633.  At a minimum, it demonstrates that Defendants cannot succeed on their motion to dismiss.

## II.   CCSD's Censorship Policies Stigmatize LGBTQ Youth In Georgia, And Its Stigmatic Harms Extend To Amici States.

The harm caused by Defendants' enactment and enforcement of the Censorship Policies extends well beyond Cobb County, Georgia.  By targeting the LGBTQ community, the Censorship Policies harm children in Amici States, including those who will be placed in Cobb County pursuant to the ICPC, as well as students who attend school in Cobb County and then move to Amici States.  And Amici States will need to devote resources to mitigate and counteract the harm that the Censorship Policies are causing to LGBTQ students and others in their States.

**A.  CCSD's enactment and enforcement of the Censorship Policies stigmatize LGBTQ youth.**

CCSD's Censorship Policies stigmatize LGBTQ youth by prohibiting or limiting the discussion of LGBTQ people in schools.  And in so doing, they threaten grave harm to the health and well-being of LGBTQ individuals, their families, and their communities.  As study after study has shown, discriminatory social conditions have severe negative health impacts on LGBTQ people, resulting in increased rates of mental health disorders and suicide attempts, especially among LGBTQ youth. *See, e.g.*, What We Know Project, Cornell Univ., *What Does the Scholarly Research Say About the Effects of Discrimination on the Health of LGBT People?* (2019), https://tinyurl.com/2p84akjn (summarizing findings of 300 primary research studies, 82% of which "found robust evidence that discrimination on the basis of sexual orientation or gender identity is associated with harms to the health of LGBT people").

**1.  Educational decisions that stigmatize LGBTQ youth directly harm mental health and educational outcomes.**

As a vulnerable population, LGBTQ youth already face significant hardships. They are particularly likely to experience feelings of sadness and hopelessness, Laura Kann et al., Ctrs. for Disease Control & Prevention, *Sexual Identity, Sex of Sexual Contacts, and Health-Related Behaviors among Students in Grades 9–12 — United States and Selected Sites, 2015* 18 (2016), https://tinyurl.com/6cyefk2m, and

to be victims of bullying, Madeleine Roberts, *New CDC Data Shows LGBTQ Youth Are More Likely to Be Bullied Than Straight Cisgender Youth*, Hum. Rts. Campaign (Aug. 26, 2020), https://tinyurl.com/2wu4ajuj.  Increased victimization of LGBTQ students leads to health and suicide risks.  *Id.*  For instance, LGBTQ students in Michigan (when compared to their non-LGBTQ peers) are 2.9 times more likely to be threatened or injured with a weapon at school, 1.9 times more likely to be bullied at school or online, 2.7 times more likely to skip school because they feel unsafe, 1.5 times more likely to get Ds and Fs, and 3.2 times more likely to engage in self-harm behavior.  Mich. Dep't of Educ., *Michigan Department of Education's Lesbian, Gay, Bisexual, Transgender and Questioning (LGBTQ+) Students Project at a Glance* 1, https://tinyurl.com/4jxns374 (last visited Dec. 13, 2022).  To take just one of the most troubling examples, 23% of Michigan's LGBTQ high school students (13,500 students) attempted suicide in a recent 12-month period.  *Id.*  That rate is 4.6 times higher than their non-LGBTQ peers.  *Id.*

An inclusive school climate, which permits teachers and students to discuss sexual orientation and gender identity, can help reduce the likelihood of these damaging outcomes.  Inclusive school climates foster positive learning environments for LGBTQ youth, which are "an important factor in decreasing suicidality among LGBTQ adolescents."  April J. Ancheta, Jean-Marie Bruzzese, & Tonya L. Hughes, *The Impact of Positive School Climate on Suicidality and Mental*

*Health Among LGBTQ Adolescents: A Systematic Review* 10 (Apr. 2021), https://tinyurl.com/42hmsmdu.  LGBTQ students in schools with inclusive climates are nearly 40% less likely to attempt suicide compared with LGBTQ students who attend schools with non-inclusive climates.  Cady Stanton, *As 'Don't Say Gay' and Similar Bills Take Hold, LGBTQ Youths Feel They're 'Getting Crushed'*, USA Today (May 9, 2022), https://tinyurl.com/yckncebt.  They are more likely to feel comfortable speaking to their teachers about LGBTQ-related issues, report less severe victimization based on sexual orientation and gender expression, and are less likely to feel unsafe at school because of their sexual orientation and gender expression.  Joseph G. Kosciw et al., GLSEN, *The 2019 National School Climate Survey: The Experience of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* 73-74 (2020) ("Climate Survey"), https://tinyurl.com/5fmmzv9x.

LGBTQ-inclusive school climates are also associated with better educational outcomes.  When LGBTQ students see themselves reflected in curricula, it creates an affirming learning environment that "may result in increased student engagement and may encourage students to strive academically which, in turn, may yield better educational outcomes."  *Id.* at 74-75.  Indeed, LGBTQ students in schools with inclusive curricula achieve higher GPAs than those in schools without inclusive

curricula.  *Id.* at 75.  And LGBTQ students in schools with an LGBTQ-inclusive curriculum are more likely to say they plan to pursue post-secondary education.  *Id.*

In light of the benefits of LGBTQ-inclusive curricula, it is no surprise that research also shows that non-inclusive schools—for example, ones like the Censorship Policies that do not incorporate, or that prohibit, discussion of LGBTQ issues within the classroom—have damaging consequences for LGBTQ youth.  As explained above, the absence of an LGBTQ-inclusive climate is strongly correlated with more suicidal ideation, worse educational outcomes, and decreased feelings of safety.  LGBTQ students at schools with non-inclusive curricula are also less likely to feel supported by educators and less likely to have access to supportive school clubs, such as Gay-Straight Alliances.  GLSEN, *GLSEN Research Brief: Laws Prohibiting "Promotion of Homosexuality" in Schools: Impacts and Implications* 6-7 (2018), https://tinyurl.com/47r9yhzc ("GLSEN Research Brief").  And at non-inclusive schools, students are "more likely to face harassment and assault at school based on their sexual orientation and gender expression," *id.* at 3, and are less likely to have the benefit of supportive anti-bullying policies, *id.* at 7.

## 2.   The Censorship Policies will increase anti-LGBTQ bias.

Policies like the challenged Censorship Policies that stigmatize LGBTQ people also increase the risk of anti-LGBTQ bias inside and outside the school environment. For example, LGBTQ students attending schools with non-inclusive

20

curricula are more likely to hear homophobic remarks at school.  GLSEN Research Brief 3.  By contrast, "attending a school that included positive representations of LGBTQ topics in the curriculum was related to less frequent use of anti-LGBTQ language."  Climate Survey 73; *see also id.* (documenting less frequent usage of negative remarks about sexual orientation, gender identity, and gender expression).

Whether a school has LGBTQ-inclusive policies also correlates with the rate of peer acceptance of LGBTQ students.  Non-inclusive schools are less likely to have students who are accepting of LGBTQ people than schools with inclusive climates (39.4% vs. 51.1%).  GLSEN Research Brief 3.  By contrast, "[t]he inclusion of positive portrayals of LGBTQ topics in the classroom may . . . help educate the general student body about LGBTQ issues and promote respect and understanding of LGBTQ people in general."  Climate Survey 75.  Indeed, LGBTQ students who attend schools with LGBTQ-inclusive curricula are significantly more likely to report that their classmates are somewhat or very accepting of LGBTQ people (66.9% vs. 37.9%).  *Id.*

Further, this increased understanding and respect "may lead students in general to speak up when they witness anti-LGBTQ behaviors."  *Id.*  Relative to students in schools with anti-LGBTQ curricula, LGBTQ youth in schools with inclusive curricula report that other students are more than twice as likely to

intervene most or all of the time when hearing homophobic remarks and negative remarks about gender expression. *Id.*

**B.    The Censorship Policies' harms extend beyond Georgia and may require Amici States to expend additional funds.**

In addition to the harms inflicted on LGBTQ youth in Cobb County, the Censorship Policies will inflict harms outside of Georgia, including in Amici States, and may require Amici States to increase expenditures of state funds to combat bias and protect their most vulnerable residents.

The damaging effects of a law prohibiting instruction on LGBTQ issues in schools do not stop at a state's borders.  When a law or policy anywhere sends the message that some members of the community are disfavored, as CCSD's enforcement of the Censorship Policies does, it compounds the stigma associated with being part of that community everywhere.  Indeed, evidence suggests that, as with prior laws that victimize particular groups, the Censorship Policies will adversely affect the mental health of LGBTQ youth in other states.  For example, recent debates around laws that target the transgender community adversely affected the mental health of LGBTQ youth nationwide.  The Trevor Project, *Issues Impacting LGBTQ Youth: Polling Analysis* 6 (Jan. 2022), https://tinyurl.com/2xnr9r5t.  Two-thirds of LGBTQ youth reported that the recent debates about state laws restricting the rights of transgender people have negatively

affected their mental health.  *Id.*  And among transgender and non-binary youth, the effects were even more profound, with 85% reporting mental health harm.  *Id.*

These findings suggest that the Censorship Policies pose a risk of harm to LGBTQ youth not just in Cobb County, Georgia, but also elsewhere, including in Amici States.   State agencies in Amici States may therefore need to expend additional resources to address the Censorship Policies' negative effects on members of their own LGBTQ communities.   For example, because the Censorship Policies stigmatize and harm LGBTQ people in Amici States, those individuals may require additional mental health services.   In light of the "high prevalence of poverty in LGBT communities," state-run programs like Medicaid may bear a substantial share of the burden of addressing the significant mental health consequences stemming from the Censorship Policies.   Kellan Baker et al., Ctr. for Am. Progress, *The Medicaid Program and LGBT Communities: Overview and Policy Recommendations* (Aug. 9, 2016), https://tinyurl.com/ytp8apz3.

Further, Amici States may need to ensure that the stigma caused by the Censorship Policies do not spread to their own school environments.  As explained, Amici States provide training and assistance to school staff to address bullying, understand LGBTQ issues, and improve the educational climate for LGBTQ youth. The Censorship Policies' adverse impact on LGBTQ students' mental health could increase the demand for such school-based services.  And Amici States' education

agencies will need to expand their efforts to address barriers to the well-being and educational success of LGBTQ students.

Amici States may also need to increase funding for nonprofit organizations that provide social services to LGBTQ youth.  Amici States recognize the vital role these organizations play in promoting LGBTQ individuals' health and well-being. Massachusetts, for example, funds organizations through its Safe Spaces for LGBTQ Youth program, whose goal is to "promote self-esteem, increase social connectedness and resilience, and decrease risk for suicidal behaviors (and self-harm)."  Commonwealth of Mass., *The Safe Spaces for LGBTQIA+ Youth Program Engage Youth Who Are LGBTQIA+*, https://tinyurl.com/v25hcf86 (last visited Dec. 13, 2022).  And New Jersey's Department of Children and Families provided funding and resources to organizations that serve LGBTQ youth, such as HiTops, which provides health services and group support to LGBTQ youth throughout New Jersey.  HiTops, *About Us*, https://tinyurl.com/3bz9n622 (last visited Dec. 13, 2022). The stigmatic harms stemming from the Censorship Policies will increase the demand for these organizations' services—and the need for Amici States to provide funding for them.

Finally, the Censorship Policies directly implicate Amici States' interest in protecting at-risk youth who will be placed in Cobb County, Georgia pursuant to the Interstate Compact for the Placement of Children.  The ICPC—to which Georgia

and all Amici States are parties—provides for the movement and safe placement of children between states when children are in the state's custody, being placed for adoption, or being placed by a parent or guardian in a residential treatment facility. Am. Pub. Health Servs. Ass'n, *ICPC FAQ's*, https://tinyurl.com/342eej8h (last visited Jul. 30, 2024).  This population includes children in foster care, and recent surveys of children in foster care reveal a high percentage who identify as LGBTQ. *See, e.g.*, Marlene Matarese et al., *The Cuyahoga Youth Count: A Report on LGBTQ+ Youth Experience in Foster Care* 6 (2021), https://tinyurl.com/mp9bmunb (survey of an Ohio county identifying 32% of foster children to be LGBTQ); Theo G.M. Sandfort, *Experiences and Well-Being of Sexual and Gender Diverse Youth in Foster Care in New York City: Disproportionality and Disparities* 5 (2020), https://tinyurl.com/5e6e59kj (survey of New York City identifying 34% of foster children to be LGBTQ).  LGBTQ youth from Georgia may also be placed in Amici States under the ICPC, leaving schools and social services agencies in Amici States to address the negative impacts of CCSD's Censorship Policies.

## CONCLUSION

The Court should deny the motion to dismiss.

Respectfully submitted,

MATTHEW J. PLATKIN
Attorney General for the State of
New Jersey

JEREMY M. FEIGENBAUM
Solicitor General

MEGHAN MUSSO
Deputy Attorney General

Office of the Attorney General of
New Jersey
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 112
Trenton, NJ 08625
(609) 376-2690
jeremy.feigenbaum@njoag.gov

*/s/ Kurt Kastorf*
KURT KASTORF
Kastorf Law LLC
1387 Iverson St., Suite 100
Atlanta, GA 30307
(404) 900-0330
kurt@kastorflaw.com

August 2024

BRIAN L. SCHWALB
Attorney General for the District of
Columbia

*/s/ Caroline S. Van Zile*
CAROLINE S. VAN ZILE
(*pro hac vice pending*)
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

ANNE A. DENG
Assistant Attorney General

Office of the Solicitor General
Office of the Attorney General
for the District of Columbia
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

On behalf of:

ROB BONTA
*Attorney General*
State of California

PHILIP J. WEISER
*Attorney General*
State of Colorado

WILLIAM TONG
*Attorney General*
State of Connecticut

KATHLEEN JENNINGS
*Attorney General*
State of Delaware

ANNE E. LOPEZ
*Attorney General*
State of Hawaii

KWAME RAOUL
*Attorney General*
State of Illinois

AARON M. FREY
*Attorney General*
State of Maine

ANTHONY G. BROWN
*Attorney General*
State of Maryland

ANDREA J. CAMPBELL
*Attorney General*
Commonwealth of Massachusetts

DANA NESSEL
*Attorney General*
State of Michigan

KEITH ELLISON
*Attorney General*
State of Minnesota

AARON D. FORD
*Attorney General*
State of Nevada

LETITIA JAMES
*Attorney General*
State of New York

ELLEN F. ROSENBLUM
*Attorney General*
State of Oregon

CHARITY R. CLARK
*Attorney General*
State of Vermont

## LOCAL RULE 7.1(D) CERTIFICATION

As required by Local Rule 7.1(D), the undersigned counsel certifies that this brief was prepared in Times New Roman, 14-point font, in compliance with Local Rule 5.1.

*/s/ Kurt Kastorf*
KURT KASTORF

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.

*/s/ Kurt Kastorf*
KURT KASTORF